# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
| **ABDULAI CONTEH** | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. 1:07-cv-00786 (RWR)** |
| | ) | |
| **LURITA DOAN**[1] | ) | |
| **Administrator,** | ) | |
| **General Services Administration** | ) | |
| **Defendant.** | ) | |
| | ) | |

_____

### DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant, Administrator, General Services Administration ("GSA"), through undersigned counsel, hereby submits the following memorandum of points and authorities in opposition to Plaintiff's Motion for Preliminary Injunction ("MPI"). For the reasons set forth below, Plaintiff's motion should be denied because Plaintiff has not carried the heavy burden of demonstrating that he is entitled to the extraordinary and disfavored relief sought.

### SUMMARY

On July 23, 2008, Defendant issued a Notice of Proposed Removal indicating that Plaintiff could be removed from his position as a Budget Analyst no sooner than thirty days after he received the notice. Plaintiff filed his motion seeking to enjoin Defendant from removing, terminating, or otherwise tampering with his employment during this action. MPI at ¶20. Plaintiff has not even remotely carried his burden of showing that he is entitled to the extraordinary relief he seeks. First, Plaintiff has not shown a likelihood of success on the merits of the claims in this action. On the contrary, many of Plaintiff's claims have not been exhausted

---

[1]    On April 30, 2008 Administrator Lurita Doan resigned. At that time David Bibb became the Acting Administrator. On August 19, 2008, President Bush appointed James A. Williams as the Acting Administrator for the General Services Administrator effective August 30, 2008.

and/or are amenable to summary disposition. Second, Plaintiff is not entitled to the extraordinary relief sought because he cannot show that he will suffer irreparable harm should the Court not grant the relief he seeks. Even were a decision made to remove Plaintiff from Defendant's employ, he has not articulated how any losses he incurs cannot be remedied by money damages. Thus, any loss of income is temporary and can be remedied by appropriate back pay, restoration of position and/or other money damages should he succeed in his claims. Lastly, forcing Defendant to retain an employee his supervisor believes is underperforming cannot be in the public's interest. Indeed, the problems with Plaintiff's performance have spanned several years, despite myriad efforts to assist and guide him to improve. Forcing Defendant to retain Plaintiff in the GSA's employ, considering that he could be compensated by money damages if ultimately successful on his claims, is decidedly against public interest. For the reasons set forth below, Plaintiff's MPI should be denied.

## FACTUAL BACKGROUND

### a.    Plaintiff's Complaint

Plaintiff commenced this action on April 30, 2007, alleging that he had been subjected to discriminatory employment practices in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, 42 U.S.C. §§ 1981 and 1983, the Fair Labor Standards, and the DC Human Rights Act of 1977. Docket Entry 1 at 1. He alleges in his complaint that he was discriminated against because of his race, color, religion, sex, and national origin in violation of Title VII. Docket Entry 1 at 5. He further alleges that although he performed his duties in a competent manner and met all criteria for promotion to GS-12 on May 31, 2005, he was not promoted due to discrimination. Docket Entry 1 at 2. Although it is not clear from Plaintiff's

complaint, he appears to allege discriminatory and retaliatory conduct as follows: (1) his supervisor discriminatorily refused to sign his forms to take a certification class because of a lack of funds, Docket Entry 1 at 5, ¶12; (2) his supervisor changed his response from a "no" to a "yes" on a survey form concerning his being in a certification program, Docket Entry 1 at 6, ¶13; (3) discriminatory or retaliatory assignments from three supervisors since May 2006, Docket Entry 1 at 6, ¶14; (4) discriminatory failure to promote based on his supervisor's review of his performance even though a team leader had found his performance satisfactory, Docket Entry 1at 6, ¶15; (5) retaliatory issuance of a Performance Improvement Notice (PIN) and associated PIN meetings starting December 2005 in retaliation for a September 7, 2005 grievance alleging failure to promote in May 2005, Docket Entry 1 at 7 ¶17; (6) retaliatory denial of sick leave to undergo treatment twice in March 2006, Docket Entry 1 at 8, ¶19;  (7) discriminatory or retaliatory failure to reply to the messages left by the building nurse concerning Plaintiff's health condition, Docket Entry at 8, ¶20; (8) discriminatory or retaliatory orders to come back to work or he would not get paid or granted leave despite his doctor's advice in September 2006, Docket Entry at 8, 9, ¶21; (9) discriminatory or retaliatory assignment to prepare Fund status for 129 buildings for the entire year by close of business the same day his supervisor instructed him to work despite his doctor's advice, Docket Entry 1at 9, ¶21; and (10) discriminatory or retaliatory order to leave the Agency Christmas party in December 14, 2006 because his supervisors told him he had to submit a fund status report for November 2006 by the close of business that day, Docket Entry 1 at 9, ¶22.

    In his complaint, Plaintiff alleges that he sought informal EEO counseling on or about February 22, 2006 and filed his formal complaint on April 6, 2006.  Docket Entry 1 at 3, ¶6.  In

his formal complaint, Plaintiff alleged that he "was placed on a [PIN] for filing a grievance with the Union for failing to promote. I have also been assigned a work load beyond any other employee. I am continually harassed and my work has been nit pick [sic] by my supervisor and given unreasonable deadlines." *Ex.* A, Formal Complaint of Discrimination. Since Plaintiff sought informal counseling on or about February 22, 2006, it is clear that any allegation that occurred prior to January 6, 2006, is barred under 29 C.F.R. 1614-105(a)(1).[2] By letter dated April 21, 2006, the EEO accepted Plaintiff's claim that "you were discriminated against...when your were harassed starting December 5, 2006, regarding your work performance and assignments." *Ex.* B. The letter indicated further that Plaintiff "amended [his] harassment claim to include reprisal for filing an EEO complaint...when you were denied sick leave on [March] 29, 2006 and denied your AWS [] day on March 31, 2006." *Id.*

### b.    Plaintiff's Tenure at GSA

Plaintiff is a Budget Analyst in the Budget/Finance branch of the Metropolitan Service Center of the GSA.[3] Plaintiff is presently assigned to the Budget Activity 53 (BA 53) section of the Center. Plaintiff was hired for the position of Program Analyst at a GS-9-0343 step 10 level on April 21, 2003. *Ex.* C, Notification of Personnel Action dated April 21, 2003.[4] His

---

[2]     If the Court were to use the date Plaintiff attempted to grieve his alleged failure to promote, September 7, 2005, 29 C.F.R. 1615.104(a)(1) would bar any claims that occurred prior to July 22, 2005.

[3]     The Metropolitan Service Center is one of five service centers that consist of National Capital Region, which handles parts of Virginia, Maryland, and the District of Columbia.

[4]     Budget analysts are responsible for a wide range of budgetary duties and procedures, including developing and formulating the organization's budget request for the coming fiscal year, providing forecasts, estimates and financial plans and justifications on an annual or interim schedule, and developing supporting data for budget requests. *Ex.* D, Position Description.

supervisor at the time was Sharon Banks. On or about May 30, 2004, Plaintiff was promoted to Budget Analyst GS-11 position by his subsequent supervisor Barbara Sisco, an African American woman, whom he now alleges is the driving force behind the discrimination to which he has been allegedly subjected. *Ex*. E, Notice of Personnel Action dated May 30, 2004. Subsequently, a series change was effected changing the Plaintiff's series from Program Analyst to Budget Analyst. *Ex*. F, Notice of Personnel Action dated October 17, 2004. Plaintiff's annual performance appraisal for the year ending September 30, 2004 was overall successful, with notations that Plaintiff could improve on obtaining clarification of instructions to make sure that he fully understands his assigned tasks before commencing. *Ex*. G, Employee Review and Rating dated October 19, 2004.[5] This was the last appraisal he would receive under the pass/fail system. The new Associate Performance and Appraisal System (APPAS) with its five level system was implemented for the next appraisal cycle. *Ex*. H, Memorandum of Understanding between the GSA and the National Federation of Federal Employees, GSA Locals dated August 9, 2004.

At some point early in 2005, with the promotion he sought that is the genesis of his claims on the horizon, Plaintiff approached his supervisor, Ms. Sisco, to express concerns that he was not getting a fair assessment from his team leaders. *Ex*. I, Affidavit of Barbara Sisco dated April 9, 2007, ¶4 ("Sisco Aff. I"). As a result, Ms. Sisco offered to work directly with him and pay more attention to his work assignments and he responded favorably to that idea. Id. As the 2005 mid-year review period approached in May 2005, Ms. Sisco received input from the team

---

[5]    The GSA appraisal period runs from September 30 to October 1 of the following year.

leaders on the employees in their team.  *Id*. at ¶5.[6]  Ms. Cary's, one of Plaintiff's two team

leaders, comments were complimentary of Plaintiff and others she led.  *Ex*. K, Ms. Cary's Mid-

year Assessment of Plaintiff.  However, the inconsistency between her comments and the other

team leaders, who had more experience, raised concerns for Ms. Sisco regarding Plaintiff's

performance.  For example, one other team leader stated that Plaintiff was still struggling with

the CPI process, noting that out of the 6 she assigned him only one was done correctly.[7]  *Ex*. L,

e-Mail and Attachment from Jacqueline Smith to Barbara Sisco dated April 27, 2005.  The team

leaders also related that Plaintiff was only able to process Virginia real estate taxes.  *Ex*. I, ¶6.

As a result, Plaintiff's supervisor held a mid-year review on May 19, 2005, which

reflected these concerns.  *Ex*. M, Performance Plan and Appraisal.  During the review, Plaintiff's

supervisor advised him of her overall concern about the feedback she was getting as to his

performance problems.  *Exs*. I.  Accordingly, although Plaintiff was eligible for promotion to

GS-12 on May 31, 2005, his supervisor could not promote him because of his performance

issues.  *Ex*. N, e-Mail dated July 08, 2005.  Plaintiff's appraisal for the period ending September

30, 2005 was at an overall level 2 out of 5, indicating minimally successful performance.  *Ex*. O.

---

[6]     During the relevant period, Carolyn Vance and Jacqueline Smith were the Team Leaders
for the BA53 team to which Plaintiff was assigned.  *Ex*. J, Organizational Chart.  However, from
December 2004 through May 2005, while Carolyn Vance went on maternity leave, Cynthia Cary
acted in her place.  Cynthia was new to team leading and had comparatively less experience than
Ms. Vance and Ms. Smith.

[7]     Consumer Price Index is the annual rent processed on the anniversary date [effective
date] of the lease. The Government shall pay adjusted rent for changes in the cost of services
identified in the lease.  The operating cost escalation begins the second year of the lease and
each year thereafter.  Most lease contracts contain a clause for annual operation cost escalations.
To process payment for operating escalation, each month, the Bureau of Labor Statistics is
contacted to obtain the previous month's index.

In a further attempt to evaluate Plaintiff's readiness for the promotion he sought, Ms. Sisco assigned him additional CPIs to process, the Gross Margin Report and assigned him the D.C. Lease caseload to test Plaintiff's readiness for the promotion he sought.  *Ex* P.

Subsequently, Plaintiff filed a grievance on or around September 7, 2005.  *Ex*. Q, Letter from Robert Obrycki to Barbara Sisco dated September 7, 2005.  Because of his on-going performance problems, on December 5, 2005 his supervisor issued Plaintiff a PIN pursuant to the requirements under the MOU between the NFFE and GSA.  *Ex*. R, PIN dated December 5, 2005.  The PIN was to last for 120 days with weekly meetings regarding Plaintiff's progress.  *Id*. During the PIN period, Plaintiff did not timely submit the Rent Estimate Project, even though he had assistance and had a lower lease caseload than the Budget Analyst that prepared the annual rent estimate the year before.  *Exs*. S, T, e-Mails dated March 31, 2006 and April 4, 2006 repetitively.  His performance during that time remained minimally successful.

Eventually, Plaintiff was moved from BA 53 to BA 61.  *Ex*. U Affidavit of Barbara Sisco dated July 9, 2006 ("Sisco Aff. II").  The former is faster paced and the ability to multi-task is crucial because there are so many projects and assignments that require a quick turnaround.  *Id*. Nevertheless, despite moving to a slower-paced environment, his mid-year review reflected his continued performance problems.  *Ex*. V, Plaintiff's 2006 Appraisal.  His supervisor recommended he take several courses to help him improve.  Sisco Aff. I.  She even signed him up for a course, which he took, but did not complete the exam required for credit in the Financial Management Certification Program.  *Ex*. W, e-Mail from Keith Hunter dated November 9, 2007. On November 22, 2006, Plaintiff's annual performance review was held, reflecting his performance level at a 2, again minimally successful.  *Ex*. V.  In December 2006, Plaintiff was

issued an Associate Performance Planning Worksheet for Non-supervisory Associates which

identified six critical elements for his position.  *Ex*. X  Performance Plan.  A second PIN was

also issued in December 2006.[8]  *Ex*. Y.  Second PIN Issued to Plaintiff in 2006.  The December

2006 PIN period ended in April 2007.  *Ex*. Z, PIN End Memo dated April 5, 2006.

       On November 16, 2007, Plaintiff had his annual performance review resulting in a Level

1 performance rating.  *Ex*. AA, Plaintiff's 2007 Appraisal.  On November 28, 2007, Plaintiff

was placed on a Performance Improvement Plan (PIP) in accordance with the MOU.[9]  *Ex*. AD.

During the 60-day period of the PIP, meetings were to be held for Plaintiff's benefit.[10]  Plaintiff

indicated to his new supervisor, Karen Smith, that he had been instructed not to attend.  *Ex*. AB,

e-Mails between Plaintiff and Karen Smith dated January 16, 2008.  He did not bring his

performance to an acceptable level during the PIP period.  On July 23, 2008, Defendant issued

the Proposed Removal ("NPR") based on unacceptable performance.  *Ex*. AC, NPR.  Because

this action was in mediation, the issuance of the notice of proposed removal was delayed.  At the

time it was issued, the agency believed that good faith mediation had ended.[11]

---

[8]     Plaintiff filed a formal complaint concerning this and the level 2 rating.  He requested a hearing before EEOC on September 25, 2007 and withdrew the request on November 26, 2006.  By order dated December 3, 2007 the Administrative Judge granted the withdrawal request.

[9]     By message dated December 28, 2007, Plaintiff contested this matter alleging that the agency misapplied, misinterpreted, and violated the MOU between GSA and NFFE on the Associate Performance Plan and Appraisal System (APPAS) dated October 1, 2004.

[10]    The purpose of a formal Performance Improvement Plan is to help an employee succeed.  This format enables an employer to set goals, establish measures, conduct review sessions and chart progress.  Typically, a Performance Improvement Plan follows a Performance Improvement Notice.

[11]    On February 7, 2008, Plaintiff was issued a Record of Infraction for approaching a contract specialist at her desk and yelling several times, "What is wrong with you? You need to take your medicine," resulting in her asking Plaintiff several times to leave her desk or she

## PRELIMINARY INJUNCTIVE RELIEF STANDARD

Interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly. *Washington v. District of Columbia*, 530 F.Supp.2d 163, 168 (D.D.C. 2008) (citing *Mazurek v. Armstrong*, 520 U.S. 986, 972 (1997)); *Farris v. Rice*, 453 F.Supp.2d 76, 78 (D.D.C. 2006). To obtain injunctive relief, Plaintiff must show (a) a substantial likelihood of success on the merits; (b) that he would suffer irreparable harm absent an injunction; (c) that issuing an injunction would not significantly harm the Defendant or other parties; and (d) that the public interest will be furthered by the injunction. *Washington, supra; Howard v. Evans*, 193 F. Supp. 2d 221, 226-27 (D.D.C. 2002) (citing *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)).

In applying the aforementioned four-part test, a court may balance the strengths of each factor. *Id.* However, it is critical that the moving party show a substantial likelihood of success on the merits. *Howard v. Evans*, 193 F. Supp. 2d at 227. "It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. Indeed, absent a substantial indication of likely success on the merits, there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *Id.* (quoting *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 38 F.Supp.2d 114, 140 (D.D.C. 1999). Moreover, "if a party makes no showing of irreparable injury, the court may deny the motion for injunctive relief without considering the other factors." *Howard v. Evans*, 193 F. Supp. 2d at 227. In his MPI, Plaintiff has woefully failed to demonstrate that he is entitled to any relief let

would call the police. On February 14, 2008 plaintiff contacted the EEO office alleging that the Record of Infraction was based on his national origin, sex, and religion. The EEO counselor attempted to resolve the matter, but was told the plaintiff's counsel advise him not to sign the agreement. The matter was later dismissed.

alone preliminary injunctive relief. Plaintiff's motion only contains the stock language of the equitable relief standard but pleads NO facts that would justify the relief sought. Accordingly, his request for injunctive relief must be denied.

In *Sampson v. Murray,* 415 U.S. 61 (1974) the Supreme Court held that the traditional standards governing preliminary injunctions were not appropriate in government employment cases due to the "historical denial of all equitable relief by the federal courts" in past employment cases, coupled with the rule that the government has traditionally been granted the widest latitude in the dispatch of its own internal affairs… and the unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or the employee." The rule that the Government has traditionally been granted the widest latitude in the handling of its internal affairs coupled with the unwillingness of courts to grant equitable relief in employment cases, weighs against routinely applying the more traditional standards governing stays in other situations. The Court in *Sampson* required the moving party to make "a showing of irreparable injury sufficient in kind and degree to override these factors cutting against the general availability of preliminary injunctions in Government personnel cases." 415 U.S. at 83-83. Only in genuinely "extraordinary cases" may irreparable injury be found. *Id.* at 92. Although the D.C. Circuit has not decided the issue of whether this heightened irreparable harm standard applies in Title VII cases, it has been regularly applied in D.C. District Court cases. *Rahman v. Johanns,* 501 F.Supp.2d 8, 19-21 (D.D.C. 2007); *Farris v. Rice,* 453 F.Supp.2d 76, 77-80 (D.D.C. 2006); *Jordan v. Evans,* 355 F. Supp.2d 72, 77(D.D.C. 2004). Plaintiff fails to meet even the less stringent standard applicable to non-personnel cases.

**ARGUMENT**

**I.  Plaintiff Cannot Show Irreparable Injury**

Plaintiff also cannot show irreparable injury.  Where government personnel matters are at issue, courts reserve injunctive relief for extraordinary circumstances.  *Sampson v. Murray*, 415 U.S. 61 (1974); *Wagner v. Taylor*, 836 F.2d 566, 757 n.66 (D.C. Cir. 1987).  This higher standard for government personnel matters acknowledges both the wide latitude afforded the government in conducting its internal affairs and the historical unwillingness to grant equitable relief in employment cases.  *See Sampson*, 415 U.S. at 83.

Although *Sampson* established a heightened standard for injunctive relief, the Court did not explicitly define what "extraordinary circumstances" were required.  Instead, the Court explained that the employee seeking injunction needs to, "at the very least . . . make a showing of irreparable injury sufficient in kind and degree to override the[] factors cutting against the general availability of injunctions in Government personnel cases."  *Id.* at 84.  Notably, insufficient savings or difficulty finding reemployment "will not support a finding of irreparable injury, however severely they may affect a particular individual" as those injuries are "common to most discharged employees and [are] not attributable to any unusual actions relating to the discharge itself."  *Id.* at 92 n. 68.

This District Court has applied *Sampson*'s higher standard for injunctive relief in Title VII cases brought by federal employees.  *Farris v. Rice*, 453 F. Supp. 2d 76, 79-80 (D.D.C. 2006).  In such cases, the courts have recognized that a plaintiff seeking injunctive relief in a Title VII action against the federal government must make "a more stringent showing of irreparable injury".  *Id.*

11

Plaintiff proffers that removing, terminating or otherwise tampering with his employment during this action "will irreparably infringe his rights, claims and equities in this case." (Docket Entry 1, ¶19.[12]  He posits that  his termination will undermine the controversy of this case because it will require the cause of action to be amended, which will alter the court's docket. (Docket Entry 1: p. 6, paragraphs 22 and 23).  He also explains that termination would unfairly extinguish plaintiff's income, federal employee tenure, health insurance, retirement benefits and render him unable to cope with his financial obligations including without limitation his family needs, monthly mortgage and car payments as well as his ability to prosecute this case.

As noted above, these type of injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough.  *Equal Rights Center v. Post Properties, Inc., et al,* 522 F. Supp. 2d. 1 (D.D.C. 2007).  Further, his allegations of unfairness in the termination are matters properly handled and resolved in litigation at a later date.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm. *Id.*  Additionally, to make a proper showing of irreparable harm, the moving party must assert facts proving that the harm is imminent and not remote or speculative.  *Reuters Ltd. v. United Press Int'l, Inc.,* 9032d 904, 907 (2d Cir. 1990).   The plaintiff has not articulated that his removal from the General Services Administration, were that action to be undertaken, would result in his having no income or benefits.  Given his espoused credentials, it is not unlikely that he will be able to garner income and benefits from another source.

---

[12]     At this time the decision to remove plaintiff has not been made.  Rather, his supervisor has proposed his removal.

## II.    Plaintiff Cannot Demonstrate a Substantial Likelihood of Success on the Merits of his Claims

Plaintiff has failed to exhaust all claims other than those referenced in the letter of acceptance for investigation of Plaintiff's claims. *Ex*. B. The accepted claims were "harass[ment] starting December 5, 200[5], regarding your work performance" and "reprisal for filing your EEO complaint [on or about February 22, 2006] when you were denied sick leave on [March] 29, 2006, and denied your AWS [] day on March 31, 2006." *Id.* Plaintiff cannot succeed on the merits of exhausted claims let alone the unexhausted ones.

### a.    Exhausted Claims

#### i.    Hostile Work Environment/Harassment

Although it is not clear from Plaintiff's complaint, it appears that Plaintiff is alleging that he was harassed and subjected to a hostile working environment starting in December 2005. He also appears to allege that, after he sought informal EEO counseling, he was subjected to reprisal on March 29 and 31, 2006, when he was denied sick leave and his AWS day respectively. Hence, the relevant time frame for exhausted claims was between December 5, 2005 and March 31, 2006. Neither Plaintiff's complaint nor his MPI make clear which claims fall into the relevant time period so Defendant has endeavored to identify them. It appears that Plaintiff is alleging that he was "harassed starting December 5, 2005" and retaliated against on March 29 and 31, 2006. This period coincides with Plaintiff's PIN period which ran 120 days from approximately December 5, 2005 until April 5, 2006. Indeed, Plaintiff is alleging that he was harassed "regarding [his] work performance and assignments." Plaintiff did not amend his complaint after April 2006, therefore, he could not have added any allegations thereafter.

Thus, to establish his claim of a hostile work environment, Plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action. *Smith v. Jackson*, 539 F.Supp.2d 116, 137 (D.D.C. 2008) (citing *Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005). In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look at the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, (1993)). While the plaintiff is not required to plead a prima facie case of hostile work environment in the complaint, the alleged facts must be able to support such a claim. *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).

The Supreme Court has held that a hostile work environment exists only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 22. In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title Vll does not become a general civility code." *Faragher*, 524 U.S. at 788. Indeed, these standards are intended to "filter out complaints

14

attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive

language, gender-related jokes, and occasional teasing.'" *Id.* "Even a few isolated incidents of

offensive conduct do not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126,

1134 (D.C. Cir. 2002).

From December 2005 until April 2006, Plaintiff was on a PIN because his supervisor

determined that he was underperforming. As part of the PIN, Plaintiff was required to meet

every week with his Supervisor to go over his progress. Also, during this period Plaintiff was

assigned the annual rent estimate project. In his complaint, Plaintiff alleges that "[i]n March,

2006, Plaintiff researched and reviewed about twenty Rent Estimate Details with [certain serial

numbers] and submitted them to [Ms.] Sisco [who] deliberately, knowingly and willfully altered

the above listed Rent Estimate Details...submitted to her and on the basis of her alternations

queried Plaintiff as not having done them properly...." Docket Entry 1, ¶18. This allegation is

baseless. In response to these allegations, Ms. Sisco testified at her deposition that Plaintiff

submitted certain documents to her which, as his supervisor, she reviewed and returned with

comments. *Ex*. AE, Deposition of Barbara Sisco at 472 ("Sisco Depo."). Plaintiff appears to

draw an unsupported inference that, because an individual whom Plaintiff worked with on the

rent estimate project simply thanked Plaintiff for submitting supporting documentation, that Ms.

Sisco improperly criticized Plaintiff for not submitting sufficient supporting documentation. *Id*.

From the record, it is not even clear that the two incidents were related. In any event, this

incident does not support a harassment claim because it is the normal course of the workplace

for a supervisor to give direction and instructions to a subordinate. It certainly does not rise to

the level of severe and pervasive that could alter the conditions of the workplace.

15

During the PIN period, Plaintiff also alleges that he was harassed because he was "the only Budget Analyst with whom [Ms.] Sisco has held weekly PIN meetings since December 2005." Docket Entry 1, ¶31. Plaintiff also alleges that he is "the only Budget Analyst who has been subjected to [a] PIN for 15 months under [Ms.] Sisco despite satisfactory reviews by his direct supervisors." *Id*. at ¶29. He further alleges that he "is the only Budget Analyst who has ever been under[] [Ms.] Sisco's direct supervision in addition to having two other supervisors. *Id*. at ¶28. Again, Plaintiff is either grossly misguided or conveniently telling only half the story. At his deposition, Plaintiff admitted that team leaders only assign work and do not perform supervisory functions such as evaluations. *Ex*. AF, Deposition of Abdulai Conteh at 86-88 ("Conteh Depo."). Accordingly, not only has Plaintiff failed to demonstrate how, even if true, having three supervisors constituted a hostile work environment, he later contradicted his own claim by acknowledging that team leaders and supervisors play different roles. *Id*.

With regard to the rent estimate, Plaintiff alleges in one of his affidavits that, unlike the previous preparers of the same document who had three months and help to complete it, he had only three weeks and no help. But, at his deposition, Plaintiff conceded that, not only did he receive data entry help from a coworker Ms. Sisco asked to assist him, he received notification that he was assigned to the project in December 2004 and a password to begin data entry in February 2005. *Ex*. AG, Conteh Depo. at 107-108; 134-135; 89; and 131 (admits assigned rent estimate in January 2006 and it was due March 31, 2006). He even admits that he started working on the project before he got his password. Conteh Depo at 99. Time frames for the rent estimate projects are set by the Region or National office and missing them is considered unforgivable. *Ex*. AH, Affidavit of Sharon Banks ("Banks Aff.); *Ex*. U. Managers are held

16

accountable for deadlines that are missed.  *Id.*  Plaintiff did not satisfactorily complete the assignment by the deadline despite being given adequate time and assistance to do so.  *Ex.* AZ, e-mail messages dated March 31, 2006 and April 4, 2006, respectively.

For harassment to be considered discriminatory, it must be severe or pervasive.  *Harris v. Forklift Systems. Inc.,* 510 U.S. 17 (1993).  This is evaluated from the standpoint of a reasonable person, taking into account the context in which it occurred. *Highlander v. K.F.C. National Management Co.*, 805 F.2d 644 (6th Cir. 1986).   Unless the conduct is very severe or persistent, a single incident or group of isolated incidents will not be regarded as discriminatory harassment.  *Harris* at 21.  Conduct that is not severe or pervasive enough to create an objectively hostile or abusive environment—an environment that a *reasonable person* would not find hostile or abusive—is beyond the purview of Title VII.  *Harris*, 510 U.S. at 22; *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 752 (1998).

None of Plaintiff's allegations are "sufficiently severe or pervasive to alter the conditions" as to state a hostile work environment claim.  *Harris*, *supra*.  Taken as a whole, the complained-of conduct is not so severe as to create an objectively hostile environment.  Neither is the conduct pervasive.  Much of the allegedly offending conduct resulted from management's attempts to address his performance problems.  For example, the incidents outlined in his formal complaint surrounded the December 2005 PIN, its meetings, and the assignments given under the PIN.  The earlier incidents identified in the federal complaint were separated in time from each other by at least a month.  Plaintiff has not shown that a reasonable person would find that his workplace is pervaded by illegal harassment.

Plaintiff cannot show that the complained-of conduct is based on a protected class. Facially, the incidents are unrelated.  Likewise, the plaintiff has not shown facts from which it can be inferred that despite the fact that the complained-of conduct appears to be unrelated, it should nevertheless be inferred to be related to a protected class.  Each of the incidents enumerated in the plaintiff's federal complaint as being discriminatory are addressed below.

Even if Plaintiff could demonstrate a prima facie case, he would not be able to rebut Defendant's legitimate non-discriminatory reasons because the record is clear that Defendant has demonstrated that Plaintiff's performance-related issues account for why Plaintiff's work had to be closely scrutinized.  Plaintiff's deficiencies were further exposed when he was unable to complete the rent estimate in a timely manner.

ii.    Retaliation Claims

Plaintiff is not likely to succeed on the merits of his retaliation claims because he can neither establish a prima facie case nor rebut Defendant's legitimate non-discriminatory reasons. To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (1) she engaged in protected behavior; (2) the employer took an action against plaintiff with material consequences such that it would dissuade a reasonable person from making or supporting a charge of discrimination; and (3) there is a causal link between the action and the protected activity.  *Burlington Northern v. White*, 548 U.S. 53 (2006); *Rochon v. Gonzales*, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006).  That is, a plaintiff must demonstrate "materially adverse consequences . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm," which would have dissuaded a reasonable employee from making or supporting a charge of discrimination.  *Rochon*, 438 F.3d at 1219 (citing *Brown v.*

18

*Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).  If the plaintiff is able to establish a <u>prima facie</u> case of retaliation, then the Court should apply the familiar <u>McDonnell Douglas</u> analysis applicable to discrimination claims.

Accordingly, once the *prima facie* case is established, the burden of production shifts to the employer to provide legitimate, non-discriminatory reasons for the its actions.  *McKenna v. Weinberger*, 729 F.2d 783, 788 (D.C. Cir. 1984).  The employer's burden of production is satisfied if it explains what it has done or produces evidence of legitimate non-discriminatory reasons for its actions.  *St. Mary Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993).

Plaintiff's allegations that he was retaliatorily denied sick and AWS leave are baseless because they are not sufficiently adverse.  In addition, Plaintiff's allegations of retaliation are a gross distortion of the record.  First, he was granted over 4 hours of annual leave—his sick leave having been exhausted—to go to his medical appointment.  *Ex*. AI.  Secondly, his initial requests were not for ongoing treatment for a severe medical condition or appendicitis.  Rather, the leave request indicated, "[d]octor schedule a second x-ray and and [sic] other exam to be done."  *Ex*. AJ, Leave request.  He did not initially tell his supervisor that he thought he had appendicitis. *Ex*. I.  Further, the request was to take leave within days of a deadline for the Rent Estimate Project he had been assigned to complete, but had not completed and never completed.  *Ex*. U. The deadline for the rent estimate was set outside of the Service Center and Plaintiff's supervisors and team leaders had no flexibility.  *Id*.  Actually, Ms. Sisco permitted him to switch his Alternate Working Schedule day off from Friday to Monday.  *Id*.  The same has been asked of other associates.  *Ex*. AK.

Plaintiff alleges that he was retaliated against based on his protected activity of grieving the failure to promote him and his opposition to the PIN meeting and constant monitoring. Docket Entry 1, ¶25. To succeed on this claim, Plaintiff must show that he engaged in activity protected by Title VII. This, in turn, requires a showing that he opposed a practice made an unlawful employment practice under Title VII or that he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. 42 U.S.C. § 2000e-3. Plaintiff does not allege the latter. The former clause, known as the "opposition clause," has as an element, the requirement that a plaintiff have reasonably believed in good faith that he was opposing an employment practice which violates Title VII. *Parker v. Baltimore & Ohio Railroad*, 652 F.2d 1012, 1020 (D.C. Cir. 1981). The September 7, 2005 grievance did not address discrimination, nor does plaintiff allege that it does. *Ex.* Q. There is no indication that plaintiff's grievance was based on his belief that the failure to promote him was based on his race, color, national origin, religion, or sex. *King v. Jackson*, 468 F.Supp.2d 33 (D. D.C. 2006), aff'd at 487 F.3d 970 (D.C. Cir. 2007). Therefore, plaintiff's allegations that the complained-of conduct was in retaliation for his grievance or opposition to PIN meetings and monitoring are unpersuasive. Moreover, Plaintiff cannot establish a causal link between the grievance an the PIN. In any event, Defendant has proffered an adequate non-discriminatory reason for placing Plaintiff on a PIN due to his sub-par performance during the 2005 review year.

**b.    Unexhausted Claims**

Plaintiff cannot demonstrate a likelihood of success on his unexhausted claims let alone a substantial likelihood of success. Plaintiff has failed to exhaust all other claims that he alleges in his complaint or elsewhere making them amenable to dispositive resolution. "It is well

established that a federal employee may assert a Title VII claim in federal court only after a timely complaint has been presented to the agency involved." *Norriddin v. Goldin,* 382 F.Supp.2d 79, 92 (D.D.C. 2005); *Brown v. Gen. Servs. Admin.,* 425 U.S. 820, 832 (1976); 42 U.S.C. § 2000e *et. Seq.;* 29 C.F.R. § 1614.407.  A plaintiff's failure to bring a complaint to an Equal Employment Opportunity (EEO) counselor within 45 days of the alleged incident will result in the plaintiff losing the right to bring that claim before a federal court. *See, e.g. Bowden v. United States,* 106 F.3d 433, 437 (D.D.Cir. 1997).  In *National Railroad passenger Corp. v. Morgan,* the Supreme Court held that a claimant must exhaust her administrative remedies for each discrete incident of discrimination which constitutes an "unlawful employment practice." 536 U.S. 101, 110-113 (2002).  Termination, failure to promote, denial of transfer, or refusal to hire are easily identified discrete acts. *Id.* at 114.  Once a formal administrative complaint has been filed, the agency has 180 days from the date of the last amendment to the formal complaint to investigate the issues raised in the complaint. *See* 42 §2000e-16(c); 29 C.F.R. § 1614.407(b).  Only after 180 days have lapsed, or after the agency issues a final decision (whichever is earlier), may the employee pursue his or her claims in federal court. *Id.*  A complaint brought in federal court before such time is subject to dismissal. *Id*.

i.    Failure to Promote

To the extent that the federal complaint alleges discrimination or retaliation by not promoting plaintiff to GS-12 in May 2005—at his one year anniversary from promotion to GS-11—and in July 2005 when he requested Ms. Sisco to do so, this discrete incident was not raised in the administrative complaint. *See,* Docket Entry 1at 2, ¶¶ 2, 3, 6, 16.  These matters were not addressed in his informal or formal complaint. *Exs*. AL, Informal Complaint, *Ex*. A, Formal

Complaint.  In fact, the incidents alleged in the informal complaint were characterized as beginning on December 5.  *Ex*. AL, Informal Complaint. They were not accepted for investigation at the agency level.  *Ex*. B.  The focus of the investigation was not on his not being promoted.  Neither his affidavit submitted during the investigation, nor his rebuttal statement addressed the non-promotion.  *Ex*. AM, Affidavits of Abdulai Conteh.

Although the plaintiff contacted an agency EEO counselor several times, he did not informally or formally complain to an EEO Counselor about the failure to be promoted.  A federal employee who believes he has been discriminated against is required to contact an EEO counselor to try to resolve the matter before filing a formal complaint.  29 C.F.R. §1614.105(a).  This must be done within 45 days of the alleged discriminatory act or, in the case of a personnel action, within 45 days of its effective date.  29 C.F.R. §1614(a)(1).  Plaintiff failed to seek counseling for his non-promotion claim within the requisite period.

Even if Plaintiff's February 22, 2006 contact with the EEO counselor concerned his non-promotion, at that time, the 45 day period for raising that issue had expired.  Since Plaintiff failed to exhaust his administrative remedies as to a non-promotion claim, such claims will not likely survive a dispositive motion, let alone a review on the merits.

ii      <u>Denial of Permission to Take a Class and Training</u>

Plaintiff alleges that Ms. Sisco's denial of  his request to take a class in December 2004 because of a lack of funds was discriminatory.  Docket Entry 1 at 5, ¶12.  In order to take a course, the employee must submit a request.  *Ex*. AN, Sisco. Depo. at 175.  Requests are handled on a first come, first served basis.  *Id*.  When plaintiff's request was being considered there were no funds available for training.  *Ex*. U.  Plaintiff has not and cannot show that there

was funding for training available at the time his request was denied.  Therefore, he cannot show pretext.

   Second, he alleges that his supervisor having changed his response from a "no" to a "yes" on a survey about whether he was enrolled in the Financial Certification Program, was discriminatory.  Docket Entry 1 at ¶13.  His supervisor changed the response because she believed that he was enrolled in the Financial Certification Program.  *Ex*. U, *Ex*. AO, Sisco Depo. at 440.  However, when she saw his response, she approached him about it and he indicated that he was not enrolled.   Ultimately, she went ahead with his response because she recognized that employees can un-enroll themselves and she would not have any knowledge of that development.  *Id*.  In addition to this petty matter not being sufficiently adverse to be actionable, Plaintiff provided no evidence to raise and inference that the actions were discriminatory.

   Plaintiff suggests that he was not provided adequate training.  Plaintiff was provided on-the-job training as a budget analyst.  *Ex*. U.  On-the-job training was viewed as being more beneficial than classroom training for his situation.  *Id*.  Receiving on-the-job training was consistent with what other associates received upon their arrival to the budget analyst position.  As plaintiff is quick to point out, he came to the position equipped with a college degree and an MBA.  That circumstance distinguished him from other associates in the division.  *Ex*. I.  Plaintiff was provided the opportunity for formal training.  He attended an appropriation law seminar.  *Ex*. AQ.  He attended—although he did not complete the examination that would have allowed him to garner credit toward a Financial Management Certification—a class for Budget Estimating using Microsoft Excel.  *Ex*. I.  He was encouraged by his supervisor to take courses.

*Id*. Accordingly, Plaintiff cannot show that the reasons for his non-promotion and for his December 2005 PIN—namely, his performance problems—were pretextual.

### iii.    The December 2005 PIN

The issuance of the PIN could not have come as a surprise to the plaintiff considering what transpired over the 2005 appraisal period.  Namely, his supervisor expressed concerns about his performance during the mid-year review in May 2005.  She also declined to promote him when he requested that in July 2005.  Before that he had been issued a level 2 annual performance appraisal in December.  The performance deficiencies upon which Plaintiff's PIN was based are well-documented and Plaintiff cannot establish discriminatory intent.

The December 2005 PIN was designed to provide him with an action plan and allow him the opportunity to improve his performance.  His supervisor met with him and provided assistance and guidance.  While the plaintiff has suggested that during the weekly meetings held during the PIN his performance was not discussed, his statement that at the meetings his supervisor thought everything he did was wrong contradict him. *Ex*. AR.

### iv.    Allegation of Being Required to Work While Sick

Plaintiff also alleges that his supervisor instructing him to come back to work against his doctor's advice in September 2006 is discriminatory.  Plaintiff had been approved leave in August 2006.  He remained absent after the last day of his approved leave.  Nearly a week later, his supervisor contacted him inquiring as to his work status.  At that time, she indicated that he needed to bring in medical documentation or return to work otherwise he would be in an AWOL status. Plaintiff came to work on September 12, 2006 with a doctor's certificate indicating that he was to return to work on September 14, 2006.  His supervisor asked him if he should be at

24

work, to which he responded that it was okay.  *Ex*. AS, Affidavit of Barbara Sisco dated August 29, 2008.

v.    <u>Christmas Party</u>

Plaintiff also alleged that he was asked to leave the agency Christmas party in 2006. Plaintiff relates that this happened because his supervisors told him he had to submit a fund status report by the close of business that day.  Docket Entry 1, ¶22.  Plaintiff knew of this assignment prior to the day of the agency party.  *Ex*. T, e-Mail from Roland Caton to Plaintiff, dated December 14, 2006.  With proper time management, he could have completed the assignment before the party.  Nevertheless, he was permitted to attend the party and never instructed to leave the party.  *Id.*

vi.    <u>Religious Discrimination</u>

Plaintiff has alleged that he has been discriminated against because he is a Muslim. Plaintiff has not alleged facts by which an inference can reasonably be drawn that these facially neutral incidents had a discriminatory motive.[13]  For example, while plaintiff relates that there is a bias against Muslims because of the war, he does not allege that his supervisor, team leaders, or anyone else in the workplace, has that bias.  He posits that he has overheard comments about wiping out "the Muslim areas of the globe."  *Id.*  That his prior team leader's husband is a minister and that some members of the division say "have a blessed day" is also insufficient to support an inference that the alleged conduct is based on his religion.  *Ex*. AR.  He does not allege that these comments were made by a GSA employee or in the GSA workplace.

---

[3]    To the contrary, during his deposition he responded to a question concerning where e-mails were coming from, by saying, "Well, Barbara don't like me.  She has done a lot of things just to discredit me, because she hates me.  So she can do whatever."  C. Dep., p. 91.

Regardless, such a stray statement, by itself, is not enough to support an inference that the complained-of conduct was based on the Plaintiff's religion.

vii.   <u>Gender Discrimination</u>

Plaintiff has suggested that his supervisor is discriminating against him based on him being male because there are mostly black females in the organization.  However, he is unable to show that the conduct is based on his sex.  That the majority of the employees under his supervisor's supervision were female, is not enough to show that the alleged conduct was based upon his sex.   The evidence shows that his supervisor took performance measures against both sexes.  *Ex.* AU.

Both his supervisor and plaintiff identify their race as African-American.  To the extent that the plaintiff alleges discrimination based on the color of his skin, he does not articulate how the alleged discriminatory conduct is based on the color of his skin.  It has also not been shown that his supervisor knew of his national origin at the time of the complained-of conduct.

Even if Plaintiff could succeed in establishing a *prima facie* case of discrimination or retaliation, the agency can rebut a presumption of discrimination by articulating a legitimate nondiscriminatory reason for its employment decision.  *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  The employer's burden is merely one of production, not persuasion.  *Id.* at 255-256.

The ultimate burden of showing that the agency intentionally discriminated against him remains at all times with Plaintiff.  *See Burdine*, 450 U.S. at 253.  Even if plaintiff demonstrates a *prima facie* case and sufficient pretext, the employer will still be entitled to judgment as a matter of law if "no rational fact finder could conclude that the action was discriminatory."

26

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000).

In noting that his acting team leader's job performance evaluation dated May 3, 2005 was good, he was promoted to GS-11 on May 31, 2004, and he received a Within Grade Increase on May 28, 2006, plaintiff appears to take the position that his performance was actually satisfactory; therefore, the defendant's reasons were pretextual.  This argument is undermined by subsequent evaluations.

Ms. Cary's evaluation of plaintiff's performance was given when she was acting team leader in Ms. Vance's absence.  She was in this status for approximately four to five months. *Ex*. AV, Sisco Depo. at 142, 144.  Hence, she was not an experienced team leader.  *Ex*. AW, Sisco Depo. at 146.  Indeed, Plaintiff's supervisor questioned Ms. Cary's evaluations of plaintiff and others under her purview.  *Ex*. AX, Sisco Depo. at 152.  She specifically questioned Ms. Cary's evaluation in light of information she had received from the more experienced team leaders.  *Ex*. AW

While his supervisor promoted Plaintiff from a GS-9 to a GS-11 in 2004, this does not demonstrate that he was performing successfully in the higher graded position nearly a year after the promotion.  Neither does the receipt of a Within Grade Increase indicate that he was performing well in this instance.  The process for awarding a within grade increase is largely automatic.  Unless someone timely takes action to stop the process of awarding a within grade increase, it will occur.  In this instance, action was not timely taken to stop the automatic award. Lastly, the plaintiff's awards, prior to joining the Agency lend little support for his proposition that he is performing well at GSA as a Budget Analyst in his fourth year.

As to the Gross Margin Report, plaintiff related that he was given a three day turn-around time for this project. ROI, 000182. Plaintiff was assigned this on or about December 15, 2006. It was due on January 19, 2006. That date was extended until February 2, 2006. This was not an unrealistic deadline for the project. It was consistent with the deadline assigned to complete the project in the past. *Ex*. I. Although at deposition, plaintiff for the first time indicated that he was not provided the proper documentation for the project, he did not indicate what documentation was missing  *Ex*. AY

Plaintiff has repeatedly accused defendant of altering documents. In his complaint he attached documents related to the Rent Estimate Project that had hand-written notes on them, suggesting that the hand-written notes were alterations. Therein, he also identified her changing "no" to "yes" on a form that was for her use in responding to a survey. Yet, she has explained that she ultimately listed plaintiff as not being enrolled in the program as he had indicated on his paper provided to her. At deposition plaintiff accused defendant of producing altered e-mail messages. Defendant agreed to print out the original string of e-mail messages on the questioned items. Defendant provided these, which showed no alteration to the substantive content or spirit of the documents.   In his Motion he claims that a photocopied e-mail message that obviously had a sticky note with comments on it when copied, was altered. Notably, a copy of that message without the sticky note is part of the report of investigation provided to plaintiff in the administrative proceedings.   Plaintiff has not articulated how any of these "alterations" prejudice him.

III.    **Granting Plaintiff Injunctive Relief would Harm Defendant and Serve no Public Interest**

In *Sampson,* the Court stressed the importance of granting the government "the widest possible latitude in the dispatch of its own affairs." 415 U.S. at 83. If Plaintiff's request for injunctive relief were granted, the Defendant's ability to make the most fundamental personnel decisions in dispatching its affairs would cease. Moreover, if Plaintiff were successful on this motion, Defendant would be compelled to retain Plaintiff, who has underperformed over the past three years. Not only would this result not serve a public interest, it could potentially harm the public. For all of these reasons, Plaintiff should not be awarded injunctive relief.

<u>**CONCLUSION**</u>

Based on the foregoing, the Court should deny Plaintiff's request for a preliminary injunction. A proposed order is attached.

Dated: September 5, 2008                     Respectfully submitted,

                                             /s/
                                             _____
                                             JEFFREY A. TAYLOR, D.C. BAR #498610
                                             United States Attorney


                                             /s/
                                             _____
                                             RUDOLPH CONTRERAS, D.C. BAR 434122
                                             Assistant United States Attorney

OF COUNSEL:                                  /s/
MARGE A. OVERLY, ESQ.                        _____
Office of the Regional Counsel              KENNETH ADEBONOJO
National Capital Region                      Assistant United States Attorney
General Services Administration              555 4th Street, NW
                                             Washington, DC 20530
                                             (202) 514-7157

                                             Attorneys for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of September 2008, I caused the foregoing

Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction to be served, on

Plaintiff's attorney, Obinna Duruji, Esq., via the Court's Electronic Case Filing system.


___/s/_____
KENNETH ADEBONOJO

# FORMAL COMPLAINT OF DISCRIMINATION
*(Read information on the back of Copy 3 carefully before completing this form.)*

NOTE: IF YOU WISH TO FILE A FORMAL COMPLAINT OF DISCRIMINATION BASED ON RACE, COLOR, RELIGION, SEX, NATIONAL ORIGIN, AGE, HANDICAP, OR REPRISAL; COMPLETE THIS FORM.

| 1. COMPLAINANT INFORMATION | 2. EMPLOYMENT INFORMATION |
|---|---|
| **a. NAME** *(Last, First, MI)*<br>CONTEH, ABDULAI | **a. TYPE** *(Check one)*<br>☑ GSA    ☐ FORMER GSA<br>☐ FEDERAL    ☐ NON-FEDERAL |
| **b. HOME ADDRESS** *(Street, City, State, ZIP Code)*<br>9113 Littlestone DR<br>Fort Washington MD 20744 | **b. NAME OF PROGRAM OFFICE**<br>Metropolitan WPO<br>**c. OFFICE ADDRESS** *(Street, City, State, ZIP Code)*<br>1099 14th St NW<br>Washington DC 20005 |
| **c. HOME TELEPHONE NUMBER**<br>(301) 265-0259 | |
| **d. SOCIAL SECURITY NUMBER**<br> - 6044 | **d. OFFICE TELEPHONE NO.**<br>(202) 219-3338 |

**3. POSITION TITLE/SERIES/GRADE**
Budget Analyst GS 11 Series 560

## 4. CHECK BASIS(ES) YOU BELIEVE CAUSED THE DISCRIMINATION

| | | | f. HANDICAP *(Check one)* |
|---|---|---|---|
| a. RACE | ✓ | *(State type)* African American | ☐ PHYSICAL *(State type below)*    ☐ MENTAL *(State type below)* |
| b. COLOR | ✓ | *(State type)* Black | |
| c. RELIGION | ✓ | *(State type)* Muslim | **g. AGE** *(State years)* 48    **DATE OF BIRTH** 1/21/58 |
| d. NATIONAL ORIGIN | ✓ | *(State type)* Africa | |
| e. SEX *(Check appropriate boxes)*<br>☐ FEMALE ☑ MALE ☐ EQUAL PAY ☐ SEXUAL HARASSMENT | | | **k. REPRISAL** |

**5. DESCRIPTION OF DISCRIMINATION** (Explain, briefly, how you believe you were discriminated against *(that is, treated differently from other employees or applicants because of your race, color, religion, sex, national origin, age, mental or physical handicap, or reprisal)*. If your complaint involves more than one allegation of discrimination: (1) list each allegation; (2) provide the date(s) of alleged discriminatory act(s); and (3) furnish specific factual information in support of each. Use additional blank sheets of paper, if necessary.

I was placed on a performance improvement plan for filling a grievance with the union for failing to promote. I have also been assigned a work load far beyond any other employee. I am continually harassed and my work has been "nit pick" by my supervisor and given unreasonable deadlines.

| **6a. NAME OF EEO COUNSELOR**<br>Sandra Davies | **6b. TELEPHONE NUMBER**<br>( ) |
|---|---|

## 7. REPRESENTATION

| **a. NAME OF REPRESENTATIVE**<br>Robert O'Brycki | **b. TITLE** *(Attorney, Union, etc.)*<br>NFFE Vice president | **c. TELEPHONE NUMBER**<br>(202) 708-7396 |
|---|---|---|
| **d. ADDRESS** *(Street, City, State, ZIP Code)*<br>710 5th NW Washington DC 20407 | | |

**8. STATE REMEDY SOUGHT IN THIS COMPLAINT** I am requesting the PIN removed from my records and that I be given a 3 or higher rating for OS. I am requesting mone payout associated with team awards. I am requesting compensatory da and reasonable attorneys fees. I am also request a transfer to another services delivery team in a similar position without loss of pay or status.

| **9a. SIGNATURE OF COMPLAINANT**<br>*Conteh* | **9b. DATE**<br>4/6/2006 |
|---|---|

### DO NOT WRITE BELOW THIS LINE (For Agency Use Only)

| **AGENCY DOCKET NUMBER**<br>06-NCR-WP-AC-10 | **DELIVERED BY** *(Check one)* | **DATE OF DELIVERY** |
|---|---|---|
| **NAME OF COMPLAINANT**<br>Abdulai Conteh | MAIL *(Include date of postmark)* | |
| | ☑ HAND DELIVERY | 4/6/06 |
| **SIGNATURE OF RECEIVING OFFICIAL**<br>*Barbara V. Stewart* Barbara V. Stewart, EEO Specialist | OTHER *(Specify)* | **DATE** 4/6/06 |

GENERAL SERVICES ADMINISTRATION    1. REGIONAL EEO OFFICE    GSA (Rev. 8-93)

**EXHIBIT**
A

**GSA**®

GSA National Capital Region

April 21, 2006

Mr. Abdulai Conteh
9113 Littlestone Drive
Fort Washington, MD 20744

Ref:  GSA Case Number:  06-NCR-WP-AC-10

Dear Mr. Conteh:

On April 7, 2006, you were sent a letter acknowledging receipt of your formal Equal Employment Opportunity (EEO) discrimination complaint dated, hand delivered, received and deemed filed on April 6, 2006, and your amendment request of April 7, 2006. The acknowledgment letter also informed you that your complaint was under review for acceptance/dismissal. This notice is to provide you with the status of your formal EEO complaint.

Based on a review of the formal complaint and the EEO Counselor's Report, it has been determined that the following claim(s) and amendment will be **Accepted** for formal investigation. A copy of the counselor's report is enclosed.

**Your claim that you were discriminated against because of your Race (African American), Color (Black), National Origin (Africa), Sex (male) and Religion (Muslim), when you were harassed starting December 5, 2006, regarding your work performance and assignments.**

**Also, you amended your harassment claim to include reprisal for filing an EEO complaint as a basis, when you were denied sick leave on February 29, 2006, and denied your AWS (Alternative Work Schedule) day on March 31, 2006.**

If you believe the claim(s) in this complaint have not been correctly identified, please notify me, in writing, within five calendar days after your receipt of this letter, specifying why you believe that the claim(s) have not been correctly identified. If no response is received from you within the specified timeframe, the accepted claim(s) will be forwarded for formal investigation.

Voluntary attempts to settle your complaint can be made throughout the administrative process. If a settlement of the complaint is reached, the terms of the settlement will be stated in writing and you will be given a copy.

000171

U.S. General Services Administration
301 7th Street, SW
Washington, DC 20
www.gsa.gov

EXHIBIT

tabbies®

B

-2-

Pursuant to 29 CFR Part 1614, the agency has 180 calendar days to complete the investigation (from the date of filing a formal complaint) or to issue the Notice of Final Action on the complaint.

Upon completion of the investigation, you will have the right to request a final agency decision or a hearing before an Equal Employment Opportunity Commission (EEOC) Administrative Judge (AJ). If you request a hearing before an EEOC Administrative Judge, you must send your hearing request directly to the EEOC field office. Your written request must be sent within 30 calendars days upon receipt of the Notice of Final Action. Your request must be sent to the Washington Field Office, EEOC, 1801 L Street, NW., Suite 100, Washington, DC 20507. If you request a hearing, you must also certify to the EEOC field office that you sent a coy of your request for a hearing to the agency. Your copy to the agency should be sent to Ms. Avis B. Johnson, EEO Officer, General Services Administration, National Capital Region, EEO Office (WAD-E), 7th & D Streets, SW., (ROB/7002), Washington, DC 20407.

If you request a hearing, you are expected to proceed without delay in presenting your complaint before the assigned EEOC AJ. Therefore, if you plan to have a representative, you should immediately obtain representation and you should also begin preparing a list of proposed witnesses, with a summary of the testimony you believe each will present at the hearing. The AJ will request this list after being assigned your case.

Failure to prosecute your complaint in a timely fashion may be grounds for the AJ to return your case to the agency. The agency will issue a final decision based on the evidence presented in your investigative and complaint file.

However, if you request an immediate final decision to be rendered on the merits of each allegation contained in your complaint based on the investigative file, the head of the agency, or his designee, will render a decision without a hearing. A request for a final decision without a hearing must be made to Ms. Avis B. Johnson, EEO Officer, within 30 calendar days from the day you receive the notice of final action.

In the absence of any response from you, upon the expiration of the 30-day notice period as to your options to a decision with or without a hearing, the agency will, within 60 calendar days, issue a final decision.

In the event that GSA has not issued a notice of final action within 180 days from the filing of your complaint, you may request a hearing at any time after 180 days has elapsed from the filing of the complaint, by submitting your written request directly to the appropriate EEOC field office, provided above.

000172

-3-

If your complaint is dismissed, you will receive a final decision on the complaint or that portion of the complaint, which is dismissed. The letter dismissing your complaint will delineate your rights of appeal.

If you are dissatisfied with the final decision with or without a hearing, you may appeal to the EEOC. An appeal to the EEOC must be postmarked or, absent a postmark, received by the Commission within 30 calendar days from the day you receive the final decision. The 30-day period for filing a Notice of Appeal begins to run on the day after you receive the final decision.

However, if an attorney represents you, the 30-day timeframe begins to run on the day after your attorney receives the final decision. Any statement or brief in support of an appeal may be submitted to the Commission, with copies to the agency, within 30 calendar days from the date the appeal is filed. You must certify the date and method by which service was made on the agency regarding any appeal filed with the Commission.

Appeals must be filed on the EEOC Form 573(REV 4-92), and must indicate what it is you are appealing and why. The EEOC Form 573 will be forwarded with the notice of final action on your complaint. In addition, appeals to the Commission should be forwarded to the Director, Office of Federal Operations, Equal Employment Opportunity Commission, PO Box 19848, 1801 L Street, NW, Washington, DC 20036.

In addition, with respect to claims filed under Title VII, you may file a civil action in the appropriate Federal District Court in any of the following situations:

   a. Instead of appealing GSA's final decision to the EEOC, you may file a civil action in an appropriate United States District Court. If you choose to file a civil action, you must do so within 90 calendar days from the day you receive the final decision.

   b. If you appeal GSA's final decision to the EEOC and the EEOC renders a decision on your appeal, you may appeal the EEOC decision by filing a civil action within 90 calendar days from the day you receive the EEOC decision on your appeal.

   c. If GSA has not issued a final decision after 180 days have elapsed from the date you filed your formal complaint, you may file a civil action.

   d. If the EEOC has not issued a decision on your appeal within 180 calendar days from the date of filing the appeal.

000173

-4-

e. On complaints alleging violations of the Equal Pay Act, the time limit for filing a civil action is as follows, regardless of whether you pursued any administrative complaint processing:

   (1) Within two years of the date of the alleged violation, or,

   (2) If the violation is willful, within three years of the date of the alleged violation.

If you choose to file a civil action, and you do not have or are unable to obtain the services of a lawyer, you may request the court to appoint a lawyer to represent you. In such circumstances as the court may deem just, the court may appoint a lawyer and may authorize the commencement of the action without the payment of fees, costs or security. Any such request must be made within the above referenced 30-day time limit for filing suit and in such form and manner as the court may require.

Please note that if you file a civil action, you must name the appropriate agency head as the defendant. Failure to name the head of the agency may result in loss of any judicial redress to which you may be entitled. The current agency head of the General Services Administration is Mr. David Bibb, Acting Administrator.

If you have any questions, please call me on (202) 708-8588.

Sincerely,

*Avis B. Johnson*

Avis B. Johnson
EEO Director


Enclosure


Cc: Robert O'Brycki, Complainant's Union Representative


000174

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

**...IFICATION OF PERSONNEL ACTI...**

| 1. Name (Last, First, Middle) | | | | | | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|---|---|---|---|---|
| CONTEH, ABDULAI NMN | | | | | | | | ...-6044 | ...-1958 | 04-21-2003 |

**FIRST ACTION**

**SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 101 | Career-Cond Appointment | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| BWA | OPM Delegation Agr GSA-01, OPM DELEGATION | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number | | | | | 15. TO: Position Title and Number |
|---|---|---|---|---|---|
| | | | | | **Program Analyst** **WW29505 – 271** |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | GS | 0343 | 09 | 10 | $51,476.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| | | | | $46,175.00 | $5,301.00 | $51,476.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| | Public Buildings Service Metropolitan Service Center |

## EMPLOYEE DATA

| 23. Veterans Preference | | | | | | | | 24. Tenure | | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1 – None | 3 – 10-Point/Disability | 5 – 10-Point/Other | | | | | 2 | 0 – None    2 – Conditional | | YES    X    NO |
| | 2 – 5-Point | 4 – 10-Point/Compensable | 6 – 10-Point/Compensable/30% | | | | | | 1 – Permanent    3 – Indefinite | | |

| 27. FEGLI | | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|---|
| C0 | Basic only | 9    Not Applicable | 0 |

| 30. Retirement Plan | | 31. Service Comp. Date (Leave) | 32. Work Schedule | | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|---|
| K | K – FERS and FICA | 04-21-2003 | F | Full-Time | |

## POSITION DATA

| 34. Position Occupied | | | 35. FLSA Category | | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|---|---|
| 1 | 1 – Competitive Service    3 – SES General | | E | E – Exempt | 192.P1126001.61.11.000.001 | 0052 |
| | 2 – Excepted Service    4 – SES Career Reserved | | | N – Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| WPD | W2500 | 0000 | 11.48 | Nonsensive (NS) National Security Risk |

45. Remarks   – Continued

**SF 2817 MUST BE RETURNED WITHIN 31 CALENDAR DAYS.**

| ...mploying Department or Agency ...eral Services Administration | | | 50. Signature/Authentication and Title of Approving Official |
|---|---|---|---|
| ...gency Code | 48. Personnel Office ID | 49. Approval Date | Electronically Signed by:  Frances L. Stephens |
| 3 | 1909 | 04-28-2003 | Director, Consolidated Processing Cente... |

...rt 50-316



**EXHIBIT**
C
tabbies

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

**. .IFICATION OF PERSONNEL ACTI**

| 1. Name (Last, First, Middle) | | | |
|---|---|---|---|
| CONTEH, ABDULAI NMN | 2. Social Security Number ... ..–6044 | 3. Date of Birth ... ..–1958 | 4. Effective Date 04–21–2003 |

**FIRST ACTION**

SECOND ACTION

| 5–A. Code 101 | 5–B. Nature of Action Career–Cond Appointment | 6–A. Code | 6–B. Nature of Action |
|---|---|---|---|
| 5–C. Code BWA | 5–D. Legal Authority OPM Delegation Agr GSA–01, OPM DELEGATION | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

7. FROM: Position Title and Number

15. TO: Position Title and Number
Program Analyst
WW29505 – 271

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | | |

14. Name and Location of Position's Organization

| 16. Pay Plan GS | 17. Occ. Code 0343 | 18. Grade/Level 09 | 19. Step/Rate 10 | 20. Total Salary/Award $51,476.00 | 21. Pay Basis PA |
|---|---|---|---|---|---|
| 20A. Basic Pay $46,175.00 | 20B. Locality Adj. $5,301.00 | 20C. Adj. Basic Pay $51,476.00 | 20D. Other Pay $0 | | |

22. Name and Location of Position's Organization
Public Buildings Service
Metropolitan Service Center

**EMPLOYEE DATA**

| 23. Veterans Preference 1 | 1 – None   3 – 10–Point/Disability   5 – 10–Point/Other<br>2 – 5–Point   4 – 10–Point/Compensable   6 – 10–Point/Compensable/30% | 24. Tenure 2 | 0 – None   2 – Conditional<br>1 – Permanent   3 – Indefinite | 25. Agency Use | 26. Veterans Preference for RIF   YES  X  NO |
|---|---|---|---|---|---|

| 27. FEGLI C0 | Basic only | 28. Annuitant Indicator 9 | Not Applicable | 29. Pay Rate Determinant 0 |
|---|---|---|---|---|

| 30. Retirement Plan K | K – FERS and FICA | 31. Service Comp. Date (Leave) 04–21–2003 | 32. Work Schedule F | Full–Time | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied 1 | 1 – Competitive Service   3 – SES General<br>2 – Excepted Service   4 – SES Career Reserved | 35. FLSA Category E | E – Exempt<br>N – Nonexempt | 36. Appropriation Code 192.P1126001.61.11.000.001 | 37. Bargaining Unit Status 0052 |
|---|---|---|---|---|---|

| 38. Duty Station Code 110010001 | 39. Duty Station (City – County – State or Overseas Location) WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA | | |
|---|---|---|---|

| 40. Agency Data WPD | 41. W2500 | 42. 0000 | 43. 11.48 | 44. Nonsensitive (NS) National Security Risk |
|---|---|---|---|---|

45. Remarks

Appointment affidavit executed 21–APR–2003.

Appointment is subject to completion of one year initial probationary period beginning 21–APR–2003.

Service counting toward career tenure from 21–APR–2003.

Selected from 0399DE19, PBS–03–11, dated 31–JAN–2003.

Previously employed at MG–1101–11 STEP 02 AT $57,036 ANNUALLY.

Full performance level of employee's position is GS–12.

Employee is automatically covered under FERS.

Creditable Military Service: NONE.

Frozen Service: NONE

WELCOME TO THE NCR!!.

F 2809 AND TSP1 MUST BE RETURNED WITHIN 60 CALENDAR DAYS.

*Remarks Continued On The Next Page*

| Employing Department or Agency General Services Administration | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| 47. Agency Code 03 | 48. Personnel Office ID 1909 | 49. Approval Date 04–28–2003 | Electronically Signed by:  Frances L. Stephens |

Part 50–316

Director, Consolidated Processing Center

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

1 · ...TIFICATION OF PERSONNEL ACTI...

| 1. Name (Last, First, Middle) | | | | | |
|---|---|---|---|---|---|
| CONTEH, ABDULAI NMN | | | | | |

| | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| **FIRST ACTION** | ... -6044 | ... 1958 | 04–21–2003 |

| 5–A. Code | 5–B. Nature of Action | | |
|---|---|---|---|
| 002 | Correction | | |

**SECOND ACTION**

| 5–C. Code | 5–D. Legal Authority | 6–A. Code | 6–B. Nature of Action |
|---|---|---|---|
| | | 101 | Career–Cond Appointment |

| 5–E. Code | 5–F. Legal Authority | 6–C. Code | 6–D. Legal Authority |
|---|---|---|---|
| | | BWA | OPM Delegation Agr GSA–01, OPM DELEGATION, |

| 6–E. Code | 6–F. Legal Authority |
|---|---|
| | |

7. FROM: Position Title and Number

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis |
|---|---|---|---|---|---|
| | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay |
|---|---|---|---|
| | | | |

14. Name and Location of Position's Organization

15. TO: Position Title and Number

**Program Analyst**
WW29505 – 271

| 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|
| GS | 0343 | 09 | 10 | $52,058.00 | PA |

| 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|
| $46,175.00 | $5,883.00 | $52,058.00 | $0 |

22. Name and Location of Position's Organization
Public Buildings Service
Metropolitan Service Center

**EMPLOYEE DATA**

| 23. Veterans Preference | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|
| 1 | 1 – None   3 – 10-Point/Disability   5 – 10-Point/Other<br>2 – 5-Point   4 – 10-Point/Compensable   6 – 10-Point/Compensable/30% | 2   0 – None   2 – Conditional<br>1 – Permanent   3 – Indefinite | | YES  X  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   Basic only | 9   Not Applicable | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K   K – FERS and FICA | 04–21–2003 | F   Full–Time | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1   1 – Competitive Service   3 – SES General<br>2 – Excepted Service   4 – SES Career Reserved | E   E – Exempt<br>N – Nonexempt | 192.P1126001.61.11.000.001 | 0052 |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| WPD | W2500 | 0000 | 12.74 | Nonsensitive (NS) National Security Risk |

45. Remarks

Corrects item 20B from 5,301.00.

Corrects item 20C from 51,476.00.

Corrects item 20 from 51,476.00.

...nploying Department or Agency
...ral Services Administration

| ...ency Code | 48. Personnel Office ID | 49. Approval Date | 50. Signature/Authentication and Title of Approving Official |
|---|---|---|---|
| 3 | 1909 | 05–03–2003 | Electronically Signed by:  Frances L. Stephens<br>Director, Consolidated Processing C... |

...rt 50–316

# *PD LIBRARY*

Region:              National Capital Region

Standard:            Agency Standard

**Position Title:**   Budget Analyst

| Pay Plan: | Series: | Grade: | PD# | Position Status | Supervisory Status | FPL |
|-----------|---------|--------|-----|-----------------|--------------------|----|
| GS | 0560 | 11 | WWWDM124 | Competitive Service (1) | Non-supervisory (8) | varies |

| I/A | Competitive Level : | FLSA: | Drug Test: | Position Sensitivity: | Financial Statement |
|-----|---------------------|-------|------------|----------------------|---------------------|
| ● Yes ○ No | N001 | ○ Exempt ○ Non-Exempt ● See Text Below | Position does not require drug test (L) | Non-sensitive (1) | ● N/A ○ SF-27 ○ SF-45 |

Public Trust Indicator:              Level 1 - Low Risk (1)
Occupational Category Code:          Administrative (A)

Classified by: Joseph J. Demeo      On:    01/16/2002

Description:
Note: Full Performance Level is determined at regional level based on effective position management.

FLSA determination:  AFGE = nonexempt based upon negotiated settlement agreement.
                      All others = exempt

## BUDGET ANALYST, GS-0560-11

Serves as Budget Analyst for an assigned organizational component of the General Services Administration, at either a regional or Central Office location. The incumbent performs a specified portion or portions of the full range of budget analysis assignments, and related financial and program management functions.

## MAJOR DUTIES

As a principal budget analyst for the organization assigned, is responsible for a wide range of budgetary duties and procedures which includes program planning, analysis and full technical and procedural administration of assigned major budget activities. In this capacity, performs substantially all of the following functions:

Assists in developing and formulating the organization's budget request for the coming fiscal year. Furnishes technical guidance and assistance to managers and other employees in


EXHIBIT
D

formulating, developing, coordinating, and integrating budgetary and financial management requirements by providing forecasts, estimates and financial plans and justifications on an annual and/or interim schedule. As required, develops supporting data for budget requests and submits to the supervisor for additional review and levels of concurrence. Performs necessary analyses of consolidated budget requests using such techniques as cost-benefit analysis and by researching possible alternative methods of funding; prepares statements justifying funding requests for higher-level management and/or the Central Office.

Monitors the use and rate of expenditure of assigned budget accounts to ensure that funds and ceiling are not overspent and recommends the reprogramming of funds as necessary. Periodically reviews interim budget reports and/or other management directives for changes in requirements and supporting documentation; ensures that all tables, schedules, justifications and forms are included with consolidated budget submissions and responses. Prepares a variety of reports covering the status of funds, expenses, and obligations as required by the regional and Central Office(s). Interprets OMB directives and circulars and recommends revised procedures in response to changes in agency policies and/or government regulations. Issues implementing instructions when funding changes are required by legislative or regulatory order, and monitors implementation of such changes for their effect on allowances.

Reviews the performance of assigned budget activities to determine if discrepancies in operating budget plans exist, and recommends any remedial actions required. Develops budgetary procedures for administering allowances, and implements and/or monitors internal financial controls for assigned budget activities to avoid violation of the Anti-Deficiency Act. Serves as a central point of contact for information regarding assigned budget activities and related program activities, and assists the supervisor in preparing responses to GAO and internal audit queries and reports. Serves as liaison between subordinate field activities and the organization's centralized budget organization to coordinate budget activities and provide technical assistance as required.

## KNOWLEDGE REQUIRED BY THE POSITION        Factor Level 1-7     1250 points

Comprehensive knowledge of GSA and Federal budget processes, policies, procedures, and regulations to assure that budget estimates, projections, and submissions conform to requirements, guidelines, and financial objectives.

Detailed knowledge of assigned organization and programs to analyze and evaluate the effects of continuing changes in program plans and funding on the accomplishment of the organizations' budget and program goals and objectives.

Skill in the identification, analysis, and resolution of a range of budgetary problems to develop alternative solutions involving the resolution of conflicting goals and objectives.

Knowledge of accounting systems in order to locate and analyze data and prepare reports for substantive programs.

**SUPERVISORY CONTROLS**                    Factor Level 2-3                    275 points

The supervisor assigns work in terms of overall budgetary objectives and priorities. The employee independently plans, schedules, coordinates and carries out recurring work assignments, and evaluates completed work for accuracy and any follow-up actions required. Work is reviewed for effectiveness in meeting budgetary and program objectives and deadlines, and consistency of budgetary actions and recommendations.

**GUIDELINES**                    Factor Level 3-3                    275 points

Guidelines include established techniques and precedents, OMB, federal and agency regulations and directives, and agency policy. Guidelines are not always directly applicable to the work performed, and the incumbent must use judgment in choosing, interpreting, and applying established guidance to specific parameters of the assignment involved.

**COMPLEXITY**                    Factor Level 4-4                    225 points

The work involves complex and varied duties performed in connection with the organization's budget process, including preparation of detailed budget estimates, justifications and budget execution plans; monitoring rates of obligations and expenditure of funds, and providing budgetary advice and recommendations to management. Assignments are of more than average difficulty and involve the consideration of legal and regulatory constraints, methods for obtaining and distributing funds, proposed uses of requested funds, cyclical time frames and deadlines, and alternative means of accomplishing budgetary and program objectives. Work often involves making decisions and recommendations concerning the technical treatment of budgetary data, under uncertain conditions and/or time constraints.

**SCOPE AND EFFECT**                    Factor Level 5-3                    150 points

The primary purpose of the work is to review, analyze, and monitor program and budgetary activities for the organization assigned, to assure compliance with applicable guidelines and priorities. The employee exercises financial control over the rate of expenditures, and assists management in the planning, scheduling and timing of program and/or administrative operations within established funding limitations. Budgetary advice and recommendations provided directly support the organization served; work performed contributes to the accomplishment of program goals and objectives by ensuring the availability of funds to support administrative and/or program operations.

**PERSONAL CONTACTS**                    Factor Level 6-3

Contacts are with program managers, other management officials of the organization and/or individuals from outside the organization who represent the budget and program interests of other Federal agencies, contractors, and private business. Contacts normally take place at formal budget briefings or in negotiations.

## PURPOSE OF CONTACTS                    Factor Level 7-c        180 points

Contacts are made to persuade managers and officials with differing goals and objectives to accept and approve recommended funding requests, budgetary actions, and estimates. Contacts are also made to resolve budgetary issues and problems, and to brief management officials regarding the current funding status of agency programs. Contacts with persons outside the Agency are to exchange information and to obtain data required to compile, monitor, or adjust the organization's budget.

## PHYSICAL DEMANDS AND WORK ENVIRONMENT        Factor Level 8-1 & 9-1   10 points

The work is primarily sedentary. Work is normally performed in an office setting.

**Total Points = 2365**
**GS-11 Grade Range = 2355 - 2750**

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

N.  IFICATION OF PERSONNEL ACTIO.

| 1. Name (Last, First, Middle) | | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|---|
| CONTEH, ABDULAI NMN | | | -6044 | -1958 | 05-30-2004 |

**FIRST ACTION** | **SECOND ACTION**

| 5-A. Code | 5-B. Nature of Action | 6-A. Code | 6-B. Nature of Action |
|---|---|---|---|
| 702 | Promotion | | |
| 5-C. Code | 5-D. Legal Authority | 6-C. Code | 6-D. Legal Authority |
| N6M | Reg 335.102 Career Prom | | |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |
| | | | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| Program Analyst WW29505 - 271 | Program Analyst WW29702 - 45 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19.Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0343 | 09 | 10 | $54,360.00 | PA | GS | 0343 | 11 | 05 | $57,338.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $47,422.00 | $6,938.00 | $54,360.00 | $0 | $50,020.00 | $7,318.00 | $57,338.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Public Buildings Service Metropolitan Service Center | Public Buildings Service Metropolitan Service Center |

**EMPLOYEE DATA**

| 23. Veterans Preference | | | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|---|---|
| 1 | 1 - None  3 - 10-Point/Disability  5 - 10-Point/Other<br>2 - 5-Point  4 - 10-Point/Compensable  6 - 10-Point/Compensable/30% | | 2  0 - None  2 - Conditional<br>1 - Permanent  3 - Indefinite | | YES  X  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0  Basic only | 9  Not Applicable | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per |
|---|---|---|---|
| K  K - FERS and FICA | 03-05-2000 | F  Full-Time | Biweekly Pay Period |

**POSITION DATA**

| 34. Position Occupied | | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|---|
| 1 | 1 - Competitive Service  3 - SES General<br>2 - Excepted Service  4 - SES Career Reserved | E  E - Exempt<br>N - Nonexempt | 192.P1126001.61.11.000.001 | 0052 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| WPD | W2500 | 0000 | 14.63 | Noncritical-Sensitive (NCS) National Security Risk |

45. Remarks

Full performance level of employee's position is GS-12.

CONGRATULATIONS ON YOUR PROMOTION!!.

EXHIBIT
E

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Officer |
|---|---|
| General Services Administration | |
| **47. Agency Code** | **48. Personnel Office ID** | **49. Approval Date** | Electronically Signed by:  Frances L. Stephens |
| GS03 | 1909 | 06-04-2004 | Director, Consolidated Processing Center |

5-Part 50-316

Editions Prior 7/91 Are Not Usable

Standard Form 50-B
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

...TIFICATION OF PERSONNEL ACTI...

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|
| CONTEH, ABDULAI NMN | | 6044 | -1958 | 10-17-2004 |

**FIRST ACTION**

| 5-A. Code | 5-B. Nature of Action |
|---|---|
| 995 | Position Title/Number Correction |
| 5-C. Code | 5-D. Legal Authority |
| | |
| 5-E. Code | 5-F. Legal Authority |
| | |

**SECOND ACTION**

| 6-A. Code | 6-B. Nature of Action |
|---|---|
| | |
| 6-C. Code | 6-D. Legal Authority |
| | |
| 6-E. Code | 6-F. Legal Authority |
| | |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|
| Program Analyst | Budget Analyst |
| WW29702 - 45 | WW0M143 - 105 |

| 8. Pay Plan | 9. Occ. Code | 10. Grade/Level | 11. Step/Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade/Level | 19. Step/Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GS | 0343 | 11 | 05 | $57,338.00 | PA | GS | 0343 | 11 | 05 | $57,338.00 | PA |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| $50,020.00 | $7,318.00 | $57,338.00 | $0 | $50,020.00 | $7,318.00 | $57,338.00 | $0 |

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|
| Public Buildings Service | Public Buildings Service |
| Metropolitan Service Center | Metropolitan Service Center |

**EMPLOYEE DATA**

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 — 1 - None  2 - 5-Point  3 - 10-Point/Disability  4 - 10-Point/Compensable  5 - 10-Point/Other  6 - 10-Point/Compensable/30% | 2 — 0 - None  1 - Permanent  2 - Conditional  3 - Indefinite | | YES  X  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|
| C0   Basic only | 9   Not Applicable | 0 |

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part-Time Hours Per Biweekly Pay Period |
|---|---|---|---|
| K   K - FERS and FICA | 03-05-2000 | F   Full-Time | |

**POSITION DATA**

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 — 1 - Competitive Service  2 - Excepted Service  3 - SES General  4 - SES Career Reserved | E   E - Exempt  N - Nonexempt | | 0052 |

| 38. Duty Station Code | 39. Duty Station (City - County - State or Overseas Location) |
|---|---|
| 110010001 | WASHINGTON / DISTRICT OF COLUMBIA / DISTRICT OF COLUMBIA |

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|
| WPD | W2500 | 0000 | 14.63 | Noncritical-Sensitive (NCS) National Security Risk |

45. Remarks

EXHIBIT
F

| 6. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|
| General Services Administration | Electronically Signed by: Frances L. Stephens |

| 7. Agency Code | 48. Personnel Office ID | 49. Approval Date | Director, Consolidated Processing Center |
|---|---|---|---|
| GS03 | 1909 | 10-21-2004 | |

...Part 50-316

Editions Prior ...

# EMPLOYEE PERFORMANCE REVIEW AND RATING

| PART I. GENERAL INFORMATION |
|---|

## EMPLOYEE'S NAME

| LAST | FIRST | MI | SOCIAL SECURITY NUMBER | CORRESPONDENCE SYMBOL | PAY | |
|---|---|---|---|---|---|---|
| Conteh | Abdulai | | -6044 | WPD | PLAN GS | GRADE 11 |

| TYPE OF RATING | REVIEW PERIOD | TYPE OF POSITION |
|---|---|---|
| [X] ANNUAL   [ ] INTERIM | FROM 10/1/2003    TO 9/30/2004 | [ ] SUPERVISORY   [X] NONSUPERVISORY |

**PART II. CRITICAL ELEMENT RATING** (Attach performance plan) (Use additional forms if there are more than 7 critical elements)

| CRITICAL ELEMENT | RATING (check one) | | COMMENT ON THE EMPLOYEE'S PROGRESS TOWARD MEETING THE PERFORMANCE STANDARD FOR EACH CRITICAL ELEMENT (Use additional pages if necessary.) |
|---|---|---|---|
| | SUCCESSFUL | UNACCEPTABLE | |
| 1. | x | | Program Management<br>Met standards for expected performance. |
| 2. | X | | Customer Focus<br><br>Met standards for expected performance. |
| 3. | X | | Cost Containment<br><br>Met standards for expected performance. |
| 4. | | | |
| 5. | | | |
| 6. | | | |
| 7. | | | |

| PART III. SUMMARY RATING | PART IV. PROGRESS REVIEW CERTIFICATION | |
|---|---|---|
| [X] SUCCESSFUL    [ ] UNACCEPTABLE | [X] PROGRESS REVIEW COMPLETED | DATE |

**GENERAL SERVICES ADMINISTRATION**

NCR FORM 3440  (REV. 8-97)



EXHIBIT

## PART V.  INDIVIDUAL DEVELOPMENT PLAN (IDP) CERTIFICATION

IDP RECEIVED BY EMPLOYEE

DATE 10/19/2004

## PART VI.  COMMENTS ON OVERALL PERFORMANCE

COMMENT ON THE EMPLOYEE'S OVERALL PERFORMANCE CITING SPECIFIC EMPLOYEE PROJECTS OR OUTPUTS.  USE ADDITIONAL PAGES IF NECESSARY.

Abdul has focused on Data Accuracy in addition to processing CPI's and taxes for the BA53 program in FY 2004.  Abdulai successfully completed his assignments meeting most established timeframes.  Abdulai conducted research and assisted in resolving numerous data accuracy issues.  Time did not allow him to assist with the BA53 lease reconciliation initiative in FY2004.  Abdulai attended data accuracy meetings and was an integral part of the Data Accuracy Team.  Abdulai is a team player and always offers his assistance.  One area that will need improvement is obtaining clarification of instructions to make sure that he fully understands his assigned tasks. Additional assignments will be forthcoming such as preparing the monthly budget fund status report and participation on the FFO Team in FY 2005.

## PART VII.  TRAINING AND DEVELOPMENT

DISCUSS PROFESSIONAL GROWTH NEEDS AND AVENUES THAT THE EMPLOYEE CAN PURSUE TO MEET THESE NEEDS.  USE ADDITIONAL PAGES IF NECESSARY.

See IDP

## PART VIII.  SIGNATURES

RATING OFFICIAL

NAME OF RATING OFFICIAL
Barbara Sisco

DATE 10/19/04

REVIEWING OFFICIAL (Necessary only if rating is at the unacceptable level)

NAME OF REVIEWING OFFICIAL

DATE

EMPLOYEE (Indicates only that a copy of the rating was received, not necessarily agreement with the rating.)

DATE 10/19/2004

NCR FORM 3440  (REV. 8-97)  BACK

**MEMORANDUM OF UNDERSTANDING**
**between the**
**GENERAL SERVICES ADMINISTRATION**
**and the**
**NFFE COUNCIL OF GSA LOCALS**

**Re: GSA Associate Performance Plan and Appraisal System (APPAS)**

Effective October 1, 2004, the following provisions are substituted for the provisions of Article 15, Performance Appraisal System, of the GSA-NFFE National Agreement.

Section 1. Policy
A. Performance appraisal systems applicable to bargaining unit employees will be fair, equitable and in accordance with Office of Personnel Management regulations.
B. The agency will utilize the appraisal system established in GSA Order CPO P 9430.1, dated December 31, 2003, "GSA Associate Performance Plan and Appraisal System," and the provisions below for the performance appraisal of bargaining unit employees.
C. The Employer agrees that the union has an interest in the performance standards established for the various occupations of unit employees. The Employer further agrees to notify the union during the development and revision of model performance standards and to give consideration to the union's ideas and suggestions.
D. Upon request, the Employer will make performance standards available for the union's review.

Section 2. Critical Elements and Performance Standards
A. The Employer has the right to make the final determinations in establishing critical elements and performance standards.
B. A performance plan identifying the critical elements and performance standards of the position must be developed as soon as feasible (normally within 30 days) after the beginning of each permanent assignment or any detail or temporary promotion that is expected to last 120 days or longer.
C. Critical elements and performance standards must be consistent with the duties and responsibilities contained in the employee's position description, except on a detail.
D. Employees cannot be held responsible for meeting critical elements and performance standards until they are made aware of and given copies of the elements and standards. The Employer will answer any questions the employee asks as to what is necessary to achieve each level of performance, whether or not a specific standard is written.


EXHIBIT

E. Each employee will have the opportunity for substantive participation in the development of the performance plan upon which his/her performance will be appraised.

F. Upon receipt of a new performance plan, an employee will be given an opportunity up to four days to review, comment, and suggest changes or additions.

G. Groups of employees, where appropriate, can work together to draft a single performance plan or to comment on a draft performance plan that would be applicable to all.

H. After an initial discussion of the performance plan is completed, the supervisor and the employee will complete the appropriate form. The employee has the right to enter comments on the plan in the performance file. A copy of the form will be given to the employee.

I. In addition to the written copy of the critical elements and performance standards, the employee will be given a copy of the appraisal form and an explanation of the element ratings and how they will be applied.

J. Once critical elements and performance standards for a position have been developed, they need not be changed when the position's incumbent is changed. However, the new incumbent should be given an opportunity to review and comment on the performance plan before the performance plan may be used to appraise the new incumbent's performance.

K. Substantive changes in performance plans during a rating period must be documented by completing a new form.

<u>Section 3. Annual Performance Rating</u>

A. After completion of the rating period, a performance rating will be completed, approved and issued to the employee within forty-five (45) days calendar days.

B. Employees will be evaluated only for work performed or reasonably expected to be performed during the rating period. An employee's performance will not be adversely affected by work not assigned.

C. In preparing the rating the supervisor will make appropriate allowances for work-related factors beyond the control of the employee which may have made it difficult to meet the written performance standards or which would, when taken into consideration, raise the employee's rating to a higher level.

D. A rating other than Level 3 will be justified in writing and made part of the employee's performance appraisal file.

E. An employee may provide a concise written summary of relevant performance accomplishments to the rating official by the last day of the rating period. The rating official will consider the information provided in the summary when preparing the rating. The summary will be forwarded with the recommended rating to the reviewing official if appropriate. This summary will not preclude the employee from making written comments for inclusion in the performance file.

F. Supervisors and employees may use this opportunity to discuss individual development plans in accordance with Article 18, Section 3, of this agreement. At the performance review the supervisor will discuss the employee professional growth needs and avenues to meet those needs.

G. The same agency official cannot serve as both the rating and reviewing official.

H. If the supervisor and employee do not agree on the rating, the employee may note this in writing for inclusion in the performance rating file.

I. An employee's signature on the appraisal form indicates only that the appraisal has been received, not an employee's agreement with the appraisal.

J. Employees serving on temporary assignments (e.g., details or temporary promotions) for 120 days or more during the annual rating period receive an interim rating covering the period of the temporary assignment.

Section 4.  Performance Reviews

A. Employees will be given a performance review at least semi-annually.  Supervisors should counsel employees regarding their performance on an as-needed basis or upon the employee's request.  Special emphasis should be placed on those cases on which an employee's performance has significantly deteriorated.

B. During the performance reviews, the supervisor will answer any questions the employee may have concerning what is necessary to improve performance.  The employee may make written comments regarding the conference which will be attached to the record of the meeting.  A copy of any summary of or comments about the review, which are entered into the record by the supervisor, will be given to the employee.

C. The supervisor will inform the employee during the review whether the employee's performance to date remains consistent with the overall rating received on the last annual rating.

D. If a review reveals unacceptable performance, the supervisor will develop a written performance improvement plan in accordance with Section 7A of this article if he or she has not already done so.

E. An interim rating is the summary performance rating that is completed when an employee changes position or completes a temporary assignment of 120 days or more.  Interim performance ratings should normally be completed within thirty (30) days after completion of the interim rating period.

Section 5.  Union Representation of Employees

Normally performance reviews will be conducted as one-on-one meetings between the supervisor and employee.  Employees who are concerned about the results of a performance review may request the presence of a union representative at a follow-up discussion.  As with the performance reviews, the supervisor will answer questions the employee or union representative may have concerning the employee's performance rating.

Section 6.  Level 2 Performance

A. At any time an employee's pattern of performance is considered to be at Level 2 in one or more critical elements, but is not unacceptable in any critical element, the supervisor will inform the employee of the pattern of performance in writing.

B. The notification will specify the critical element(s) in which the employee is at Level 2 and should reference the requirements for fully successful performance.  It will also advise the employee that he or she will be given an opportunity to improve but that continuing performance at Level 2 will have negative consequences on pay and awards.

C. To assist the employee to improve during the opportunity period, the supervisor should consider the following options and pursue those that are both appropriate and feasible.

1. Refer the employee for counseling under the Employee Assistance Program concerning the possibility of a treatable illness that may be affecting performance (this is mandatory when the supervisor has reasonable cause to believe that the employee's performance is affected by abuse of alcohol or other drugs),

2. Provide the employee an opportunity to observe or review the work of a fully successful performer,
3. Provide intensive coaching, and/or
4. Provide formal training specifically related to the performance deficiency.
D. Employees who perform at Level 2 may be reassigned, but may not be demoted or removed under 5 CFR 432 solely for the Level 2 performance.

Section 7.  Unacceptable Performance
A. At any time a supervisor determines that an employee is not performing at an acceptable level in one or more critical elements, the supervisor will develop a performance improvement plan. The purpose of the plan is to assist the employee in improving performance to the desired level. The plan will specify, as appropriate, the counseling, training, and/or short term specific actions to be accomplished within a set time frame before the Employer will initiate a performance based demotion or removal.
The employee will be given the following information:
1. An explanation of those aspects of performance in which the employee's performance falls below Level 2,
2. That the supervisor will advise the employee of what must be done to bring his/her performance up to at least Level 2,
3. A statement that his/her performance may result n a reassignment, demotion or removal unless improvement to at least Level 2 is shown,
4. A statement that this notice gives the employee a reasonable period of time to bring his/her performance up to Level 2 or Level 3.
At the end of the specified period, the employee shall be advised as to whether his/her performance has been at least at Level 2 or higher level.
B. If, after being given the opportunity to improve, the employee continues to fail to meet performance standards for one or more critical elements, the Employer must consider reassignment, demotion or removal of the employee from his/her position as appropriate.
C. If the Employer considers it necessary to effect a demotion or removal, any such action, if taken under the procedures of 5 U.S.C. Chapter 43 (432 actions), must entitle the employee to:
- 30 days advance written notice which identifies the specific instances of unacceptable performance within no more than the last twelve months and the critical elements of the employee's position involved in each instance,
-  A notification that the employee has the right to reply to the proposal orally and in writing and to be represented by the union or other representative,
- A written decision which has been issued or concurred in by an official who is in a higher position than the official who proposed the action,
- Receive the decision letter prior to the effective date of the action,
- Notification of appeal or grievance rights which includes Merit Systems protection Board and negotiated grievance procedure rights.
D. In 432 actions only instances which were stated in the proposal letter may be cited as the basis for the action; however, any improvements in the employee's performance during the notice period may be cause for reconsideration of the action.  Actions taken under 5 USC Chapter 75 (752 actions) are subject to the provisions of Article 30.
E. The requirement for issuing a performance improvement plan does not apply to those serving a probationary or trial period.

F. Upon request of an employee, the supervisor will conduct a meeting with the employee and the employee's union representative to discuss the employee's progress under the performance improvement plan.

Section 8. Denial of Within-Grade Increases

A. At least sixty (60) calendar days prior to the date an employee is eligible for a within-grade increase, the supervisor will review the employee's work. If the review leads to the conclusion that the employee is not performing at an acceptable level of competence, the supervisor will prepare a performance improvement plan in accordance with Section 7, or a notification of Level 2 performance in accordance with Section 6. The supervisor will notify the employee as soon as possible that his or her current performance will not support a within-grade increase.

B. General Schedule Employees - Within Grade Increases/Step Increases

1. An employee under the General Schedule (GS) who is paid at less than step 10 of the grade of his/her position must be advanced in pay to the next higher step provided the employee has completed the required waiting period, has not received an equivalent increase during the waiting period, and is performing at an acceptable level of competence.

2. An employee under this system who is performing at Level 3 or higher shall be considered to be performing at an acceptable level of competence. Therefore, when the employee is informed in writing of the critical elements and performance standards for his/her position, he/she shall be informed simultaneously of the acceptable level of competence.

3. If a within-grade increase is denied for a general schedule employee, the employee will be informed in writing of the reason(s) for the negative determination, the right to seek reconsideration, and the right to seek review through the negotiated grievance procedure.

C. Wage System - Step Increases.

1. The timing and procedures for within-grade increases for wage system employees shall be in accordance with OPM regulations.

2. A wage system employee will be automatically advanced to the next higher rate of his/her grade at the beginning of the first applicable pay period following completion of the required waiting period, provided his/her performance in his/her position is satisfactory and he/she has not received an equivalent increase in pay during his/her waiting period.

3. A wage system employee who is denied a within-grade increase may seek review of the denial through the negotiated grievance procedure.

D. The explanation of the right to request reconsideration will include:

The request must be in writing within fifteen (15) days of receipt of the negative determination;

The employee, if otherwise in a duty status, will be granted a reasonable amount of official time to review the material that is the basis of the negative determination and to prepare a response.

The employee has the right to be represented by the union;

The name and address of the person to whom the request for reconsideration shall be delivered. This will be an official at a higher level than the reviewing official.

E. The person who receives a request for reconsideration will issue a decision on the request for reconsideration as promptly as feasible. If a performance rating resulting in the denial is grieved, the reconsideration decision may be delayed until the grievance is settled.

If the decision is to grant the within-grade increase, the decision will be made retroactive to the first day of the first pay period following completion of the waiting period.

If the decision is to deny the within-grade increase, the notice of decision will inform the employee of the right to appeal under Article 7 of this agreement

Section 9.  Performance Records
A.  To the extent appropriate, supervisors shall maintain records of performance supporting performance reviews and annual ratings which may include, as appropriate:
1.  What work was assigned,
2.  When it was assigned,
3.  What instructions, written or oral, were given concerning:
a.  Time requirements, if a factor,
b.  Cost requirements, if a factor,
c.  Quality requirements,
d.  Quantity requirements,
e.  Process requirements (e.g. steps to follow, a procedure to use),
4.  When assignments were past due,
5.  When assignments were cancelled or transferred to other employees, and
6.  When assignments were completed and whether they met, failed to meet, or exceeded standards.
B.  The annual overall rating will be kept on file for the period specified in OPM regulations.
C.  Materials supporting the denial of a within-grade increase will be maintained until any grievances or appeals are adjudicated.  Included will be the negative determination, the employee's written request for reconsideration, a report of inquiry, if made, the decision on the request for reconsideration, and a written summary of any personal presentation if one is made.
D.  The employee, and the employee's union representative designated in writing, have the right to a copy of any of the documents covered by this section.
E.  Performance records are subject to the provisions of Section 7 of the Employee Rights article.

Section 10.  Appraisal System Information
A.  Supervisors will advise employees of the provisions of the performance appraisal system including the definition of and significance of critical elements, the purposes of performance standards, the relationship of performance appraisal to awards, within-grade salary increases, and completion of probation, the use of GSA appraisal system forms, and the purposes of semi-annual performance reviews.
B.  Should the Employer schedule general training sessions on the appraisal system, Union representatives may attend.

Section 11.  Special Circumstances
A.  Negative affects on ratings shall not be based on errors resulting from employee reliance on erroneous information or material from a supervisor.
B.  If employees are given assignments for which they have no prior knowledge or experience, they shall be given appropriate direction or training.
C.  Employees are encouraged to stay abreast of technological changes and adapt to reorganizations.  Performance appraisals can be impacted by outstanding adaptability and efforts by employees.  Performance appraisals must make allowances for work related factors beyond the employee's control, authorized absences for union representational duties, and requested and approved leave.  If applicable, and upon request, the Employer will explain how these factors were taken consideration.

The union may reopen negotiations on this article at any time after October 1, 2005.

For the Agency:                                    For the Union:

_____                         _____

_____                         _____
(Date)                                             (Date)



EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
WASHINGTON FIELD OFFICE
Washington, DC 20507

| | |
|---|---|
| Abdulai Conteh , ) | |
|            *Complainant,* ) | EEOC Case No. 570-2007-00194X |
|   v. ) | |
| ) | Agency No. 06-NCR-WP-AC-10 |
| U.S. General Services Administration, ) | |
|         *Agency.* ) | |
| ) | |

**AFFIDAVIT OF BARBARA SISCO**

I, Barbara Sisco, do hereby declare:

1. I am over the age of eighteen and competent to testify as to the matters below.

2. I am currently employed by the General Services Administration ("GSA") as a Supervisory Program Analyst and Branch Chief for the Financial Management Branch, Metropolitan Service Center, National Capital Region, General Services Administration.

3. This affidavit supplements the one I signed on July 7, 2006, found at Tab F3 of the Report of Investigation on this matter.

4. Early in 2005 the complainant came to me and said he did not feel that he was getting a fair assessment of his performance from his team leaders. He asked me if there was anything I could do. I offered to work directly with him and pay more attention to his work assignments. He responded favorably to that idea.

5. On December 15, 2005 I assigned the complainant the Gross Margin Report tasking. The project was due on January 19, 2006. This was more than adequate time in which to complete the report. Normally, about a month is allowed to complete this report. There was nothing unusual about the assignment on this occasion that indicated that more time would be needed to complete the project.

6. On or about May 19, 2005 I held a mid-year review with the complainant. Prior to meeting with the complainant I obtained input from the team leaders who worked with

him. They advised me that he was still struggling with the CPI process and was only able to process Virginia real estate taxes. During the mid-year review I shared my overall concern that the feedback I had received from the team leaders indicated that he was having serious problems. I pointed out the problem areas and reiterated that I would monitor his assignments closely, provide assistance and get a clear picture of his overall performance.

7. At the 2006 mid-year review I recommended that he take three courses: an Excel course, Essentials of Analysis, and Federal Financial Management. All of these would be credited towards obtaining his Financial Management Certification. He had submitted a request for the excel course earlier, but at that time there was no funding available and he did not renew his request after that time. After the 2006 mid-year review, I signed him up for the Excel refresher class because he had not submitted a request. He attended the class around July 2006, but has not completed the examination. For the Financial Management Certification program, the course is not considered complete unless he takes the examination.

8. Complainant came to GSA with a college degree and an MBA. Only four employees under my supervision have a college degree and none of those have a Masters degree. Those who do not have a degree require more formal training courses. We use the certification program and college courses to do this. We have paid for courses that are business related and related to the job. Someone that comes to the position with a formal degree is asked to focus on on-the-job training that would apprise them of GSA procedures, rules, processes, and systems. Most people in the division have been denied some training due to insufficient funds. I never promised the complainant training.

9. While there may have been times that I took phone calls or made phone calls while the complainant was in my office, these would not have lasted for long periods of

2

time. At the weekly meetings on the PIN, the team leader normally attended. I do not

recall any weekly meeting during which the complainant's performance was not addressed.

Normally, we reviewed the work that he had already been assigned and those tasks with

which he was having trouble. We would also provide feedback.

10. In October 2004, associates that were performing budget related duties and

functions were reclassified to budget analyst, series 560, positions. This was done so that

Metropolitan Services Division would be more in line with other service centers

concerning classifying associates in the budget analyst field.

11. The first time the complainant came to me about a printer, the division had

already completed a division-wide printer purchase with end of year money. That was

followed by a period of tight funding. It was decided that the division would avoid making

piecemeal printer purchases. The second time that complainant came to me about a printer

I asked him to search for one that was on hand because we were still operating under the

guidance to limit unnecessary, non-essential purchases of small office equipment such as

printer and scanners. Complainant has had access to a central printer, no more than 15

steps away from his workstation since 2004. He was not the only employee that was asked

to look around for an old printer.  Around mid-2006 he was provided a desktop printer.

I SWEAR AND AFFIRM, UNDER PENALTY OF PERJURY UNDER THE LAWS OF
THE UNITED STATES OF AMERICA, THAT THE FOREGOING IS TRUE TO THE
BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Executed on _April 9, 2007_

_Barbara Sisco_
Barbara Sisco

3

Metropolitan Service Center (WPD)
10/19/05

**KEY**
Building Manager GS-12 = New position desired by division
Administrative Aide = Contractor position
■ = Approved Critical Hire

**Deputy Director**
GS-1101-15
29936
Sharon Banks

---

**Financial Mgmt**
Supr. Program Anal.
GS-343-14
29578
Barbara Howard-Sisco

**Business Support**
Supr. Program Anal.
GS-343-14
29578
Gilbert Ford

---

**RWA Team**

Reimb. Team Ldr.
GS-1101-13
28988
Rhonna Kinslow √

Prog Anal
GS-343-12
29873
Doris Teele △
Arlene Windle Dillard △

Prog Anal
GS-343-11
29702
Kimberleigh Lufer √

Prog Analyst
GS-343-11
xxxx
Tracey Jacobs △

Budget Anal
GS-560-11
WW0M143
Dinesha Quarles

---

Prog Anal.
GS-343-13
30075
Karen Willis √

Budget Anal.
GS-560-13
30113
Robert Huber √
Iola Smalls √

Prog Anal
GS-343-12
29873
Donna Wells √

Admin Officer
GS-341-11
28944
Sharon McAdams

Admin Aide
GS-303-7
29260
vacant
Crystal Jackson
Kelly D'Angelo

**Admin Support**
Eric Blanco, Lan Admin
Yuwa Igodan, Receptionist
Tomika Carter, Clerk
Shirley Graham, Techn Asst
Thelma Davis, Business Specl
Ngozi Ofili, Admin Aide

---

**BA-61 Pegasys Team**

Ld Budget Anly
GS-560-13
30120
Roland Caton √

Budget Anal
GS-560-12
30112
Bobbie Daugett Smith √
Anthony Marable √

Budget Anal
GS-560-11
WW0M143
vacant √

Budget Anal
GS-560-9
xxxxxx
Metwab Mekonnen √
vacant ■

Program Analyst
GS-0343-11
29702
Patrick Donovan √

Admin Aide
GS-303-7
29260
vacant

Admin Officer
GS-303-9
29260
Ventrice Westmass

---

**BA-53 Team B**

Ldr. Budget Anal.
GS-560-13
30120
Carol Vance √

Budget Anal
GS-560-12
30112
Cynthia Cary √
Vacant √

Budget Anal
GS-560-9
xxxxxx
Vacant (2) √

---

**BA-53 Team A**

Ldr. Budget Anal.
GS-560-13
30120
Jacqueline Smith √

Budget Anal
GS-560-12
30112
Jamie Evans Johnson √
vacant √

Budget Anal
GS-560-11
WW0M143
Abdul Conteh √
Vicky Taylor, Budget Anal

---

Budget Anal.
GS-560-13
30113
Queen Nevils √

Prog Anal
GS-343-12
29873
Jennifer Jenkins √
Evelyn Smith √

Admin Aide
GS-303-6
29071
Gail Murray

2 of 8

is detailed to unclassified set of duties NET 120 days

EXHIBIT
J

# Job Performance Appraisal Evaluation for Abdulai Conteh

*Performed by: Cynthia Cary, "Acting" BA 53 Team Leader*
*Date: May 3, 2005*

During my current tenure as the "Acting" BA 53 Team Leader from December 27, 2004 to present, my overall performance evaluation for Mr. Abdulai Conteh exceeds the standards. Mr. Conteh is definitely a team player and participates with others to accomplish the task at hand. Not only do I find him pleasing to work with, I observed that he also demonstrates the same positive relationship with other colleagues and always helps out to achieve overall functions of the BA 53 program.

Mr. Conteh has assisted in completing Real Estate Taxes (RETs) and CPIs with little guidance. Whenever guidance is needed, he listens effectively and accepts constructive criticism positively. His commitment to self-improvement has grown and he can be counted on for consistent quality performance.

In my opinion, Mr. Conteh exceeds the standards and is definitely an asset to the BA 53 Team.

**Deliverable Products:**

- CPIs
- RETs

**Problems encountered:** N/A

**Weak points:**     Proof-reading material for grammatical errors

**Strong points:**     Great team player, Willingness to assist others

**Overall Performance:**     Exceeds the Standards





EXHIBIT

K



**Jacqueline D. Smith/WPD/RW/GSA/GOV**

04/27/2005 01:25 PM

To   Barbara A. Sisco/WPD/RW/GSA/GOV@GSA

cc

bcc

Subject   Analysts performance

Barbara,

Attached is the analysts performance. I have not done mine yet, and dont think I will get to it today. Make me last.

Let me know if you have any questions.

thanks



Analystperformance.doc

Jacqueline D. Smith
Lead Budget Analyst, Metropolitan Service Center
Phone No: (202) 219-3233/Fax No: (202) 219-2378
Efax No:    (202) 692-3344
Never let a bleak past overshadow a bright future.

EXHIBIT

April 27, 2005

To:        Barbara Sisco

From:      Jacqueline Smith

Subject:   Analysts Performance

**Abdulai**

I don't have a lot of dealings with Abdulai.  He is still struggling with our CPI process. I asked him to process approx. 6 CPIs, only 1 was correct.   Currently, I believe he's assisting with the Charles E Smith taxes.

## Performance Plan and Appraisal Record for Non-supervisory Associates

### Part I  Administrative Data

| a. Associate Name (Last, First, MI) Conteh, Abdulai. | b. SSN -6044 | c. Pay Plan, Series & Grade GS-560-11 | d. Office Symbol WPD |
|---|---|---|---|
| e. Organization PBS, NCR, Metropolitan Service Center | | f. Rating Period Covered (MM/DD/YYYY – MM/DD/YYYY) 10/01/2004 - 09/30/2005 | |

### Part II Position Description Review Certification

I certify that I have reviewed the associate's position description. If I do not believe it is an accurate statement of the major duties and responsibilities of the position, I have initiated appropriate action.

Position Description has been reviewed        ☒           Initial and Date:  5/19/05

### Part III  Performance Plan and Appraisal Instructions

**INSTRUCTIONS:**

A performance plan must be issued to the associate at the beginning of each rating period. These plans may be modified during the performance cycle, but associates must perform under a documented performance plan for a minimum of 120 days before they can be rated.

Development of the performance plan should be a collaborative endeavor between the supervisor and the associate. The performance plan for each associate must contain critical elements, and may contain non-critical elements. Critical elements are work assignments or responsibilities or such importance that unsatisfactory performance on the element would result in a determination that an associate's overall performance is unsatisfactory. Objectives, activities, and tasks should be identified under each critical element.

Performance will be measured against 5 levels, as follows:

Level 5 – Meets and consistently exceeds performance expectations as defined in Level 3

Level 4 – Meets and often exceeds performance expectations as defined in Level 3

Level 3 – Meets performance expectations. Objectives, activities, and specific tasks associated with each critical element are carried out with expected levels of quantity, quality, timeliness and cost-effectiveness in accordance with performance plan. Responsibilities are carried out in accordance with all official guidance, policies, and applicable laws, rules and regulations.

Level 2 – Partially meets performance expectations as defined in Level 3

Level 1 – Does not meet performance expectations as defined in Level 3

Expectations for performance under each critical element should be set at the Level 3. Once the performance plan is finalized and a copy provided to the associate, both the supervisor and associate must certify issuance and receipt under Part VII. Mid-year performance reviews are required under GSA's APPAS. Both the supervisor and associate must certify the mid-year performance review under Part VII.

Within 45 days of the end of the rating cycle, evaluate the performance plan objectives, underlying activities and tasks, and assign a rating to each critical element based on how well the associate met the performance expectations. Document the rating for each critical element and the derived summary rating on this form (see Part VIII for instructions on deriving summary ratings). Overall comments on performance and identification of training and/or developmental needs should be documented in Parts V and VI, respectively. If the summary rating is at the Level 5 or the Level 1, the associate's appraisal must be reviewed and approved by the second level supervisor.

The supervisor and associate must certify under Part VIII that an annual performance appraisal was conducted, and a summary rating was issued to the associate. Once both parties sign it, a copy of this form, including the performance plan, must be provided to the associate. The original must be submitted to the servicing Human Resources Office for filing in the associate's Official Personnel Folder.



000406

EXHIBIT

| Part IV  Performance Plan and Critical Element Appraisal | |
|---|---|
| **CRITICAL ELEMENTS** | **Critical Element Rating** |
| **Critical Element 20%:**<br>Developing and Monitoring Operating Budget | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☒<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element 30%:**<br>Customer Service | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☒<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element 45%:**<br>Budgetary/Financial Analysis | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☒<br>Level 1 ☐ |
| **Critical Element 5%:**<br>**Internal Process Improvement** | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☒<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element _____%:** | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element _____%:** | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element _____%:** | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☐<br>Level 1 ☐ |

000407

| Part V Comments |
| --- |

**Comments on Overall Performance (attach additional pages as necessary).**

Mr. Abdulai Conteh has primarily focused on assisting with Data Accuracy in addition to processing CPI's and taxes for the BA53 program in FY 2005. Mr. Conteh completed his assignments with a degree of accuracy while meeting most established timeframes. Mr. Conteh still requires substantial assistance from senior analysts and the Team Leaders to resolve BA53 financial issues. Mr. Conteh successfully completed the monthly lease reconciliation for several months in FY2005 with assistance from Team Leaders and Senior Analysts. Abdulai is a team player and always offers his assistance. Several assignments that I assigned to Mr. Conteh required several revisions. Mr. Conteh was not able to assist with the development of the BA53 database as I had hoped. Mr. Conteh took over the DC caseload in June, but was not able to conduct an analysis/audit of the assigned caseload by yearend.

| Part VI Development and Training |
| --- |

**Indicate professional growth needs and avenues to meet those needs (attach additional pages as necessary.)**

Budget formulation, financial analysis and/or auditing

000409

**Part VII  Certification of Performance Plan and Mid-Year Review**

**Performance Plan Developed:**
Signatures below certify that the supervisor and associate have discussed performance expectations, and the associate has been given a copy of their performance plan.

_Barbara Luce_     _10/22/04_
Supervisor/Rating Official     Date

_Benton_     _10/22/04_
Associate     Date
*I understand my signature does not constitute agreement or disagreement with the plan, but merely verifies I have received the information.*

**Mid-Year Progress Review:**
Signatures below certify that the supervisor and associate have discussed performance against the expectations and changes have been made to the performance plan as necessary.

_Barbara Luco_     _5/19/05_
Supervisor/Rating Official     Date

_Benton_     _5/19/2005_
Associate     Date

**Part VIII  Summary Rating**

*Guidance for deriving summary rating:*
After assessing each critical element and assigning the appropriate rating level, the summary rating should be derived using the following methodology:

Level 5 is assigned if 70% of the total critical element weights are at Level 5, and no critical element is rated below Level 3.

Level 4 is assigned if 60% of the total critical element weights are rated at Level 4 or above, but does not meet the 70% rule for assigning a Level 5 summary rating; and no critical element is rated below Level 3.

Level 3 is assigned if 50% of the total critical element weights are rated at Level 3 or above, but does not meet the 60% rule for assigning a Level 4 summary rating; and none are rated below Level 3.

Level 2 is assigned if one critical element is rated at Level 2.

Level 1 is assigned if one critical element is rated at Level 1.

**Summary Rating:**     Interim ☐     Annual ☐

     Level 5 ☒  Level 4 ☐  Level 3 ☐  Level 2 ☒  Level 1 ☐

_Barbara Luce_     _12/1/05_
Supervisor/Rating Official     Date

Reviewing Official     Date
*For summary ratings at Level 5 or Level 1*

_Benton_     _12/1/05_
Associate     Date
*I understand my signature does not constitute agreement or disagreement with the rating, but verifies I have received the rating.*



**Abdulai**
**Conteh/WPD/RW/GSA/GOV**

07/08/2005 08:58 AM

To  Barbara A. Sisco/WPD/RW/GSA/GOV@GSA

cc

bcc

Subject  Re: Promotion[]

Barbara:

Sorry for the miscommunication, I thought you said to wait for Jamie's returned, I stand corrected. I was flabbergasted when I thought her name was mention.
Tuesday is fine,  thanks for the gratitude and hope to meet with you.

Abdulai Conteh
Budget Analyst
Metropolitan Service center
Fax(202) 219-3338
Efax(202) 692-3305
Barbara A. Sisco/WPD/RW/GSA/GOV



**Barbara A.**
**Sisco/WPD/RW/GSA/GOV**

07/08/2005 08:40 AM

To  Abdulai Conteh/WPD/RW/GSA/GOV@GSA

cc

Subject  Re: Promotion[]

Good Morning Abdulai,

As discussed I will set up a meeting next week (looks like Tuesday afternoon would be good for me) to discuss my evalution of whether you are ready to be promoted to the next level.  I continue to receive feedback from all of my team leaders (Carol and Jackie) regarding all of their subordinate associates so I am not sure where Jamie fits in since she is not a team leader.  An invitation for our uncoming meeting will be forthcoming.

Barbara Sisco
Metropolitan Service Center (WPD)
Financial Management Branch Manager
202 219 1779 - Desk 202 219 2317

Abdulai Conteh/WPD/RW/GSA/GOV



**Abdulai**
**Conteh/WPD/RW/GSA/GOV**

07/07/2005 04:27 PM

To  Barbara A. Sisco/WPD/RW/GSA/GOV@GSA

cc

Subject  Promotion

Barbara:



EXHIBIT

tabbies'

N

This is a reminder based on our conversation this morning. As I reminded you based on our conversation in May that You might process my promotion base on my performance as you are going to be giving me assignments .

As of this date every assignment you and Jackie gave me has done and I received good comments from Jackie and no comment from you. This morning per our conversation , you said for me to wait until Monday because Jamie is out sick .

Please make our meeting possible Monday, I'll like to know the decision on my promotion.

Abdulai Conteh
Budget Analyst
Metropolitan Service center
Phone (202) 219-3338
Efax   (202) 692-3305

## Performance Plan and Appraisal Record for Non-supervisory Associates

### Part I  Administrative Data

| a. Associate Name (Last, First, MI) Conteh, Abdulai. | b. SSN -6044 | c. Pay Plan, Series & Grade GS-560-11 | d. Office Symbol WPD |
|---|---|---|---|
| e. Organization PBS, NCR, Metropolitan Service Center | | f. Rating Period Covered (MM/DD/YYYY – MM/DD/YYYY) 10/01/2004 - 09/30/2005 | |

### Part II  Position Description Review Certification

I certify that I have reviewed the associate's position description. If I do not believe it is an accurate statement of the major duties and responsibilities of the position, I have initiated appropriate action.

Position Description has been reviewed    ☒      Initial and Date: __5/19/05__

### Part III  Performance Plan and Appraisal Instructions

**INSTRUCTIONS:**

A performance plan must be issued to the associate at the beginning of each rating period. These plans may be modified during the performance cycle, but associates must perform under a documented performance plan for a minimum of 120 days before they can be rated.

Development of the performance plan should be a collaborative endeavor between the supervisor and the associate. The performance plan for each associate must contain critical elements, and may contain non-critical elements. Critical elements are work assignments or responsibilities or such importance that unsatisfactory performance on the element would result in a determination that an associate's overall performance is unsatisfactory. Objectives, activities, and tasks should be identified under each critical element.

Performance will be measured against 5 levels, as follows:
Level 5 – Meets and consistently exceeds performance expectations as defined in Level 3
Level 4 – Meets and often exceeds performance expectations as defined in Level 3
Level 3 – Meets performance expectations. Objectives, activities, and specific tasks associated with each critical element are carried out with expected levels of quantity, quality, timeliness and cost-effectiveness in accordance with performance plan. Responsibilities are carried out in accordance with all official guidance, policies, and applicable laws, rules and regulations.
Level 2 – Partially meets performance expectations as defined in Level 3
Level 1 – Does not meet performance expectations as defined in Level 3

Expectations for performance under each critical element should be set at the Level 3. Once the performance plan is finalized and a copy provided to the associate, both the supervisor and associate must certify issuance and receipt under Part VII. Mid-year performance reviews are required under GSA's APPAS. Both the supervisor and associate must certify the mid-year performance review under Part VII.

Within 45 days of the end of the rating cycle, evaluate the performance plan objectives, underlying activities and tasks, and assign a rating to each critical element based on how well the associate met the performance expectations. Document the rating for each critical element and the derived summary rating on this form (see Part VIII for instructions on deriving summary ratings). Overall comments on performance and identification of training and/or developmental needs should be documented in Parts V and VI, respectively. If the summary rating is at the Level 5 or the Level 1, the associate's appraisal must be reviewed and approved by the second level supervisor.

The supervisor and associate must certify under Part VIII that an annual performance appraisal was conducted, and a summary rating was issued to the associate. Once both parties sign it, a copy of this form, including the performance plan, must be provided to the associate. The original must be submitted to the servicing Human Resources Office for filing in the associate's Official Personnel Folder.

000406



EXHIBIT

| Part IV  Performance Plan and Critical Element Appraisal | |
|---|---|
| **CRITICAL ELEMENTS** | **Critical Element Rating** |
| **Critical Element 20%:**<br>Developing and Monitoring Operating Budget | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☒<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element 30%:**<br>Customer Service | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☒<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element 45%:**<br>Budgetary/Financial Analysis | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☒<br>Level 1 ☐ |
| **Critical Element 5%:**<br>**Internal Process Improvement** | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☒<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element _____%:** | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element _____%:** | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element _____%:** | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☐<br>Level 1 ☐ |

## Part VII  Certification of Performance Plan and Mid-Year Review

**Performance Plan Developed:**

Signatures below certify that the supervisor and associate have discussed performance expectations, and the associate has been given a copy of their performance plan.

| | |
|---|---|
| *Barbara Nixie* | 10/22/04 |
| Supervisor/Rating Official | Date |
| *[signature]* | 10/22/04 |
| Associate | Date |

*I understand my signature does not constitute agreement or disagreement with the plan, but merely verifies I have received the information.*

**Mid-Year Progress Review:**

Signatures below certify that the supervisor and associate have discussed performance against the expectations and changes have been made to the performance plan as necessary.

| | |
|---|---|
| *Barbara Nixco* | 5/19/05 |
| Supervisor/Rating Official | Date |
| *[signature]* | 5/19/2005 |
| Associate | Date |

## Part VIII  Summary Rating

*Guidance for deriving summary rating:*

After assessing each critical element and assigning the appropriate rating level, the summary rating should be derived using the following methodology:

Level 5 is assigned if 70% of the total critical element weights are at Level 5, and no critical element is rated below Level 3.

Level 4 is assigned if 60% of the total critical element weights are rated at Level 4 or above, but does not meet the 70% rule for assigning a Level 5 summary rating; and no critical element is rated below Level 3.

Level 3 is assigned if 50% of the total critical element weights are rated at Level 3 or above, but does not meet the 60% rule for assigning a Level 4 summary rating; and none are rated below Level 3.

Level 2 is assigned if one critical element is rated at Level 2.

Level 1 is assigned if one critical element is rated at Level 1.

**Summary Rating:**      Interim ☐      Annual ☐

Level 5 ☑   Level 4 ☐   Level 3 ☐   Level 2 ☒   Level 1 ☐

| | |
|---|---|
| *[signature]* | 12/1/05 |
| Supervisor/Rating Official | Date |

| | |
|---|---|
| | |
| Reviewing Official | Date |

*For summary ratings at Level 5 or Level 1*

| | |
|---|---|
| *[signature]* | 12/1/05 |
| Associate | Date |

*I understand my signature does not constitute agreement or disagreement with the rating, but verifies I have received the rating.*

000408

| Part V Comments |
|---|

***Comments on Overall Performance (attach additional pages as necessary).***

Mr. Abdulai Conteh has primarily focused on assisting with Data Accuracy in addition to processing CPI's and taxes for the BA53 program in FY 2005. Mr. Conteh completed his assignments with a degree of accuracy while meeting most established timeframes. Mr. Conteh still requires substantial assistance from senior analysts and the Team Leaders to resolve BA53 financial issues. Mr. Conteh successfully completed the monthly lease reconciliation for several months in FY2005 with assistance from Team Leaders and Senior Analysts. Abdulai is a team player and always offers his assistance. Several assignments that I assigned to Mr. Conteh required several revisions. Mr. Conteh was not able to assist with the development of the BA53 database as I had hoped. Mr. Conteh took over the DC caseload in June, but was not able to conduct an analysis/audit of the assigned caseload by yearend.

| Part VI Development and Training |
|---|

***Indicate professional growth needs and avenues to meet those needs (attach additional pages as necessary.)***

Budget formulation, financial analysis and/or auditing



Jacqueline D.
Smith/WPD/RW/GSA/GOV

05/26/2005 08:15 AM

To   Abdulai Conteh/WPD/RW/GSA/GOV@GSA, Cynthia S.
     Cary/WPD/RW/GSA/GOV@GSA, Vicky L.
     Taylor/CONTRACTOR/WPD/RW/GSA/GOV@GSA, Jamie E.
cc   Barbara A. Sisco/WPD/RW/GSA/GOV@GSA, Carol A.
     Vance/WPD/RW/GSA/GOV@GSA

bcc

Subject   Fw: DC caseload [correction]

After a brief discussion with Barbara this morning, effective June 1st, Abdulai will assume full responsibility of the DC caseload.

Effective July 1st, in addition to the delegated leases, Jamie will assume full responsibility of the MD caseload.

If you have any questions, please let me know.

thanks


Jacqueline D. Smith
Lead Budget Analyst, Metropolitan Service Center
Phone No: (202) 219-3233/Fax No: (202) 219-2378
Efax No:    (202) 692-3344
Never let a bleak past overshadow a bright future.
----- Forwarded by Jacqueline D. Smith/WPD/RW/GSA/GOV on 05/26/2005 07:08 AM -----



Jacqueline D.
Smith/WPD/RW/GSA/GOV

05/20/2005 01:15 PM

To   jamie johnson

cc   Barbara A. Sisco/WPD/RW/GSA/GOV@GSA, Cynthia S.
     Cary/WPD/RW/GSA/GOV@GSA, Vicky L.
     Taylor/CONTRACTOR/WPD/RW/GSA/GOV@GSA, Abdulai
     Conteh/WPD/RW/GSA/GOV@GSA, Carol A.
     Vance/WPD/RW/GSA/GOV@GSA

Subject   DC caseload


In addition to the delegated leases, effective May 23, 2005, you will assume full responsibility of the DC caseload.

Let me know if you have any questions.

thanks


Jacqueline D. Smith
Lead Budget Analyst, Metropolitan Service Center
Phone No: (202) 219-3233/Fax No: (202) 219-2378
Efax No:    (202) 692-3344
Never let a bleak past overshadow a bright future.



## METROPOLITAN LEASES

| Lease Number | Loc Code | Loc Name | Loc Address | Eff date | Exp date | Current Rent | Rentable Sqft | Status |
|---|---|---|---|---|---|---|---|---|
| LDC00199 | DC0436 | POSTAL PLZ SHOP CTR | 1905-B 9TH ST NE | 1-Sep-00 | 31-Aug-10 | $260,341.06 | 7,700 | AC |
| LDC01275 | DC0571 | 122 C STREET, NW | 122 C STREET, NW | 5-Apr-01 | 4-Apr-11 | $727,540.20 | 22,552 | AC |
| LDC00366 | DC0366 | 800 K ST. NW. | 800 K ST., N.W. | 2-Aug-01 | 1-Aug-06 | $1,437,064.87 | 39,282 | AC |
| LDC01481 | DC1105 | TECHWORLD PLAZA I | 1222 22ND ST NW | 1-Jan-02 | 31-Dec-05 | $684,000.00 | 49,560 | AC |
| LDC01490 | DC0398 | 1 MASS AVE NW | 1 MASS AVE NW | 19-Sep-02 | 18-Sep-12 | $1,549,224.10 | 45,614 | AC |
| LDC01509 | DC1178 | NATIONAL PRESS | 529 14TH ST., NW | 1-May-02 | 30-Apr-12 | $81,001.03 | 2,731 | AC |
| LDC01512 | DC1178 | NATIONAL PRESS | 529 14TH ST., NW | 26-Nov-02 | 25-Nov-12 | $351,953.55 | 16,581 | AC |
| LDC01513 | DC0813 | 1201 L STREET, NW | 1201 L STREET, NW | 12-Nov-02 | 11-Nov-07 | $399,864.93 | 12,191 | AC |
| LDC01536 | DC0343 | 370 L'ENFANT PROMENADE | 901 D STREET S.W. | 15-Jul-02 | 31-Jan-06 | $461,394.96 | 13,588 | AC |
| LDC01562 | DC0406 | 800 N CAPITOL ST NW | 800 N CAPITOL ST NW | 1-Nov-02 | 31-Oct-12 | $2,312,407.87 | 59,776 | AP |
| LDC01600 | DC0406 | 800 N CAPITOL ST NW | 800 N CAPITOL ST NW | 1-Aug-03 | 31-Jul-13 | $1,190,175.18 | 29,520 | AP |
| LDC01636 | DC1222 | 2100 M ST NW | 2100 M STREET NW | 1-Jul-03 | 30-Jun-13 | $626,248.32 | 16,468 | AC |
| LDC01739 | DC0713 | FORT LINCOLN SENIOR VILLAGE | 3298 FORT LINCOLN DRIVE | 25-Mar-04 | 24-Mar-09 | $15,290.28 | 53 | AC |
| LDC40165 | DC0389 | 1110 VERMONT AVE NW | 1110 VERMONT AVE NW | 1-Jan-95 | 31-Jan-05 | $1,686,662.06 | 64,127 | AC |
| LDC51085 | DC0373 | UNION CTR PLZ 2 | 820 FIRST ST NE | 5-Jun-01 | 4-Jun-06 | $645,976.35 | 23,520 | AC |
| LDC60283 | DC0467 | ANACOSTIA PROF. BUILDING | 2041 MLK JR AVE, SE | 15-Aug-97 | 14-Aug-07 | $171,074.83 | 9,545 | AC |
| LDC70184 | DC0343 | 370 L'ENFANT PROMENADE | 901 D STREET S.W. | 1-Jul-98 | 28-Feb-05 | $6,209,112.45 | 152,105 | AP |
| LDC70201 | DC0421 | WORLD TRADE CENTER | 400 VIRGINIA AVE | 7-Feb-97 | 6-Feb-07 | $867,135.22 | 24,503 | AC |
| LDC70211 | DC0512 | SHEPHERD PARK PLAZA | 7820 EASTERN AVE NW | 10-Mar-98 | 9-Mar-08 | $135,985.90 | 6,654 | AC |
| LDC70304 | DC0331 | 500 E STREET SW | 500 E STREET SW | 11-Aug-97 | 10-Aug-07 | $1,734,478.38 | 52,087 | AP |
| LDC70311 | DC1147 | 1291 TAYLOR ST NW | 1291 TAYLOR ST NW | 1-Feb-01 | 31-Jan-06 | $726,693.55 | 88,629 | AC |
| LDC80656 | DC0011 | POSTAL SQUARE | 2 MASSACHUSETTS AVE, NE | 1-Aug-99 | 31-Jul-09 | $317,100.00 | 12,684 | AC |
| LDC90306 | DC0011 | POSTAL SQUARE | 2 MASSACHUSETTS AVE, NE | 15-May-92 | 14-May-22 | $26,184,578.58 | 990,611 | AC |

*(Handwritten annotations appear in the margins, including "Are there taxes due on these leases?", "BID TAX RET", "Taxes?", a date/time stamp "8/15/2005 10:06 AM", "JJohnson", and various initials and checkmarks.)*

## METROPOLITAN LEASES

| Lease Number | Loc Code | Loc Name | Loc Address | Eff date | Exp date | Current Rent | Rentable Sqft | Status |
|---|---|---|---|---|---|---|---|---|
| LDC00199 | DC0436 | POSTAL PLZ SHOP CTR | 1905-B 9TH ST NE | 1-Sep-00 | 31-Aug-10 | $260,341.06 | 7,700 | AC |
| LDC01275 | DC0571 | 122 C STREET, NW | 122 C STREET, NW | 5-Apr-01 | 4-Apr-11 | $227,540.20 | 22,552 | AC |
| LDC01479 | DC0366 | TECHWORLD PLAZA I | 800 K ST. NW | 2-Aug-01 | 1-Aug-06 | $1,437,064.87 | 39,282 | AC |
| LDC01481 | | 1222 22ND ST NW | 1222 22ND ST NW | 1-Jan-02 | 31-Dec-06 | $694,000.00 | 49,580 | AC |
| LDC01105 | | 1222 22ND ST NW | 1222 22ND ST NW | 19-Sep-01 | 18-Sep-12 | $649,224.10 | 45,614 | AC |
| LDC01490 | | ONE MASS AVE | 1 MASS AVE NW | 1-May-02 | 30-Apr-12 | $45,001.03 | 2,731 | AC |
| LDC00398 | DC1178 | NATIONAL PRESS | 529 14TH ST., NW | 26-Nov-02 | 25-Nov-07 | $351,953.55 | 16,581 | AC |
| LDC01509 | DC1178 | NATIONAL PRESS | 529 14TH ST., NW | 12-Nov-02 | 11-Nov-07 | $399,864.93 | 12,191 | AC |
| LDC01512 | DC0813 | 1220 L STREET, NW | 1220 L STREET, NW | 15-Jul-02 | 31-Jan-06 | $13,588.96 | 13,588 | AC |
| LDC01513 | DC0343 | 370 L'ENFANT PROMENADE | 901 D STREET S.W. | 1-Nov-02 | 31-Oct-12 | $2,312,407.87 | 59,776 | AP |
| LDC01536 | DC0406 | 800 N CAPITOL ST NW | 800 N CAPITOL ST NW | 1-Aug-03 | 31-Jul-13 | $1,190,175.18 | 29,520 | AP |
| LDC01562 | DC0406 | 800 N CAPITOL ST NW | 800 N CAPITOL ST NW | 1-Jul-03 | 30-Jun-13 | $626,246.32 | 16,468 | AC |
| LDC01600 | DC1222 | 2100 M ST NW | 2100 M STREET NW | 25-Mar-04 | 24-Mar-09 | $15,530.28 | 53 | AC |
| LDC01636 | DC0713 | FORT LINCOLN SENIOR VILLAGE | 3298 FORT LINCOLN DRIVE | 1-Jan-05 | 31-Jan-05 | $1,686,662.06 | 64,127 | AC |
| LDC01739 | DC0373 | 1110 VERMONT AVE NW | 1110 VERMONT AVE NW | 5-Jun-00 | 4-Jun-06 | $645,976.35 | 23,520 | AC |
| LDC40165 | | UNION CTR PLZ 2 | 820 FIRST ST NE | 15-Aug-97 | 14-Aug-07 | $171,074.83 | 9,545 | AC |
| LDC51065 | DC0467 | ANACOSTIA PROF BUILDING | 2041 MLK JR AVE, SE | 1-Jul-98 | 28-Feb-05 | $6,209,112.45 | 152,105 | AP |
| LDC60283 | DC0184 | WORLD TRADE CENTER | 400 VIRGINIA AVE | 7-Feb-97 | 6-Feb-07 | $867,735.22 | 24,503 | AC |
| LDC70201 | DC0343 | 370 L'ENFANT PROMENADE | 901 D STREET S.W. | 1-Jul-98 | 9-Mar-08 | $135,985.90 | 6,654 | AC |
| LDC70211 | DC0512 | SHEPHERD PARK PLAZA | 7820 EASTERN AVE NW | 11-Aug-97 | 10-Aug-07 | $1,734,478.38 | 52,087 | AP |
| LDC70304 | DC0331 | 500 E STREET SW | 500 E STREET SW | 1-Feb-01 | 31-Jan-06 | $726,693.55 | 88,629 | AC |
| LDC70311 | DC1147 | 1291 TAYLOR ST NW | 1291 TAYLOR ST NW | 1-Aug-99 | 31-Jul-09 | $317,100.00 | 12,684 | AC |
| LDC80656 | DC0011 | POSTAL SQUARE | 2 MASSACHUSETTS AVE, NE | 15-May-92 | 14-May-22 | $26,184,578.58 | 990,611 | AC |
| LDC90306 | DC0011 | POSTAL SQUARE | 2 MASSACHUSETTS AVE, NE | | | | | |







# National Federation of Federal Employees

Local _____

Ms. Barbara Sisco                                    September 7, 2005
Financial Management Analyst
Franklin Court Building
1099 14th Street
Room 200W
Washington, DC 20005

Dear Ms. Sisco:

This letter is provided to document a grievance against GSA for failure to promote Mr. Abdulai Contei to GS-12 in a timely manner. NFFE asserts that GSA misinterpreted, misapplied, or violated Article 14, Merit Staffing, and Article 15, Performance Appraisal Systems, and related articles of the Master Agreement between GSA and NFFE.

## STATEMENT OF FACTS:

Mr. Abdulai Contei is a dedicated federal employee with over 5 combined years of Federal service. Mr. Contei has an exemplary record and has been performing at the GS-12 level for over a year. He has been a dependable, conscientious worker without any disciplinary problems.

In accordance with the provisions of the Career Ladder series, Mr. Contei should have been promoted to the GS-12 level in April, 2005. On his last "Employee Performance Review And Rating" form, no indication was given that Mr. Contei would not be promoted on time.

Therefore, NFFE sees no basis why Mr. Contei should not have been promoted on time other than an arbitrary decision by management.

## REMEDIES SOUGHT:

NFFE is requesting immediate promotion of Mr. Contei to the GS-12 level.

NFFE further requests back pay compensation retroactive to the anniversary date of April 2005 with all appropriate emoluments, and reasonable attorneys' fees as necessary to resolve this grievance.

Serving
Federal Employees
Since 1917



MEETING:

NFFE requests a meeting to discuss this matter at this step. Please call me on (202) 708-7396 with any questions and to schedule the requested meeting.

Sincerely,

Robert Obrycki
Regional Vice-President
National Capital Region
National Federation of Federal Employees
Council of GSA locals
International Association of Machinists and Aerospace Workers
Federal District 1
(IAMAW-FD1)



GSA National Capital Region

DEC 5 2005

MEMORANDUM FOR: ABDULAI CONTEH

FROM: BARBARA SISCO *Barbara Sisco*

SUBJECT: Performance Improvement Notice (PIN), GS-0560-11, BUDGET ANALYST

As we discussed during your mid-year review, your work performance at this point is minimally successful and has not improved since our discussion. This memorandum provides you with an Action Plan and establishes an opportunity period of 120 days, during which time we will assist you, in order to help you raise your level of performance from an unacceptable level to a successful level.

I will be your direct contact in the branch to assist you in achieving a satisfactory rating. In my absence, you should discuss your concerns with Carol Vance, BA53 Team Leader. Interim evaluation sessions will be conducted by your Team Leader and myself and be documented monthly. In addition, there will be weekly discussions regarding your progress. At the end of the 120-day period, if your performance level is successful, we will continue to assist and encourage you to maintain that level. However, if your level of performance is unacceptable, you will be issued a formal Performance Improvement Plan as appropriate.

You were issued your performance plan on May 19, 2005, and signed the Performance Plan Certification on the same date, which indicated that you acknowledged receipt of the plan. Your performance in the following critical elements is the focus of the PIN.

CRITICAL ELEMENT # 3- (45%) Budgetary/Financial Analysis

This position leads to a journeyman-level position with the General Services Administration, Public Buildings Service, Metropolitan Service Center, Financial Management Branch (WPD).

## STANDARDS FOR EXPECTED PERFORMANCE:

At this level the Budget Analyst is expected to:

Resolve financial issues for the assigned caseload as they arise with minimal supervisory intervention. Generate financial reports, special analysis and special projects as needed.



EXHIBIT

R

tabbies®

U.S. General Services Administration
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

Assist in managing the implementation of new programs, policies and procedures. Routinely compile accurate routine and special reports and monthly tracking reports, as assigned, within established timeframes. This should include the accurate and timely processing of assigned R620's for CPI's and taxes as well as a routine comprehensive review of assigned lease caseload to insure accurate and timely processing of all lease actions in STAR and the OA Billing Tool.

A review of your performance in this critical element reveals the following deficiencies: Under your Budget Analyst (quality) element several assigned projects required numerous revisions and your assigned case files were not documented as requested by year-end to identify outstanding actions and/or discrepancies in STAR that required action on your part to remedy the situation.

In the Budget Analyst (accuracy) element your R620's for CPI's and taxes routinely required corrections and/or were not thoroughly researched (ie. picking up the incorrect base index, not referencing accruals etc.)

As stated above, because your work performance is at a minimally acceptable level, we are providing you with the opportunity to demonstrate performance at a successful level in this critical element. During this period of time, we will take the following steps to assist you in improving your performance:

Your team leader and I will meet with you at least weekly to discuss your progress; cite any performance related problems which have been identified; provide guidance and assistance to you in an attempt to resolve these problems if any; and answer any questions you may have concerning the performance of your work.

However, if your overall performance remains at a minimal level during this opportunity period, it may become necessary for me to take further remedial action, which may include issuing a performance improvement plan.

While I have outlined the above positive steps we will be taking to assist you in this endeavor, I am also interested in exploring other forms of assistance that may be appropriate. I am concerned for your professional welfare and believe you should seek assistance as necessary.

You will be given 120 days from the date of this letter to bring your performance up to a successful level in the described critical element. It is my hope that with the assistance we will provide you, as well as your concentrated efforts and improved level of cooperation, your performance will improve to an acceptable level so that no further remedial action will be required.

000203



GSA National Capital Region

MEMORANDUM FOR RECORD

SUBJECT: Formal Complaint – Final Report of Investigation Summary
GSA Case No: 06-NCR-WP-AC-10

I acknowledge receipt of the Notice of final Action and the report of investigation in the above reference case.

_Robert O'Brycki_
Robert O'Brycki

10/30/06
Date

**U.S. General Services Administration**
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov



| | Barbara A. | To | Abdulai Conteh/WPD/RW/GSA/GOV@GSA |
|---|---|---|---|
| | Sisco/WPD/RW/GSA/GOV | cc | Carol A. Vance/WPD/RW/GSA/GOV@GSA |
| | 03/31/2006 08:53 PM | bcc | |
| | | Subject | Re: Urgent for FY08 Rent est FY08 Rent est |

Abdulai,
Once again, you have not followed instructions nor completed the assignment within the established timeframe. I read the instructions to you when you came to my office this afternoon to make sure that you understood what you needed to do and you stated that you understood what needed to be accomplished. The attached spreadsheet has not been updated. Did you forget to send the updated spreadsheet in this e-mail?

**Barbara Sisco**
**Metropolitan Service Center (WPD)**
**Financial Management Branch Manager**
**202 219 1779 - Desk 202 219 2317**

Abdulai Conteh/WPD/RW/GSA/GOV



| | Abdulai | To | Barbara A. Sisco/WPD/RW/GSA/GOV@GSA |
|---|---|---|---|
| | Conteh/WPD/RW/GSA/GOV | cc | Carol A. Vance/WPD/RW/GSA/GOV@GSA |
| | 03/31/2006 04:57 PM | Subject | Re: Urgent for FY08 Rent est FY08 Rent est |

Based on my reviewed of the spread sheet from suzette, we in the BA 53 team have finished our administrative extension for our
holdover which would correct the CBR's for the draft run on April 4th.
The other CBR's need action from the RGA's to send to BRB to make the correction. Some of these lease expired in 2005
and the RGA are not here for their input.

**Abdulai Conteh**
**Budget Analyst**
Metropolitan Service center
(202) 219-3338
(202) 692-3305
Suzette C. Xenos/CONTRACTOR/WPN/RW/GSA/GOV



| | Suzette C. | To | Abdulai Conteh/WPD/RW/GSA/GOV@GSA, Alice K. |
|---|---|---|---|
| | Xenos/CONTRACTOR/WPN/ | | Chiu/WPL/RW/GSA/GOV@GSA, Barbara A. |
| | RW/GSA/GOV | | Sisco/WPD/RW/GSA/GOV@GSA, Carol A. |
| | 03/30/2006 04:12 PM | | Vance/WPD/RW/GSA/GOV@GSA, Christine M. |
| | | | Ewing/WPF/RW/GSA/GOV@GSA, Daniel E. |
| | | | Bird/WPT/RW/GSA/GOV@GSA, Detra M. |
| | | | Washington/WPN/RW/GSA/GOV@GSA, Maria E. |
| | | | Garrison/WPG/RW/GSA/GOV@GSA, Mary E. |
| | | | Waters/WPZ/RW/GSA/GOV@GSA, Nancy J. |
| | | | Perrault/WPZ/RW/GSA/GOV@GSA, Roger J. |
| | | | Perrault/WPZ/RW/GSA/GOV@GSA, Rosemary H |



**EXHIBIT**
5



Abbasi/WPF/RW/GSA/GOV@GSA, Sharon D.
Rains/WPZ/RW/GSA/GOV@GSA, Susan M.
Leyson/WPN/RW/GSA/GOV@GSA, Tyrea T.
Hairston/CONTRACTOR/WPN/RW/GSA/GOV@GSA, Vickie
D. Pickeral/WPN/RW/GSA/GOV@GSA, Vinson
Goffin/CONTRACTOR/WPJ/RW/GSA/GOV@GSA, Detra M.
Washington/WPN/RW/GSA/GOV@GSA, Susan M.
Leyson/WPN/RW/GSA/GOV@GSA, Mirta
Gonzalez/WPN/RW/GSA/GOV@GSA

cc

Subject  Urgent for FY08 Rent est FY08 Rent est

Team,

Central Office has decided to have an extra draft run on April 4th because of some concerns in the
exception reports (including the one below). Please add a column for comments for each of the 3 reports
on the spreadsheet attached (there are 3 tabs). Your comments should state if the information is correct
and if incorrect what corrective action will be taken. If you need to update projects don't forget to
coordinate with BA53 (Detra's group) for Galaxy entry. These if incorrect will have a serious impact on our
revenue estimates and customers estimates.

Tyrea will be consolidating NCR's response and may also be contacting you. We need a response back
by Friday COB. It is only a few items per Service Center.

I have also attached again the report with expiring CBRs that I sent last week. The ones highlighted in red
expired in March or will expire in April before the 15th. The yellow ones expired Jan-Feb. Please make
sure that if the tenants are staying there is a holdover/administrative extension for leased CBRs or that the
RGA sends an email for extending owned CBRs to either Aaron Gill (Metro & DC Services) or Nicole
Heatley (Potomac & Triangle).

20060321_expiringOAev2.xls

Regards,
Suzette Xenos
Special Projects
GSA Public Buildings Service
National Capital Region - Business Resources Branch
Tel: 202-708-6088
Fax: 202-260-0613
E-fax: 202-692-3415
Suzette C. Xenos/CONTRACTOR/WPN/RW/GSA/GOV



Suzette C.
Xenos/CONTRACTOR/WPN/
RW/GSA/GOV

03/29/2006 10:45 AM

To  Abdulai Conteh/WPD/RW/GSA/GOV@GSA, Alice K.
Chiu/WPL/RW/GSA/GOV@GSA, Carol A.
Vance/WPD/RW/GSA/GOV@GSA, Christine M.
Ewing/WPF/RW/GSA/GOV@GSA, Daniel E.
Bird/WPT/RW/GSA/GOV@GSA, Detra M.
Washington/WPN/RW/GSA/GOV@GSA, Maria E.
Garrison/WPG/RW/GSA/GOV@GSA, Mary E.
Waters/WPZ/RW/GSA/GOV@GSA, Nancy J.
Podorski/WPZ/RW/GSA/GOV@GSA, Rosemary H.



Abbasi/WPF/RW/GSA/GOV@GSA, Sharon D.
Rains/WPZ/RW/GSA/GOV@GSA, Susan M.
Leyson/WPN/RW/GSA/GOV@GSA, Vinson
Goffin/CONTRACTOR/WPJ/RW/GSA/GOV@GSA, Roger J.
Perrault/WPZ/RW/GSA/GOV, Barbara A.
Sisco/WPD/RW/GSA/GOV
cc   Tyrea T.
Hairston/CONTRACTOR/WPN/RW/GSA/GOV@GSA, Vickie
D. Pickeral/WPN/RW/GSA/GOV@GSA
Subject   Unusual Lease rates in FY08 Rent est []

Team,

Attached is a report from Central Office that identifies unusual lease rates in the FY08 rent Est.  Please take a look at the 3 tabs:
- New Lease Rate Exceeding 100+%
- New Lease Rates of $50 or more
- New Lease Rates Decreasing

For instance there is a lease that went from a $22 rate to $44.  This would represent a $2-3 million difference for that space.  I encourage you to review as soon as possible because it is only a few per Service Center but the impact could be great.  Please provide a status and or resolution by April 4th.

We will discuss further today in our meeting at 2pm.  Thank you for your help!

Unusual Lease Rates Used In Rent Estimate 3_21.xls

Suzette Xenos
Special Projects
GSA Public Buildings Service
National Capital Region - Business Resources Branch
Tel: 202-708-6088
Fax: 202-260-0613
E-fax: 202-692-3415



**GSA**

Barbara A.
Sisco/WPD/RW/GSA/GOV
04/04/2006 07:59 AM

To  abdulai.conteh@gsa.gov

cc  carol.vance@gsa.gov, sharon.banks@gsa.gov

bcc

Subject  FY08 Rent Est Project

Abdulai,

As of today, please stop all work related to the FY08 Rent Est. We did not make the target, nor were the required reports submitted to the BRB for Central Office as requested from you. Too many of the CBR's that you submitted for approval were not thoroughly researched. Please continue to review your DC caseload and process all necessary actions associated with this caseload or any other assignments given by your team leader.

Barbara Sisco
Metropolitan Service Center (WPD)
Financial Management Branch Manager
202 219 1779 - Desk 202 219 2317



EXHIBIT

tabbies

**AFFIDAVIT**
**IN THE MATTER OF:  ABDULAI CONTEH V. GSA**
**GSA CASE NO.:  06-NCR-WP-AC-10**

**Location:  Washington, D.C.**

I, Barbara Howard-Sisco, solemnly swear to the truth of the following statement which is in response to questions posed by Robert Walker, Equal Employment Opportunity (EEO) Investigation, F & W Associates, and provides information pertaining to the formal complaint of discrimination, filed by Mr. Abdulai Conteh, against the U. S. General Services Administration on June 29, 2004, Case No 06-NCR-WP-AC-10.  The following claim has been accepted for investigation:

> Whether he was discriminated against because of his race (African-American), color (Black), National Origin (African), sex (male), religion (Muslim) when he was harassed starting December 5, 2006 (sic), regarding his work performance and assignments.

> Also, he amended his harassment claim to include reprisal for filing an EEO complaint as a basis, when he was denied sick leave on February 29 (sic), 2006, and denied his AWS (Alternative Work Schedule) day on March 31, 2006.

My name is Barbara Howard-Sisco.  I am African-American; my skin color is light brown, I am female; my national origin is American; and my religion is African Methodist.  I was notified of the complaint several days after his filing in February 2006.

I am a Branch Chief for the Financial Management Branch, Metropolitan Service Center.  I am a Supervisory Program Analyst, GS - 14. I have been in this position since June 2003.  I work for the General Services Administration, Metropolitan Service Center, located at 1099 14th Street, N.W., Washington, DC 20009.

My first-level supervisor is Sharon Banks, Deputy Director for Assets.  My second-level supervisor is John P. Allen, Director for Metropolitan Service Center.

Initials _____



I am Mr. Conteh's first-line supervisor. I approve his leave and evaluate him. I have team leaders who manage work flow and provide input into their team members' evaluations, but I am responsible for completing the evaluation for all of the associates.

## HARASSMENT IN WORK PERFORMANCE AND ASSIGNMENTS

I disagree with Mr. Conteh's allegation that I harassed him by giving him less time and resources to complete the Rent Estimate project than I gave other staff that had been previously assigned the project. The project started mid-January 2006 and was due to end the last day of March 2006. Mr. Conteh was given the assignment in January 2006; so he had about two and one-half months to complete the project.

Each year, one person was assigned the Rent Estimate project. Last year, 2005, Vickie Taylor, a contractor, had the project, before that in 2004, Cynthia Cary. Both Ms. Taylor and Ms. Cary are black females. I don't know their religion. Ms. Taylor is light-skinned in color and Ms. Cary is dark-skinned. The person assigned the project is responsible for all of the research needed to update rent estimates for our customers. That individual must also attend regional meetings and meetings with Realty Specialists to obtain whatever information is needed to complete the estimates. The extent of the assistance that was given to those individuals previously assigned the project for the last two years was help with the inputting of data into the Rent Estimating Tool. Cynthia helped Vickie with inputting data in 2005 and vice versa in 2004. I explained to Mr. Conteh that, as in the previous two years, the project is given to one individual, but there would be someone to help with the inputting. The individual assigned to assist Mr. Conteh with inputting data was Marcella Dimayuga. She had just started in October

000193

Initials _____

2005. She was to help him with inputting once he completed his research and compiled the information. In addition, Carol Vance, Team Leader, was there to provide assistance.

I never told Mr. Conteh that Ms. Dimayuga could not assist him. She did attend one regional meeting with him which all of the service center point of contacts where expected to attend. These meetings were held to discuss the process and progress towards achieving the established targets. Ms. Dimayuga told me that her time could be better spent doing something else because the meeting focused on issues for the regional points of contact. Since she was assisting with inputting I did not require her to attend any further meetings. She was to take instruction from Mr. Conteh and assist with the inputting as the others previously assisting with this project had done. The individual assigned to the project, Mr. Conteh, was responsible for conducting the necessary research, following up with the realty specialists, compiling the data and finalizing the estimates. In fact, Ms. Dimayuga ended up doing a lot of the research in addition to inputting because the project was moving slower than anticipated. We got her a separate password in the Rent Estimate Tool. Not only did Ms. Dimayuga assist with inputting but she also assisted with researching, review and approval of the rent estimates.

We felt that for the last two years we were able to get the Rent Estimate project accomplished within the established timeframes with one individual handling the project. Those individuals who had previously handled the Rent Estimate project had larger lease caseloads than Mr. Conteh. They were managing caseloads of approximately 75-100 leases in addition to the project. Mr. Conteh only had caseload of approximately 23-25 leases to manage. They got the work done in spite of their additional caseload.

000194

Initials

The Rent Estimate project had established regional due dates and targets that were not set by me or Metropolitan Service Center. The due dates for this project have always been established by the region. That means that I cannot change them. As to other projects, he might have had, he would not have been given unrealistic deadlines. For example, on December 15, 2006 I assigned Mr. Conteh the Gross Margin project with a due date of January 19, 2006. He received an extension on the project until February 2, 2006. There are instances where a quick turn around is required to resolve a payment issue or to provide information to the region but normally we try to give realistic deadlines. I requested an extension on the Rent Estimate project because I realized that Mr. Conteh would not get it completed on time. They gave us a couple of days. I believe that was Monday, April 3, 2006. Often, if an analyst sees that their project is nearing the due date and they are far from completion, they come in on their AWS days or reschedule it until the project is completed.

I don't remember asking anyone when they would have something completed as Mr. Conteh alleged. I meet with my two team leaders, Jackie Smith and Carol Vance to discuss work assignments and establish reasonable due dates for projects if there is not a pre-established due date from our regional or Central Office. In regards to his other projects, Mr. Conteh's job was managing a lease caseload and processing documents in order for lessors to get paid. Actions had to be processed by a cutoff so there was not much room for waiver of the time frames because we would incur financial penalty if lessors are not paid timely and develop bad vendor relations. All analysts are pushed to get the work out. On non-time sensitive projects, an analyst may come, before the project is due, to explain that they foresee a problem in meeting the deadline and based on the

000195

Initials _BHD-_

explanation of the problem I may grant an extension. However, you can't come on the due date and ask. I try not to give extensions on assignments unless there were some more pressing issues that arose which prevented timely submission of the project. There is a lot of balancing to the work load and prioritizing the workload to get everything done in a timely manner.

I disagree with Mr. Conteh's statement that he was not told before receiving the Performance Improvement Notice (PIN) that his performance was unsatisfactory. I noticed that Mr. Conteh's performance was not at the level where I thought it should have been between the months of April and September of 2005. I told him that I would look closely at his performance over the next several months and give him assignments so that I could access his capabilities when he complained that he was not getting a fair assessment from his team leaders. They felt he was struggling with the CPI's and taxes as well as the overall BA53 process. In June 2005 he was assigned a lease caseload. He was in the BA53 program long enough and at his grade level should have been able to manage a lease caseload. I paid close attention to how he handled the management of his caseload. He should have done a mini-review or audit of the caseload as soon as it was assigned to him to ascertain what had or had not been completed. We never received that analysis from him up to the point that I reassigned him to another program office, under my management.

His annual review was not satisfactory. I had his annual performance meeting on December 2, 2005. He got a rating of 2. After issuing the PIN, I tried to keep track of his progress. The team leader and I sat with him when he stared the Rent Estimate project. We walked him through it and explained how to succeed. We gave him

000196



feedback to get the project completed. He did not take notes at the meetings, which in itself was disturbing because there was a lot to absorb. He said he had it under control. He was not amenable to some of the ideas we gave him. I gave him the flexibility to manage his project accordingly. He said he could do it. We let them proceed and monitored his progress to help to ensure that we meet our targets.

During our weekly meetings I asked for a status report on his work. We kept discussing the same actions that remained undone or incomplete. Each meeting we could not get a status report. We expected him to come back with more responses. We were not getting that feedback. He did no systematic follow-up on assignments. A lot of times he did not have backup information to show how he arrived at and to support his conclusions. That information should have been included with any analysis that he was instructed to provide, including the rent estimates. He said that he did it, but the Realty Specialists came to me and said that it was not happening.

In regards to his not receiving Budget Analyst training, he had on-the-job training. Given the nature of the work, he would benefit more from OJT than from classroom training. Our Service Center converted our Program Analysts to Budget Analysts to be consistent with the other Service Centers in the region. The work he did as a Program Analyst was the same as that which he did as a Budget Analyst. I remember receiving one request from Mr. Conteh for training. At that time, I am not sure of the date, maybe December of 2004 I believe we did not have funding but he never resubmitted the request. We try, depending on assignments and workload, to determine whether additional training is needed. I told him that what he was doing was more on the job rather than class room training for budget. I decided that maybe he could benefit from a

Initials _____

course in analysis. At his mid-year review on May 17, 2006, I recommended several courses for him. Especially Excel, because he was not as proficient in Excel as I thought he was. I recommended an Excel refresher and two other courses under the financial certification program, with one of them being a course in analysis. The only request he submitted for Excel. I have not seen any requests for training from him. He has to present the requests for my signature.

Mr. Conteh has not submitted a request to his team leader Carol Vance or myself for a printer at his workstation.

I moved Mr. Conteh from budget activity 53 to budget activity 61. The reason that he was reassigned was that BA 53 is more fast-paced; the ability to multitask is crucial because there are so many projects and assignments that require a quick turnaround. In BA 61, one has to get assignments completed in a less hectic, slower paced environment where there are not a lot of routine conflicting priorities.

I did not discriminate against Mr. Conteh on the bases of his race, color, sex, national origin, or religion.

## DENIAL OF SICK LEAVE AND AWS DAY

We were getting to the end of Rent Estimate project. The ending date was suppose to be Friday, March 29, 2006. That Wednesday, Mr. Conteh was going to take the whole day off for a doctors appointment. I declined his leave request for 8 hours sick leave but approved him for 4.2 hrs. I have done this for a majority of the associates. If there is a major project, I will ask them to come in before or after an appointment, as needed if possible. I explained to Mr. Conteh that we were still falling short of our target

Initials _BJV._

for the Rent Estimate project and needed him to come in. I also asked him to switch his AWS day from that Friday so he took Monday as his AWS day.

I have asked others to do the same. I have them reschedule their AWS day rather than cancel an AWS day in its entirety. However there have been several occasions were everyone's AWS day was cancelled for the Data Accuracy project. This was a mammoth project and we were striving to achieve 100% Data Accuracy. We try not to do that if at all possible. The entire financial team has been asked to change their AWS day at one time or another. I have also asked people to come in before or after appointments. That is what I did with Mr. Conteh.

I requested and was given an extension on the Rent Estimate project. They only gave us until the following Monday, which was April 3, 2006. I asked Mr. Conteh not to take his AWS day until the entire project was complete but he said no that he needed to take his day. With a project of this magnitude, however, I would have expected a little more commitment on his part. I do not think he ever gave up his AWS day. We asked that he switch his day and I believe he took the following Monday instead.

I did not discriminate against Mr. Conteh in retaliation for his having filed a prior EEO complaint.

000199

Initials _____

I have read this statement consisting of *9* pages, and I have made all

the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty or perjury that the foregoing statement is

true, correct, and complete to the best of my knowledge and belief.

Signature: *Barbara Howard Sisco*

Date: *July 7, 2006*

Subscribed and sworn to before me this ___ day of _____ 2006

_____

EEO Investigator, F & W Associates

Or

_____

Notary Public

My commission expires: _____

Witness: *Jualgadau  July 7, 2006*

Abieyuwa Igodan

000209

Initials *BHS*

| Mid-Year Review of Performance Plan and Appraisal Record for Non-supervisory Associates | | | |
|---|---|---|---|

**Part I  Administrative Data**

| a. Associate Name (Last, First, MI)<br><br>Conteh, Abdulai | b. SSN<br><br>XXX-XX-6044 | c. Pay Plan, Series & Grade<br>GS-0560-11 | d. Office Symbol<br><br>WPD |
|---|---|---|---|
| e. Organization<br><br>WPD | | f. Rating Period Covered (MM/DD/YYYY – MM/DD/YYYY)<br><br>11/10/2006 - 09/30/2007 | |

**Part II  Position Description Review Certification**

I certify that I have reviewed the associate's position description.  If I do not believe it is an accurate statement of the major duties and responsibilities of the position, I have initiated appropriate action.

Position Description has been reviewed          ◇          Initial and Date:_

**Part III  Performance Plan and Appraisal Instructions**

**INSTRUCTIONS:**

A performance plan must be issued to the associate at the beginning of each rating period.  These plans may be modified during the performance cycle, but associates must perform under a documented performance plan for a minimum of 120 days before they can be rated.

Development of the performance plan should be a collaborative endeavor between the supervisor and the associate.  The performance plan for each associate must contain critical elements, and may contain non-critical elements.  Critical elements are work assignments or responsibilities or such importance that unsatisfactory performance on the element would result in a determination that an associate's overall performance is unsatisfactory.  Objectives, activities, and tasks should be identified under each critical element.

Performance will be measured against 5 levels, as follows:

Level 5 – Meets and consistently exceeds performance expectations as defined in Level 3

Level 4 – Meets and often exceeds performance expectations as defined in Level 3

Level 3 – Meets performance expectations.  Objectives, activities, and specific tasks associated with each critical element are carried out with expected levels of quantity, quality, timeliness and cost-effectiveness in accordance with performance plan.  Responsibilities are carried out in accordance with all official guidance, policies, and applicable laws, rules and regulations.

Level 2 – Partially meets performance expectations as defined in Level 3

Level 1 – Does not meet performance expectations as defined in Level 3

Expectations for performance under each critical element should be set at the Level 3.  Once the performance plan is finalized and a copy provided to the associate, both the supervisor and associate must certify issuance and receipt under Part VII.  Mid-year performance reviews are required under GSA's APPAS.  Both the supervisor and associate must certify the mid-year performance review under Part VII.

Within 45 days of the end of the rating cycle, evaluate the performance plan objectives, underlying activities and tasks, and assign a rating to each critical element based on how well the associate met the performance expectations.  Document the rating for each critical element and the derived summary rating on this form (see Part VIII for instructions on deriving summary ratings).  Overall comments on performance and identification of training and/or developmental needs should be documented in Parts V and VI, respectively.  If the summary rating is at the Level 5 or the Level 1, the associate's appraisal must be reviewed and approved by the second level supervisor.

The supervisor and associate must certify under Part VIII that an annual performance appraisal was conducted, and a summary rating was issued to the associate.  Once both parties sign it, a copy of this form, including the performance plan, must be provided to the associate.  The original must be submitted to the servicing Human Resources Office for filing in the associate's Official Personnel Folder.



| Part IV Performance Plan and Critical Element Appraisal | |
|---|---|
| **CRITICAL ELEMENTS** | **Critical Element Rating** |
| **Critical Element 20%:** Developing and Monitoring Operating Budget 20%<br><br>Due to the short timeframe given for the Annual Budget Call sufficient time was not available to assign this project to Abdulai.<br><br>See Attached worksheet for performance level expectations. | Level 5 ◇<br>Level 4 ◇<br>Level 3 ◇<br>Level 2 ◇<br>Level 1 ◇ |
| **Critical Element 30%:** Customer Service 30%<br><br>Abdulai seldom provides prompt and accurate feedback on issues for our internal and external customers. Abdulai seldom follows up to insure that financial issues are brought to a prompt and adequate resolution.<br><br>See Attached worksheet for performance level expectations. | Level 5 ◇<br>Level 4 ◇<br>Level 3 ◇<br>Level 2 ◇<br>Level 1 ◇ |
| **Critical Element 20%:** Budgetary/Financial Analysis 20%<br><br>Abdulai continues to be unable to successfully resolve financial issues as they arise without supervisory intervention. His routine monthly A30 and A40 budget reports continue to not be thoroughly researched, contained errors and/or do not document findings as required. Abdulai continues to not be able to identify outstanding actions and/or discrepancies that require action on his part to remedy a situation without assistance from the Team Leaders. He is unable to independently use research tools, prepare findings and provide recommendations. During the review period, Abdulai's monthly reports contain numerous formatting, adjustment, and formulae errors. Notations regarding corrective action were absent. Remarks often contained vague language and assertions were made without adequate justifications. Seldom does Abdulai's provide a quality work product that does not require numerous revisions.<br><br>See Attached worksheet for performance level expectations. | Level 5 ◇<br>Level 4 ◇<br>Level 3 ◇<br>Level 2 ◇<br>Level 1 ◇ |
| **Critical Element 5%:** Internal Process Improvement 5%<br><br>Abdulai does not have a sufficient grasp of the processes and proceedures in order to provide feedback regarding internal process improvement.<br><br>See Attached worksheet for performance level expectations. | Level 5 ◇<br>Level 4 ◇<br>Level 3 ◇<br>Level 2 ◇<br>Level 1 ◇ |
| **Critical Element 5%:** Learning and Growning 5%<br><br>Must successfully master the skills of the position. To date, Abdulai has not taken the recommended courses in Time Management and Basic Writing.<br><br>See Attached worksheet for performance level expectations. | Level 5 ◇<br>Level 4 ◇<br>Level 3 ◇<br>Level 2 ◇<br>Level 1 ◇ |
| **Critical Element 20%:** Pegasys Support 20%<br><br>Abdulai has not been able to fully grasp the Pegasys process. He still is seldom able to promptly identify outstanding issues and/or discrepancies that require action on his part to remedy the situation without team leader intervention. Overall Abdulai has not demonstrated improvement in the area of PEGASYS data entry and financial management. The factors considered include accuracy of data entry, timeliness of processing documents, associates contribution to the overall team | Level 5 ◇<br>Level 4 ◇<br>Level 3 ◇<br>Level 2 ◇<br>Level 1 ◇ |

| Part IV  Performance Plan and Critical Element Appraisal | |
| --- | --- |
| **CRITICAL ELEMENTS** | **Critical Element Rating** |
| workload, and PEGASYS report generation for the Pegasys held/rejected report, commitment report, R200/P200 reports(overdue invoices), PEGASYS workload report, RO/RA adjustments, quality assurance checks and responding to the Office of Finance's inquires.<br><br>  See Attached worksheet for performance level expectations. | |

| Part V  Comments |
| --- |

***Comments on Overall Performance (attach additional pages as necessary).***

Abdulai's overall performance does not meet the performance expectations of the position.  His performance remains at an unacceptable level in the "Budgetary/Financial Analysis" and "Pegasys Support" critical elements and his overall performance in the "Customer Service" element has declined to an unacceptable level as well.

| Part VI  Development and Training |
| --- |

***Indicate professional growth needs and avenues to meet those needs (attach additional pages as necessary.)***

Performance Improvement Period recommended.

## Part VII Certification of Performance Plan and Mid-Year Review

**Performance Plan Developed:**
Signatures below certify that the supervisor and associate have discussed performance expectations, and the associate has been given a copy of their performance plan.

Howard-Sisco, Barbara A                    12/04/2006
Supervisor/Rating Official                 Date

_____                 _____
Associate                                  Date
*I understand my signature does not constitute agreement or disagreement with the plan, but merely verifies I have received the information.*

**Mid-Year Progress Review:**
Signatures below certify that the supervisor and associate have discussed performance against the expectations and changes have been made to the performance plan as necessary.

Howard-Sisco, Barbara A                    05/23/2007
Supervisor/Rating Official                 Date

_____                 5/23/2007
Associate                                  Date

## Part VIII Summary Rating

*Guidance for deriving summary rating:*
After assessing each critical element and assigning the appropriate rating level, the summary rating should be derived using the following methodology:

Level 5 is assigned if 70% of the critical element weights are at Level 5, and no critical element is rated below Level 3.

Level 4 is assigned if 60% of the critical element weights are rated at Level 4 or above, but does not meet the 70% rule for assigning a Level 5 summary rating; and no critical element is rated below Level 3.

Level 3 is assigned if 50% of the critical element weights are rated at Level 3 or above, but does not meet the 60% rule for assigning a Level 4 summary rating; and none are rated below Level 3.

Level 2 is assigned if one critical element is rated at Level 2.

Level 1 is assigned if one critical element is rated at Level 1.

**Summary Rating:**          Interim ◇        Annual ◇

Level 5 ◇ Level 4 ◇ Level 3 ◇ Level 2 ◇ Level 1 ◇

_____                 _____
Supervisor/Rating Official                 Date

_____                 _____
Reviewing Official                         Date
*For summary ratings at Level 5 or Level 1*

_____                 _____
Associate                                  Date
*I understand my signature does not constitute agreement or disagreement with the rating, but verifies I have received the rating.*

**Privacy Act Statement:** *This form is subject to the provisions of the Privacy Act. Records will be processed and maintained by the associate's supervisor and the Consolidated Processing Center. Information will be made available to the appropriate review authorities. Disclosure of the social security number is mandatory to determine or verify eligibility for benefits accruing to associates such as additional tenure credit for reduction-in-force purposes, pay increases, within-grade increases and quality increases, which are directly linked to overall performance rating Levels. The information gathered through the use of the number will be used only as necessary in personnel administration processes carried out in accordance with established regulations and published notices of systems of records.*



| | | To | Karen.smith@gsa.gov |
|---|---|---|---|
| "Keith Hunter" | | cc | |
| <KHunter@ManagementCon | | bcc | |
| cepts.com> | | | |
| 11/19/2007 03:48 PM | | Subject | Proctor exam for Abdul |

History:                    🖅 This message has been replied to.

Hi Karen,

     Please let Abdul know that an exam must be taken and passed for the Budget Estimating Using MS Excel class in order to have it count towards the Federal Financial Management Certificate Program.

I have attached the Excel file to be used during the exam.

Also, here are the links to the 3 tracks of the Certificate program.  They show which courses must be completed to obtain the Certificate.

Accounting

http://www.managementconcepts.com/financial/fmaccountingtrack.asp


Budgeting

http://www.managementconcepts.com/financial/fmbudgetingtrack.asp


Financial Management

http://www.managementconcepts.com/financial/fmfmtrack.asp




<<Exam.xls>>

I hope this helps and please let me know if you have any questions.

Thanks!

Keith Hunter

Certificate Programs Administrator

Financial Management Division

MANAGEMENTCONCEPTS

8230 Leesburg Pike

Vienna, VA 22182

EXHIBIT

W

tabbies

tel 703.270.4049

fax 703.270.4033

khunter@managementconcepts.com

http://www.managementconcepts.com


Exam.xls

# Associate Performance Planning Worksheet – Non-supervisory Associates

Employee Name: Conteh, Abdelai

Position: Budget Analyst, GS-0560-11

Organization: WPD

Main Appraiser: Howard-Stearo, Barbara A.

Date Developed: 28-NOV-2006

Date Issued: 04-DEC-2006

## Description: External Process Improvement 5%

| PD/RS
Item 5%: | Generic
Identifier 1 | Specific
Behaviors | Standards/Examples | | | Feedback Source
For Monitoring |
|---|---|---|---|---|---|---|
| PD/RS
Business Plan,
GSA Cost
Efficiently and
effectively | Quality and
Timeliness | Successful | Level 1 | Level 3 | Level 5 | Customer Feedback,
Supervisor Observation |

## Critical Element: Learning and Growing 5%(5%)

| PD/RS
Item 5%: | Generic
Identifier 1 | Specific
Behaviors | Standards/Examples | | | Feedback Source
For Monitoring |
|---|---|---|---|---|---|---|
| PD/RS
Human
Capital Strategy | Quality | Self
Development | Level 1 | Level 3 | Level 5 | IDP and Supervisor Feedback |

## Critical Element: Pegasys Support 20%(20%)

### Description: Process Support 20%

| PD/RS
Item 20%: | Generic
Identifier 1 | Specific
Behaviors | Standards/Examples | | | Feedback Source
For Monitoring |
|---|---|---|---|---|---|---|
| PD/RS
Financial
Directive,
GSA Total
Financial
Accountability | Quality,
Timeliness
and
Accuracy | Supports
activities,
Financial
special
reports,
special
analysis | Level 1
Does not meet
expectations as defined in
Level 2 | Level 2 | Level 4
Meets and consistently
exceeds performance
expectations as defined in
Level 4 | Customer Feedback,
Supervisor Observation |

This worksheet is only intended to assist you in completing the OFFICIAL Associate Performance Plan and Appraisal documents as identified by GSA Order CPO P 9430.1


EXHIBIT

# Associate Performance Planning Worksheet – Non-supervisory Associates

Employee Name: Cornish, Abdullah

Position: Budget Analyst, GS-0560-11

Organization: WPD

Main Appraiser: Howard-Sisco, Barbara A

Date Developed: 28-NOV-2006

Date Issued: 04-DEC-2006

## Critical Element: Developing and Monitoring Operating Budget 20%(20%)

Description: Developing and Monitoring Operating Budget 20%

| Perform. Factor | Criteria/ Metrics | Standards/Description | | | | Feedback Source For Monitoring |
|---|---|---|---|---|---|---|
| | | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 | |
| FD, PBS Financial Direction, CSA Client "Financial Accountability | Timeliness, Accuracy | | Assists in the preparation and submission of the Annual Budget Call. Monitors spending against an element of the approved operating plans throughout the fiscal year. Retires items acquired and timely processing of assigned budgetary transactions. Budget reports are seldom timely and accurate. | | Assists in the preparation and submission of the Annual Budget Call. Monitors spending against an element of the approved operating plans throughout the fiscal year. Retires items acquired and timely processing of assigned budgetary transactions. Budget reports are consistently timely and accurate. | | Customer Feedback Supervisor Observation |

## Critical Element: Customer Service 30%(30%)

Description: Customer Service 30%

| Perform. Factor | Criteria/ Metrics | Standards/Description | | | | Feedback Source For Monitoring |
|---|---|---|---|---|---|---|
| | | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 | |
| CS Customer Service | Quality and Timeliness | | Usually meets and responds effectively to customer requests by or responsibilities in a timely and consistent manner, but is either not consistent, not proactive in addressing needs or does not adequately balance competing needs in and tries. | Responds to customer requests and provides accurate, timely service; explains actions and decisions in a manner which instills confidence and compliance from the customer; takes necessary follows up to ensure customer needs are met. | In addition to responding to customer requests in a consistent and effective manner, exercises is proactive in identifying and resolving/minimizing potential problems that may arise. | Proactively assists in managing the implementation of customer requests at new program, policies and procedures. Consistently completes accurate, complete reports and monthly tracking reports within established timeframes. | Customer Feedback Supervisor Observation |

## Critical Element: Budgetary/Financial Analysis 20%(20%)

Description: Budgetary/Financial Analysis 20%

| Perform. Factor | Criteria/ Metrics | Standards/Description | | | | Feedback Source For Monitoring |
|---|---|---|---|---|---|---|
| | | Level 1 | Level 2 | Level 3 | Level 4 | Level 5 | |
| FD, PBS Financial Direction, CSA Clent Accountability | Quality, Timeliness and Accuracy | | Seldom assists in managing the implementation of new programs, policies and procedures. Seldom prepares accurate routine and special reports and monthly tracking reports within established timeframes. | Generally assists in managing the implementation of new programs, policies and procedures. Prepares accurate routine and special reports and monthly tracking reports within established timeframes. | | | Customer Feedback Supervisor Observation |

## Critical Element: Internal Process Improvement 5%(5%)

This worksheet is only intended to assist you in completing the OFFICIAL Associate Performance Plan and Appraisal documents as identified by GSA Order CPO P 9430.1



GSA National Capital Region

DEC 1 1 2006

MEMORANDUM FOR:  ABDULAI CONTEH

FROM:  BARBARA SISCO  *Barbara Sisco*

SUBJECT:    Performance Improvement Notice (PIN), GS-0560-11, BUDGET ANALYST

As we discussed during your mid-year review, your work performance at this point is minimally successful and has not improved since our discussion.  This memorandum provides you with an Action Plan and establishes an opportunity period of 60 days, during which time we will assist you, in order to help you raise your level of performance from **a minimally successful level to a successful level.**

I will be your direct contact in the branch to assist you in achieving a satisfactory rating.  In my absence, you should discuss your concerns with Roland Caton, Lead Budget Analyst for the Metropolitan Financial Management Branch.  Interim evaluation sessions will be conducted by Roland Caton and myself and be documented monthly.  In addition, there will be weekly discussions regarding your progress.  At the end of the 60-day period, if your performance level is successful, we will continue to assist and encourage you to maintain that level.  However, if your level of performance **drops to a Level 1,** you will be issued a formal Performance Improvement Plan as appropriate.

You were issued your performance plan on May 31, 2006, and signed the Performance Plan Certification on the same date, which indicated that you acknowledged receipt of the plan.  Your performance in the following critical elements is the focus of the PIN.

CRITICAL ELEMENT # 3- (20%) Budgetary/Financial Analysis

This is a journeyman-level position with the General Services Administration, Public Buildings Service, Metropolitan Service Center, Financial Management Branch (WPD).

## STANDARDS FOR EXPECTED PERFORMANCE:

At this level the Budget Analyst is expected to:

Resolve financial issues for the assigned caseload as they arise with minimal supervisory intervention. Generate financial reports, special analysis and special projects as needed.

EXHIBIT

tabbies

U.S. General Services Administration
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

Assist in managing the implementation of new programs, policies and procedures. Routinely compile accurate routine and special reports and monthly tracking reports, as assigned, within established timeframes. This should include the accurate and timely compilation of BA61 data for A10 and A40 functions as well as a routine comprehensive review of assigned function codes A10 and A40 to insure accurate and timely monitoring of all A10 and A40 actions in Pegasys and FMIS.

A review of your performance in this critical element reveals the following deficiencies: Under your Budget Analyst (quality) element your routine monthly report required numerous revisions and your assigned budget function codes (A10 and A40) were not thoroughly researched and documented as requested. You did not identify outstanding actions and/or discrepancies that required action on your part to remedy the situation. You were unable to independently use research tools and prepare findings and recommendations.

Under your Budget Analyst (accuracy) element your analysis and reports for the A10 and A40 function codes routinely required corrections and/or were not thoroughly researched.

CRITICAL ELEMENT # 6- (20%) Pegasys Support

This is a journeyman-level position with the General Services Administration, Public Buildings Service, Metropolitan Service Center, Financial Management Branch (WPD).

**STANDARDS FOR EXPECTED PERFORMANCE:**

At this level the Budget Analyst is expected to:

Resolve financial issues for the assigned Pegasys workload as they arise with minimal supervisory intervention. Insure the timely and accurate processing of financial documents in the Pegasys financial system. Assist in managing the implementation of new programs, policies and procedures. This should include the accurate and timely resolution of Pegasys issues as needed and assisting in generating monthly reports and reviews as needed.

A review of your performance in this critical element reveals the following deficiencies: Under your Budget Analyst (quality) and (accuracy) elements your Pegasys transactions require numerous corrections. Your assigned Pegasys workload continues to have a high error rate. You are unable to promptly identify outstanding issues and/or discrepancies that required action on your part to remedy the situation without team leader intervention.

As stated above, because your work performance is at a minimally acceptable level, we are providing you with the opportunity to demonstrate performance at a successful level in these critical elements. During this period of time, we will take the following steps to assist you in improving your performance:

Your team leader and I will meet with you at least weekly to discuss your progress; cite any performance related problems which have been identified; provide guidance and assistance to you in an attempt to resolve these problems if any; and answer any questions you may have concerning the performance of your work.

However, if your overall performance remains at a minimal level during this opportunity period, it may become necessary for me to take further remedial action.

While I have outlined the above positive steps we will be taking to assist you in this endeavor, I am also interested in exploring other forms of assistance that may be appropriate. I am concerned for your professional welfare and believe you should seek assistance as necessary.

You will be given 60 days from the date of this letter to bring your performance up to a successful level in the described critical element. It is my hope that with the assistance we will provide you, as well as your concentrated efforts and improved level of cooperation, your performance will improve to an acceptable level so that no further remedial action will be required.



**APR 5 2006**

GSA National Capital Region

MEMORANDUM FOR:    Abdulai Conteh
Budget Analyst
Metropolitan Service Center (WPD)
Public Buildings Service

FROM:    Barbara Sisco
Branch Manager,
Metropolitan Service Center (WPD)
Public Buildings Service

Subject:    Performance Improvement Notice (PIN), GS-560-11
Final Determination: Failure to meet Performance
Expectations

This memorandum serves to recognize your efforts and accomplishments under the performance improvement notice (PIN) implemented during December 5, 2005 through April 5, 2006. This PIN was initiated as your recent past performance was rated as "minimally successful". The resulting guidance was intended to implement measures to improve our overall performance and work methods to ensure your ongoing success in your position.

As your direct contact in the branch, in conjunction with your team leader, we met routinely to discuss your assignment, workload, plans, milestones and accomplishments. However, your performance at this time remains at "minimally successful", therefore, until further evaluation of your performance and in accordance with GSA Order 9430.1 CPO, you are not eligible to receive awards, promotions or within grade increases.

Your Associate Performance Plan will continue to serve to document the requirements (critical elements) and measures (standards) of success in your Budget Analyst position. In an effort to bring your performance up to a successful level we will continue to mentor and monitor your performance accordingly and provide you feedback as we continually pursue professional development and business performance improvement initiatives for the GSA.

Attachments



EXHIBIT

tabbies

U.S. General Service
301 7th Street SW
Washington, DC 20407-0001
www.gsa.gov

50

| **Performance Plan and Appraisal Record for Non-supervisory Associates** | | | |
|---|---|---|---|
| **Part I  Administrative Data** | | | |
| a.  Associate Name (Last, First, MI)<br><br>Conteh, Abdulai | b.  SSN<br><br>XXX-XX-6044 | c.  Pay Plan, Series<br>& Grade<br>GS-0560-11 | d.  Office Symbol<br><br>WPD |
| e.  Organization<br><br>WPD | | f.  Rating Period Covered (MM/DD/YYYY ? MM/DD/YYYY)<br><br>11/10/2006 - 10/19/2007 | |

| **Part II Position Description Review Certification** |
|---|
| I certify that I have reviewed the associate's position description.  If I do not believe it is an accurate statement of the major duties and responsibilities of the position, I have initiated appropriate action.<br><br>Position Description has been reviewed          ☐          Initial and Date:_ |

| **Part III  Performance Plan and Appraisal Instructions** |
|---|

**INSTRUCTIONS:**

A performance plan must be issued to the associate at the beginning of each rating period.  These plans may be modified during the performance cycle, but associates must perform under a documented performance plan for a minimum of 120 days before they can be rated.

Development of the performance plan should be a collaborative endeavor between the supervisor and the associate.  The performance plan for each associate must contain critical elements, and may contain non-critical elements.  Critical elements are work assignments or responsibilities or such importance that unsatisfactory performance on the element would result in a determination that an associate's overall performance is unsatisfactory.  Objectives, activities, and tasks should be identified under each critical element.

Performance will be measured against 5 levels, as follows:

Level 5 ?Meets and consistently exceeds performance expectations as defined in Level 3

Level 4 ?Meets and often exceeds performance expectations as defined in Level 3

Level 3 ?Meets performance expectations.  Objectives, activities, and specific tasks associated with each critical element are carried out with expected levels of quantity, quality, timeliness and cost-effectiveness in accordance with performance plan.  Responsibilities are carried out in accordance with all official guidance, policies, and applicable laws, rules and regulations.

Level 2 ?Partially meets performance expectations as defined in Level 3

Level 1 ?Does not meet performance expectations as defined in Level 3

Expectations for performance under each critical element should be set at the Level 3.  Once the performance plan is finalized and a copy provided to the associate, both the supervisor and associate must certify issuance and receipt under Part VII.  Mid-year performance reviews are required under GSA's APPAS.  Both the supervisor and associate must certify the mid-year performance review under Part VII.

Within 45 days of the end of the rating cycle, evaluate the performance plan objectives, underlying activities and tasks, and assign a rating to each critical element based on how well the associate met the performance expectations.  Document the rating for each critical element and the derived summary rating on this form (see Part VIII for instructions on deriving summary ratings).  Overall comments on performance and identification of training and/or developmental needs should be documented in Parts V and VI, respectively.  If the summary rating is at the Level 5 or the Level 1, the associate's appraisal must be reviewed and approved by the second level supervisor.

The supervisor and associate must certify under Part VIII that an annual performance appraisal was conducted, and a summary rating was issued to the associate.  Once both parties sign it, a copy of this form, including the performance plan, must be provided to the associate.  The original must be submitted to the servicing Human Resources Office for filing in the associate's Official Personnel Folder.

**EXHIBIT**

AA

tabbies®

| Part IV  Performance Plan and Critical Element Appraisal | |
|---|---|
| **CRITICAL ELEMENTS** | **Critical Element Rating** |
| **Critical Element 20%:**<br>Developing and Monitoring Operating Budget 20%<br><br>Mr. Conteh was not given any assignments for the Annual Budget Call nor required to prevalidate any funding documents.<br><br>See Attached worksheet for performance level expectations. | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☑<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element 30%:**<br>Customer Service  30%<br><br>Mr. Conteh seldom provided prompt and accurate feedback and followup regarding financial issues.  He does not consistently follow through to ensure that an adequate resolution is achieved.<br><br>See Attached worksheet for performance level expectations. | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☑<br>Level 1 ☐ |
| **Critical Element 20%:**<br>Budgetary/Financial Analysis 20%<br><br>Mr. Conteh continued to be unable to successfully resolve financial issues as they arose without supervisory intervention.  His routine monthly budget reports for his assigned areas of responsibility, A10 and A40, were not thoroughly researched and documented and contained numerous errors.  He still was not able to identify issues and/or discrepancies that required action on his part to remedy, without the assistance of the Team Leader.  He is still unable to independently use research tools, prepare findings and provide recommendations.  Mr. Conteh's monthly reports continued to contain formatting, adjustment and formulae errors.  Mr. Conteh does not provide a work product that does not require numerous corrections and revisions.<br><br>See Attached worksheet for performance level expectations. | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☐<br>Level 1 ☑ |
| **Critical Element 5%:**<br>Internal Process Improvement 5%<br><br>Mr. Conteh does not have a sufficient grasp of existing processes and proceedures.<br><br>See Attached worksheet for performance level expectations. | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☑<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element 5%:**<br>Learning and Growning 5%<br><br>Mr. Conteh provided input for his IDP and has pursued the recommended courses.  He will still need to complete all course requirements for courses taken under the Financial Management Certification Program and complete the course in Basic Writing.<br><br>See Attached worksheet for performance level expectations. | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☑<br>Level 2 ☐<br>Level 1 ☐ |
| **Critical Element 20%:**<br>Pegasys Support 20%<br><br>Mr. Conteh has not been able to fully grasp the Pegasys process.  He still struggles with inputting routine documents into the Pegasys financial system.  He does not | Level 5 ☐<br>Level 4 ☐<br>Level 3 ☐<br>Level 2 ☐ |

| Part IV  Performance Plan and Critical Element Appraisal | |
|---|---|
| **CRITICAL ELEMENTS** | **Critical Element Rating** |
| process documents within  established timeframes and maintains a high error rate.  As a result,  he cannot be given any additional reporting responsibilities or special projects to support the team.<br><br>  See Attached worksheet for performance level expectations. | Level 1  ☑ |

| Part V  Comments |
| --- |

*Comments on Overall Performance (attach additional pages as necessary).*

Mr. Conteh's overall performance for this rating period does not meet the performance expectations of the position.  His performance remains at an unacceptable level in the "Budgetary/Financial Analysis" and "Pegasys Support"critical elements.  As a result, his performance in the "Customer Service" element has not improved.

| Part VI  Development and Training |
| --- |

*Indicate professional growth needs and avenues to meet those needs (attach additional pages as necessary.)*

Performance Improvement Plan to be issued.

**Part VII  Certification of Performance Plan and Mid-Year Review**

**Performance Plan Developed:**

Signatures below certify that the supervisor and associate have discussed performance expectations, and the associate has been given a copy of their performance plan.

| | |
|---|---|
| Howard-Sisco, Barbara A | 12/04/2006 |
| Supervisor/Rating Official | Date |

| | |
|---|---|
| _____ | _____ |
| Associate (Conteh, Abdulai | Date |
| XXX-XX-6044) | |

_I understand my signature does not constitute agreement or disagreement with the plan, but merely verifies I have received the information._

**Mid-Year Progress Review:**

Signatures below certify that the supervisor and associate have discussed performance against the expectations and changes have been made to the performance plan as necessary.

| | |
|---|---|
| Howard-Sisco, Barbara A | 05/23/2007 |
| Supervisor/Rating Official | Date |

| | |
|---|---|
| _____ | _____ |
| Associate  (Conteh, Abdulai | Date |
| XXX-XX-6044) | |

**Part VIII  Summary Rating**

_Guidance for deriving summary rating:_

After assessing each critical element and assigning the appropriate rating level, the summary rating should be derived using the following methodology:

Level 5 is assigned if 70% of the critical element weights are at Level 5, and no critical element is rated below Level 3.

Level 4 is assigned if 60% of the critical element weights are rated at Level 4 or above, but does not meet the 70% rule for assigning a Level 5 summary rating; and no critical element is rated below Level 3.

Level 3 is assigned if 50% of the critical element weights are rated at Level 3 or above, but does not meet the 60% rule for assigning a Level 4 summary rating; and none are rated below Level 3.

Level 2 is assigned if one critical element is rated at Level 2.

Level 1 is assigned if one critical element is rated at Level 1.

**Summary Rating:**         Interim ☐      Annual ☑

           Level 5 ☐   Level 4 ☐   Level 3 ☐   Level 2 ☐   Level 1 ☑

| | |
|---|---|
| Howard-Sisco, Barbara A | 11/16/2007 |
| Supervisor/Rating Official | Date |

| | |
|---|---|
| Banks, Sharon J | 01/02/2008 |
| Reviewing Official | Date |
| _For summary ratings at Level 5 or Level 1_ | |

| | |
|---|---|
| _____ | _____ |
| Associate  (Conteh, Abdulai | Date |
| XXX-XX-6044) | |

_I understand my signature does not constitute agreement or disagreement with the rating, but verifies I have received the rating._

Privacy Act Statement: This form is subject to the provisions of the Privacy Act. Records will be processed and maintained by the associate's supervisor and the Consolidated Processing Center.  Information will be made available to the appropriate review authorities.  Disclosure of the social security number is mandatory to determine or verify eligibility for benefits accruing to associates such as additional tenure credit for reduction-in-force purposes, pay increases, within-grade increases and quality increases, which are directly linked to overall performance rating Levels.  The information gathered through the use of the number will be used only as necessary in personnel administration processes carried out in accordance with established regulations and published notices of systems of records.

Karen E. Smith
Chief
Financial Management Branch
Metropolitan Service Center (WPD)
1099 14th Street, NW
Suite 200W
Washington, DC  20005
Office: 202-208-2341
Fax:    202-208-0201

Abdulai Conteh/WPD/RW/GSA/GOV



| | | |
|---|---|---|
| **Abdulai**<br>**Conteh/RW/RW/GSA/GOV**<br>01/16/2008 04:51 PM | To | Karen E. Smith/WPD/RW/GSA/GOV@GSA |
| | cc | Anthony Marable/WPD/RW/GSA/GOV@GSA, Roland H. Caton/WPD/RW/GSA/GOV@GSA |
| | Subject | Re: PIP MEETINGS |

Karen:

I am confirming to meet at 3:00 P.M tomorrow January 17th, 2007, Please provide me the room number.
As you can see, because of the late response I can't provide a  name of a NEFFE representative who
would be in attendance. However I left a message for Mr. O'brycki.

Abdulai Conteh
Budget  Analyst
Metropolitan Service center
(202) 219-3338
(202) 692-3305
Karen E. Smith/WPD/RW/GSA/GOV



| | | |
|---|---|---|
| **Karen E.**<br>**Smith/WPD/RW/GSA/GOV**<br>01/16/2008 04:29 PM | To | Abdulai Conteh/WPD/RW/GSA/GOV@GSA |
| | cc | Roland H. Caton/WPD/RW/GSA/GOV@GSA, Anthony Marable/WPD/RW/GSA/GOV@GSA |
| | Subject | Re: PIP MEETINGS |

EXHIBIT

AB

Good Afternoon Abdulai,

        I too believe there has been a very serious breakdown in communication
regarding your attendance at  your weekly performance meetings.  Your Performance
Improvement Plan (PIP) is a formal document which instructed me to hold a weekly
performance meeting with you and in the same formal document you were instructed to
attend  these performance meetings.  You have told me  on every occasion that I
asked about your attendance at these meetings that you were instructed by your Union
representation not to attend these meetings.  You have always been welcome to have
representation at these meetings, but that has never been the issue. Your performance

meeting has always been held at the same time (10:00 a.m.) and in the same place (my office) every week, therefore your representation has had plenty of notice in time to attend these meetings.

What concerns me is that these meetings are for your benefit to assess how you are currently performing your duties in relation to bringing your performance up to an acceptable level. I would like to reschedule the meeting since you will not be available tomorrow morning.  Please let me know if you will be available tomorrow afternoon at 3:00 p.m. You are welcome to bring to meeting whomever you wish.  Please let me know by 9:00 tomorrow morning if this time is acceptable and please advise who will be in attendance so that I can secure adequate meeting space.

Thank you,
Karen


Karen E. Smith
Chief
Financial Management Branch
Metropolitan Service Center (WPD)
1099 14th Street, NW
Suite 200W
Washington, DC  20005
Office: 202-208-2341
Fax:    202-208-0201


Abdulai Conteh/WPD/RW/GSA/GOV




| | Abdulai Conteh/WPD/RW/GSA/GOV 01/16/2008 01:08 PM | To | Karen E. Smith/WPD/RW/GSA/GOV@GSA |
|---|---|---|---|
| | | cc | Barbara A. Sisco/WPD/RW/GSA/GOV@GSA, Robert A. O'Brycki/WPJ/RW/GSA/GOV@GSA |
| | | Subject | PIP MEETINGS |


Karen:

I think that there has been a serious breakdown in communication regarding my  attending weekly performance meetings.
Although I strongly disagree with the issuance of the PIP and I do not feel it was warranted, I never refused to attend these meetings.
In accordance with the  MOU between GSA and NFFE, I am entitled to Union representation at these meetings. Believe me,I take this
matter very seriously and I feel like my job is in jeopardy. For that very reason, it is imperative that my representative be present at these
meetings.

In regards to your proposal to meet tomorrow at 10:00 am, I have a schedule conflict. I will be in attendance at ROB with Ms. Sisco on a grievance meeting on this subject issue.

Please provide me an alternative time tomorrow afternoon  so that I can inform my NFFE representative. If tomorrow afternoon is not convenient,
please propose dates / times when you will be available to meet next week, Friday is my AWS day.

Abdulai Conteh
Budget Analyst
Metropolitan Service center
Phone (202) 219-3338
Efax (202) 692-3305



**GSA National Capital Region**

July 23, 2008

MEMORANDUM FOR ABDULAI CONTEH
                   BUDGET ANALYST
                   METROPOLITAN SERVICE CENTER (WPD)

FROM:          KAREN E. SMITH *Karen E. Smith*
                   SUPERVISORY PROGRAM ANALYST
                   METROPOLITAN SERVICE CENTER (WPD)

SUBJECT:        Notice of Proposed Removal

This memorandum is to notify you that I propose to remove you from your position of Budget Analyst, GS-0560-11, Metropolitan Service Center (WPD), Public Buildings Service (PBS), General Services Administration (GSA) no sooner than thirty (30) calendar days from the date you receive this notice, because of unacceptable performance.

On December 4, 2006 you were issued an Associate Performance Planning Worksheet for Non-supervisory Associates which identified six (6) critical elements for your position; Developing and Monitoring Operating Budget, Customer Service, Budgetary/Financial Analysis, Internal Process Improvement, Learning and Growing, and Pegasys Support. At your mid-year review held on or about May 23, 2007 you were informed that your performance remained at an unacceptable level in Critical elements 3 (Budgetary/Financial Analyst) and 6 (Pegasys Support), and had declined to an unacceptable level in element 2 (Customer Service).

On November 28, 2007 you were given written notice that you were being placed on a Performance Improvement Plan (PIP). The notice communicated the performance standards for critical elements 3 and 4 and allowed 60 days in which to raise your level of performance from an unacceptable level and to demonstrate an acceptable performance level. The notice also informed you that meetings were to be held every Thursday morning starting at 10:00 a.m. with Roland Caton, Lead Budget Analyst; Anthony Marable, Budget Analyst (Team Leader) and myself.

U.S. General Services Admin
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

EXHIBIT

AC

During the PIP period you participated in one (1) of the eight (8) PIP meetings held from December 6, 2007 through January 29, 2008. After the period of the PIP ended, you and your representative agreed to a meeting on February 5, 2008.

During the PIP period you performed at an unacceptable level in both Critical Elements 3 and 6.

<u>Critical Element 3 –Budgetary/Financial Analyst</u>
(See attachment for full description)

**In order to meet the performance expectations for this critical element you must generally assist in managing the implementation of new programs, policies and procedures. You must compile accurate routine and special reports and monthly tracking reports within established timeframes.** Monthly fund status reports must be accurate, complete and submitted within the established timeframes. Fund status reports must be submitted to the Team Leader within established timeframes and/or no more than 2 days prior to the 4th Tuesday business review meeting. Few, if any formatting errors will be contained in the fund status reports. Few, if any mathematical errors will be present on fund status reports submitted. Variances to Plan +/- $100K should be thoroughly researched and documented in the remarks column of the reports. Few, if any follow-up actions will remain to be resolved by the next reporting cycle or provide a target resolution date. Below are the specific instances in which you failed to meet the performance expectations for this critical element.

1. On December 20, 2007 you submitted a November 2007 Fund Status Analysis (FSA). You sent an e-mail message saying that attached was your first draft of the November fund status report. Attached were two files pertaining to Operations and Maintenance (PGA) 40 funds that appeared to be identical. Your Team Leader provided comments on your submission by e-mail message. Afterward, you sent a second e-mail message saying that you thought you had sent the spread sheet and with an attachment pertaining to PGA 10 funds. These attachments contained the following errors.

   a. In PGA 40 funds, for the Approved Operating Plan (AOP) for Fiscal Year 2008 you failed to include the additional $2.2M that Metropolitan Service Center received at the end of Fiscal Year 2007 as a supplemental. You should have added $1.1M to the AOP for building number DC0011ZZ and $1.1M to the AOP for building number DC0086ZZ as place holders.

   b. In PGA 40 funds you entered "($1,966,195.00)" as the anticipated income for building MD0804ZZ for fiscal year 2008. However, that figure was the anticipated obligation--the Operations and Maintenance portion of the

U.S. General Services Administration
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

contract which was estimated to be $1,966,195.00. You then projected this figure to the end of the fiscal year as a credit.

c.  In PGA 40 funds you used an incorrect projection formula. There are 262 total workdays in Fiscal Year 2008. You incorrectly identified the total number of workdays in Fiscal Year 2008 as 217. Anthony Marable had sent the staff (including you) an updated Fiscal Year 2008 schedule of workdays reflecting that the total number of days for fiscal year 2008 was 262.

d.  In PGA 40 funds for building MD0334ZZ you stated in the remarks area of the document that the reason for the variance was continuing resolution which was incorrect. The correct justification was that the variance was due to the fact that we had not yet collected the R-type RWA funding.

e.  In PGA 40 funds you entered remarks of "change in the contract multiply distribution lines" for buildings number VA0506AN and VA0507AN, where it should have said "multiple," and it is not clear what you meant by this. You should have explained how/why the multiple distribution lines caused the variance and what corrective action you were going to take to correct the variance.

f.  In PGA 10 funds your analysis was submitted late. The report is due to your team leader on the third Tuesday of each month, which was November 18th. Roland sent you an e-mail on December 20, 2007 informing you to send the analysis.

g.  In PGA 10 funds you failed to post the anticipated income for any of the buildings on the report. You are required to enter this information for the buildings on the FSA. By failing to enter the anticipated income, the anticipated obligations are overstated.

h.  In PGA 10 funds you used the wrong projection formula. You used 217 as the total number of workdays for Fiscal Year 2008. This was incorrect; Anthony Marable had sent the staff (including you) an updated Fiscal Year 2008 schedule of workdays reflecting that the total number of days for fiscal year 2008 was 262.

i.  In PGA 10 funds you entered in the remarks section for buildings DC0011ZZ "Commercial Facilities Management (CFM) contract not yet posted due to continuing resolution (CR), variance would be reduced when posted in Pegasys". For building MD0334ZZ you entered "new option year not yet posted in Pegasys due to CR". In both cases, the remarks were incorrect. In

the case of DC001ZZ, a CFM contract was in place, but needed to be modified. In the case of MD0334ZZ, a CFM contract was in place, but the RWA R type income had not been collected.

j. In PGA 10 funds your remarks for buildings MD0331ZZ ("new option year not yet posted into Pegasys due to CR"), MD0765ZZ ("investigating, However, CR could also be a factor causing the variance"), , MD0804ZZ ("New option year not yet posted into Pegasys due to CR"), MD0811ZZ ("New option year not yet posted into Pegasys due to CR"), and MD0816ZZ ("New option year not yet posted into Pegasys due to CR") were incorrect. You did not include the multiple sources of the anticipated income (direct, reimbursable, or multiple contracts) which resulted in a larger variance.

k. In PGA 10 funds your remarks for building MD0709ZZ ("investigating, However, CR could also be a factor of the variance") were incorrect. You did not account for the anticipated income which resulted in a larger variance. This building is a White Oak building and it is completely reimbursable. The CR has no effect on this building.

2. In January 2008, you submitted the December 2007 Fund Status Report with the following errors.

a. You used the incorrect projection formula for PGA40. There are 262 total workdays in Fiscal Year 2008. You incorrectly identified the total number of workdays in Fiscal Year 2008 as 217. Anthony Marable had sent the staff (including you) an updated Fiscal Year 2008 schedule of workdays reflecting that the total number of days for fiscal year 2008 was 262.

b. You did not include the anticipated income for any of the PGA 40 funded buildings. The anticipated income should have been presented and prorated ($447,765.00) by building. The anticipated income was provided to you on January 9, 2008.

c. You did not enter credits in the fourth column under lump sum actions for PGA 40 funds as you should have. The lump sum actions were provided to you on January 9, 2008.

d. The remarks entered for buildings DC0086ZZ ("the anticipating budget requested is reduced"), MD0709ZZ ("investigating"), and MD0804ZZ ("Option year not yet posted") were incorrect. Any variance of $100K has to be explained in the remarks section of the Fund Status Analysis. The reason for

the variance is that you did not put in the anticipated income. Yet your explanations indicate other reasons that have nothing to do with the variance.

e. You failed to include $1.9M in the anticipated obligations analysis for building MD0804ZZ.

f. You did not include an anticipated income for any buildings in the Fiscal Year 08 on the December 2007 PGA10 Fund Status Analysis when that should have been presented and prorated ($181,248.00) by building.

g. You incorrectly noted a debt of a lump sum action amount for building MD0334ZZ on the December 2007 FSA in the column marked "FY 08 ADJST BK DEC." This column is the FY 08 adjusted book month for December and is a subtotal of the first four columns. This amount should have been a credit of about $14,679.00 and should have been added back into the projection formula. As a result the end of year projected obligations were overstated.

h. In the remarks section for buildings MD0334ZZ, MD0709ZZ, MD0765ZZ, MD0804ZZ, MD0811ZZ, MD0816ZZ, and MD0818ZZ you entered incorrect explanations. In the remarks section of building MD0331ZZ you stated "New option year not yet posted." This was not correct. The contract was a multiple distribution line contract to other buildings on the FDA White Oak Campus.

3. On around February 20, 2008 you submitted the January 2008 Fund Status Report with the following errors.

a. For PGA40 funds your beginning obligation numbers were incorrect. You did not include obligations and income for building number VA0882ZZ. After December the staff was told that they would have to get the anticipated income on their own as it would no longer be provide by Roland Caton. Anyone of the staff can download the income and obligations for their inventory off Financial Management Information System (FMIS). The correct anticipated obligation numbers were provided to the entire staff (including you) prior to your submission of the FSA to your team leader on February 20, 2008.

b. For PGA40 funds you failed to include an explanation in the remarks section for what you noted to be above a $100K variance on building VA0349ZZ. You are required to do so.

U.S. General Services Administration
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

c. For PGA10 funds your beginning income and anticipated incomes were incorrect because your report was missing incomes that were posted in January for buildings VA0347ZZ, VA0839ZZ, VA1287ZZ, and VA1447ZZ. These omission of the incomes for these buildings meant that the income was understated resulting in overstating the obligations.

d. For the PGA10 Fund Status Analysis for building VA0325ZZ you did not include the amount of $6,600 in the lump sum obligation reflected in the column, "FY 08 ADJST BK JAN." This resulted in overstating the obligations. This amount was reflected in the FY 07 BA61 Lump Sum Actions for that building, which was provided to you prior to your submission of the FSA on February 20, 2008.

Critical Element 6—Pegasys Support<br>(See Attachment for full description)

**In order to meet performance expectations for this critical element you must generally manage the Pegasys process for the Service Center. You must adhere to policies and procedures. You must compile accurate routine and special reports and monthly tracking reports within established timeframes.** Entries into Pegasys must be accurate, coded correctly and completed within 48 hours. All documents should be reviewed and rejected as needed in accordance with our internal control deadlines. Below are the specific instances in which you failed to meet the performance expectation of this critical element.

Pegasys is the official financial system for GSA. It tracks obligations and expenses. Into this system all of GSA's financial data is entered. The quality control process for entries into Pegasys is as follows. Completed documents are placed in the quality control box and then reviewed for errors by our Quality Control Analyst. Documents containing errors are returned to the analyst who prepared them to correct the errors.

1. In December 2007 you only signed for twenty-one (21) documents to process into Pegasys. Of those 21 documents, you only processed seventeen (17) documents into Pegasys. Four (4) documents had to be reassigned to another analyst. As identified below, these documents contained numerous errors.

a. On December 3, 2007 you failed to submit a payment in the amount of $7,500 for account number PN5N02351 and the information package did not include the necessary fax confirmation for that account.

b. On December 5, 2007 you entered the incorrect address for the vendors physical and remit to addresses on PJ8N00105. You reversed the vendor's physical and remit addresses in Pegasys.

c. On December 5, 2007 you did not input the office address in Pegasys as required for document number PJ8N00104.

d. On December 11, 2007 you entered the incorrect invoice number in Pegasys for document number 1B7N01171.

e. On December 11, 2007 you entered the incorrect period of performance into Pegasys for document number 1B5N02316.

f. On December 11, 2007 you signed for document number PJ6NA3385-CCA INC for $87,932.00. On December 12, 2007 you were instructed to enter information for document number PJ6NA3385 into Pegasys. On December 20, 2007 an e-mail was received informing me that the document had not been processed in Pegasys. You were asked to process the document but could not locate it. A copy was given to you and processed in Pegasys on December 20, 2007 which was not incompliance with the 48-hour processing requirement.

g. On December 15, 2007 you entered the incorrect date for document number 1B8N00025. You entered a date of December 15, 2007 when the actual date of the invoice was December 12, 2007. .

h. On December 20, 2007 you entered the incorrect invoice number in Pegasys for account number 1B8N00331. You entered invoice number 4658A instead of 4658.

i. On December 19, 2007 you entered the incorrect date for account number PJ8N00053. You entered a date of December 15, 2007 when the actual date of the invoice was December 12, 2007.

j. On December 27, 2007 you entered the incorrect period of performance for document number 1B4N01797. You entered 3.1.05 – 2.28.06 on accounting line 1, instead of 11.1.07-11.30.07.

2. In January 2008 you signed for twenty-two (22) documents to process into Pegasys. You only processed thirteen (13) of those documents. In the thirteen (13) that you processed, you made the following errors that had to be corrected in Pegasys:

- 8 -

    a. On January 16, 2008 you entered the incorrect invoice number into Pegasys for document number PJ7N02973. You entered invoice number 122007.101917.01 instead of 122007.10197.01.

    b. On January 22, 2008 you entered the incorrect invoice number into Pegasys for document number 1B4N03720. You entered invoice number 1113720 instead of 111378-21.

    c. On January 25, 2008 you entered the incorrect invoice date into Pegasys for document number PJ7N02636. You entered invoice date 12/05/2007 instead of 10/17/2007.

    d. On January 25, 2008 you entered the incorrect invoice date into Pegasys for document number PJ8N00053. You entered invoice date of 1/16/2008 instead of 1/14/2008.

The procedures governing this action, as well as the rights extended to you are set forth in 5 C. F. R. Part 432 (January 1, 2008) and Article 15 (Performance Appraisal Systems), Section 7 (Unacceptable Performance) in the Memorandum of Understanding (MOU) between the GSA and the National Federation of Federal Employees (NFFE) on the GSA Associate Performance Plan and Appraisal System (APPAS) signed in August 2004.

This is a proposal, not a decision. Therefore, you have fifteen (15) calendar days from the date you receive this memorandum to reply. Your answer may be made orally, in writing, or both. You may also submit affidavits and other documentary evidence in support of your answer. Any reply you make will be fully considered in making a decision. Your written reply should be made to the following person, or to the official who may be acting in her capacity at the address below:

        Sharon J. Banks
        Director, Metropolitan Service Center
        Public Buildings Service
        National Capital Region
        General Services Administration
        1099 Fourteenth Street, N.W., Room 200W
        Washington, D.C. 20005

If you wish to make a personal reply, please contact Ms. Banks at (202) 219-3367 to schedule an appointment.

You have the right to be represented by any person of your choice, or you may represent yourself. You must designate your representative in writing, to Ms. Banks before he/she can represent you. A Designation of Representative form is provided in the event you wish to designate someone to represent you.

During this time you will remain in an active duty status. You are entitled to arrange with your supervisor for a reasonable amount of official time to prepare your reply, meet with a designated representative, secure affidavits or other documents, and review the material relied upon supporting the reasons for the proposed removal. If you do not reply within the fifteen (15) calendar day period allowed for your reply, Ms. Banks or her designee will make a decision based on the evidence then available. If you do reply to this notice, the decision will be based on careful consideration of the evidence of record, and any written and/or oral replies to this notice.

As soon as possible after your reply, or after fifteen (15) calendar days from receipt of this notice if you do not reply, a written notice of decision will be given to you that:  1) takes the proposed action; 2) does not take the proposed action; 3) reduces your grade; or 4) reassigns you to another position for which you are qualified. A final decision will be made within thirty (30) calendar days after expiration of the advance notice period.

If you have any questions regarding your rights or the procedures involved in proposing this action, or would like to review or obtain a copy of the material relied upon supporting the reason for the proposed removal, you may contact Beverly C. Howard, Human Resources Specialist, Employee and Labor Relations Branch, Human Resources Division at (202) 708-5321.

_____
Abdulai Conteh

7/23/2008
Date

Your signature indicates you received the original of this memorandum.

Attachment:  Performance Plan
             Designation of Representative Form

cc:   Employee/union copy (w/o attachment)
      Beverly C. Howard, HRD, WCPR (w/o attachment)
      Sharon J. Banks, WPD (w/o attachment)

U.S. General Services Administration
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov



GSA National Capital Region

November 28, 2007

Memorandum for Abdulai Conteh
Budget Analyst, Metropolitan Service Center (WPD)


Dear Abdulai:

This Memorandum constitutes notice that you are not meeting the performance expectations as outlined in your performance plan under Critical Element #3, Budgetary/Financial Analysis and Critical Element #4, Pegasys Support. I am placing you on a Performance Improvement Plan for a period of two months to provide you with the opportunity to improve and demonstrate acceptable performance in Critical Elements #3 and #4. If after being given this opportunity to improve and you fail to meet performance standards for one or more critical element, it will result in my recommending your demotion in grade or removal from Federal Service.

On May 23, 2007, I met with you and discussed your mid year performance rating and advised you that your performance in the Budgetary/Financial Analysis and Pegasys Support Critical Elements were at an unacceptable performance level which was causing your Critical Element #2, Customer Service, to decline as well. I explained that your current performance puts you on the borderline of falling below a Level 2 rating in one or more critical element and I stressed to you the importance of improving your performance before the final rating period ending September 30, 2007. I discussed with you specific examples of deficiencies in your performance, and provided you with documentation during your recent Performance Improvement Notice (PIN) meetings. I also encouraged you to seek out opportunities for additional on the job training in areas you feel you are lacking in knowledge and I would continue to arrange for and fund whatever formal training was necessary to bring your performance to the fully successful level.

During our meeting on May 23, 2007, I also clarified the critical elements and associated performance expectations for your position of Budget Analyst, GS-0560-11/04 for the rating period covering October 1, 2006 to September 30, 2007, which was extended to October 19, 2007 due to your extended leave of 3 weeks during the month of August. You confirmed that we discussed your performance expectations by signing the Performance Plan and Appraisal Record form on May 23, 2007. You were then given a copy of the Performance Plan and Appraisal Record form along with the Associate Performance Planning Worksheet, which contained your critical elements and performance expectations. A copy of the form and worksheet is attached.

U.S. General Servic
301 7th Street, SW
Washington, DC 20
www.gsa.gov



EXHIBIT

Despite our discussions, you have shown continued deficiencies in keeping up with the workload and accomplishing tasks in a timely manner. For example, you continually process significantly fewer Pegasys documents but have a high error rate. You also continue to demonstrate an inability to produce an accurate monthly fund status report that is fully researched and adequately addresses all variances in a timely manner.

The intent of this Performance Improvement Plan is to identify your specific deficiencies and to assist you in meeting the expectations for successful performance under Critical Element #3, Budgetary/Financial Analysis and #4, Pegasys Support. The following is a list of the acceptable level of performance expectations along with a list of specific incidences of how your performance fails to meet performance expectations:

**Monthly fund status reports are complete, accurate and submitted within the established timeframes with all follow up actions completed by the next reporting period.**

1. You submitted the May fund status report on June 21, 2007. The report contained numerous errors and was not thoroughly researched. For A10 the approved operating plan was not correct, the building names did not match the building numbers, the anticipated income totals were not correct and the remarks contained insufficient information. It was apparent that you did not substantially research nor satisfactorily address all of the variances +/- $100K. Roland informed you of the errors and you submitted a revised fund status report on June 25, 2007. The reports still contained errors and you did not document any additional research.

2. You resubmitted the June fund status reports to on July 18, 2007. The report contained numerous errors and was not thoroughly researched. For A40 the approved operating plan was not correct. The building names were not recorded for all of the building numbers, the anticipated income totals were not correct and the remarks contained insufficient information for both reports. It was apparent that you did not substantially research nor satisfactorily address all of the variances +/- $100K.

3. You did not submit the July fund status reports when you returned from your extended sick leave from August 6, 2007 though August 24, 2007.

4. You submitted the August fund status reports on September 24, 2007. The report contained numerous errors and was not thoroughly researched. For A10 the approved operating plan was not correct, the building names did not match the building numbers, the anticipated income totals were not correct and the remarks contained insufficient information. It was apparent that you did not spend sufficient time researching the variances to satisfactorily address all of the variances +/- $100K. Roland informed you of the errors and you submitted a revised fund status report on October 2, 2007. The reports still contained errors and you needed to further research highlighted variances.

**Entries into Pegasys are accurate, coded correctly and are completed within 48 hours. Necessary corrective actions are made within 48 hours. All documents should be reviewed and rejected as needed in accordance with our internal guidelines.**

For the period of June 1, 2007 through September 28, 2007 approximately 44% of the documents you processed in Pegasys exceeded the 48 hour timeframe.

1. You logged out the Receiving Report for 1B6NA1967 on 9/28/07, but to date this document has not been processed in Pegasys. An invoice is pending that is approaching the 30 day threshold for processing invoices. This document had to be given to another analyst for input into Pegasys on 10/12/07.

2. You logged out PJ6NA2082 on 9/11/07 and it was not been entered in Pegasys by you until 10/17/07.

3. You logged out the contract modification for 1B6NA2797 on 9/6/07 and to date it has not been entered in Pegasys.

4. You logged out the contract for 1B7N02718 and processed the document in Pegasys on 9/27/07 but no RO or RA was entered in the lease module.

5. PJ6NA3410 was logged out by you on 9/12/07 and it was processed by another analyst on 9/14/07 which was your AWS day.

6. PJ7N01442 was logged out by you on 7/24/07 and it was processed by another analyst on 7/30/07.

7. PJ7N02150 was logged out by you on 7/9/07 and it was processed in Pegasys by another analyst on 7/12/07.

8. 1B4N01797 was processed by another budget analyst on May 25, 2007 while you were on your AWS day. Notification was received from Finance that an invoice was received for payment on May 23, 2007 but could not be processed because the contract modification document had not been entered in Pegasys. You logged out the contract modification document for 1B4N01797 on March 1, 2007 but never processed the document in Pegasys.

9. The receiving report for contract PJ7N0045 was logged out by you on June 12, 2007 but not processed in Pegasys until after you were asked to provide a status on the action on 6/19/07.

10. Upon reviewing the contract for 1B6NA3765 which you entered into Pegasys on June 19, 2007, we discovered that the monthly accruals were incorrect. You set up the monthly accruals for the total value of the contract which was $41,016.90. The

3

accruals should have been set up for only $2,412.75.

11. The receiving report for contract 1B6NA1919 was processed by you on June 18, 2007 with the incorrect vendor information. The documents should have been rejected and forwarded back to the appropriate contract specialist.

12. The receiving report for 1B7N01387 was logged in by the contract specialist on July 27, 2007 but the document was not logged out. On August 1, 2007, the team leader was notified of an outstanding invoice for this contract. The document was found on your desk and had not been processed in Pegasys.

13. On September 28, 2007, you logged out document 1B7N00872. It was entered in Pegasys on 9/28/07 but the lease profile reflects the incorrect monthly accruals. The accruals should be $436.08 monthly and instead you entered $265.21 monthly. The purchase order number was entered incorrectly in the RO template.

14. On September 25, 2007, document PN7N01843 was entered in Pegasys but there was no record of the invoice being faxed to Finance. It was noted in the quality review that there was no fax verification in the original package. When you were notified of the error you produced a copy of the fax transmittal.

15. On September 28, 2007 you entered the modification for PJ7N01189 to correct the building number from VA1447ZZ to VA1287ZZ but the building number remains unchanged.

**ACCEPTABLE LEVEL OF IMPROVEMENT WILL BE MEASURED BY THE FOLLOWING:**

Monthly fund status reports will be accurate, complete and submitted within the established timeframes.

- All fund status reports will be submitted to the Team Leader within established timeframes and/or no more than 2 days prior to the 4th Tuesday business review meeting.

- Few, if any formatting errors will be contained in the fund status reports submitted.

- Few, if any mathematical errors, will be present on fund status reports submitted.

- Variances to Plan +/- $100K should be thoroughly researched and documented in the remarks column of the reports.

4

- Few, if any follow-up actions will remain be resolved by the next reporting cycle or provide a target resolution date.

Pegasys documents will be logged out daily and processed with 48 hours with minimal coding errors. Coding errors must be corrected immediately upon notification.

- All Pegasys documents will be processed within 48 hours after receipt.

- Few, if any coding errors will be present on Pegasys documents but if corrections are required the corrections will be made within 24 hours of notification.

- You will respond within 24 hours to issues relating to the processing of your Pegasys documents and take the necessary actions to bring those issues to a prompt and adequate resolution.

## REFERENCE AND TRAINING INFORMATION

You should have reference materials and procedural guidelines such as training manuals, meeting notes and your personal work notes which you can review. You have attended the following training sessions:

- Appropriation Law- attended January 12 - January 15, 2003
- Fund Status Analysis- attended June 1, 2006 – June 5, 2006
- Fund Status Analysis-attended February 1, 2007-February 2, 2007
- Pegasys Training- attended July 20, 2006
- Pegasys Refresher Training- attended October 2006
- Microsoft Excel - attended July 24, 2006
- Time Management- attended July 17, 2007
- Basic Writing and Grammar- attended September 26, 2007 (1 day of 2 day course still pending)

## WHAT I WILL DO TO ASSIST YOU:

I recently made arrangements for you to receive individual refresher training in budget fund status analysis and Pegasys. You received the budget fund status training on February 28, 2006 and the Pegasys training on March 13, 2006.

Today begins an opportunity period for you to improve your performance that will continue until January 28, 2008. During this period, Karen Smith, your Branch Manager, will assign you the full range of duties for your position and closely review your performance with the assistance of your team leaders Roland Caton and Anthony Marable. They will work with Karen regarding the deadlines and scheduling of your work. In addition, Karen Smith, Financial Management Branch Manager for the Metropolitan Service Center, will be assigning and reviewing your work as well.

5

Karen, Roland and Anthony will be available to you throughout your opportunity period for consultation about work techniques and setting priorities. Karen Roland and Anthony will meet weekly to discuss your progress, review your assignments, goals, objectives, and activities. Tentatively, this meeting will be scheduled for every Thursday morning at 10:00AM. If either of them has leave scheduled for Thursday or are unavailable, you will meet on Friday mornings at 10:00 AM, unless alternative arrangements are made by prior agreement. It is your responsibility to attend these meetings and for your benefit, we will make every effort to avoid scheduling conflicts.

If there is any further specific help from us that you feel would benefit you in improving your performance, please discuss it with us. Although we will assist you, you are personally responsible for completing your work and for improving your performance.

If you desire consideration for any medical condition that may be contributing to your unacceptable performance, please advise us at once. This is your opportunity to submit medical evidence. I will take your medical condition into account in determining the administrative actions to be undertaken in your case.

I also want to remind you of the Employee Assistance Program (EAP) and recommend that you seek their assistance, if needed. This program was established to provide counseling and assistance to employees who are experiencing problems that contribute to unsatisfactory performance or conduct. The EAP process is kept confidential, except under some limited circumstances. You can contact the EAP at 1-800-222-0364.

If your performance does not improve by the end of the Performance Improvement Plan period, January 28, 2008, I will have no choice but to recommend your demotion in grade or removal from the Federal Service. You may be demoted or removed at any time during the Performance Improvement Plan period should your performance in one or more critical element addressed in this letter become unacceptable during the performance improvement period, Your Performance Improvement Plan process will begin at the receipt of this letter. You are also expected to maintain an acceptable level of performance in all of your other critical elements.

It is my hope that through working together under the Performance Improvement Plan, your performance will improve. I want you to succeed during your opportunity period. Please give your best effort to improve your performance.

Sincerely,

Barbara Sisco
Deputy Director, Metropolitan Service Center

6

ATTACHMENTS
- - Performance Plan and Appraisal Record Form
- Associate Performance Planning Worksheet

Cc:Sharon Banks,Cheryl George, NFFE representatives

Page 472

1          Q      Is not about ability.  Am I taking

2     your answer as my question is answered or do

3     you want to answer my question?

4          A      The question that you asked me was

5     --

6          Q      How did you get this document?

7          A      To the best of my knowledge, these

8     printed documents were provided Abdulai.

9          Q      Okay.

10         A      And this would be and let me

11    clarify that because this is the cover page

12    that I made notations on and gave back to him

13    to go back and do further research and I kept

14    a copy for my file.

15         Q      Okay.  Where are we, 39A, B?

16              MR. ADEBONOJO:  B.

17              BY MR. DURUJI:

18         Q      This will be 39C.  I want you to

19    identify the document from whom to whom and

20    look at the date.

21         A      Okay.

22         Q      Is that email from Dianah Small?

EXHIBIT
AE

8c30a558-8fa5-4569-a4f5-cd659dbf37ef

Page 86

1    what I produced to her.  But this was just a set up, because

2    she was upset and she did not give me my promotion.

3           So she was doing it to me to set me up.  This is

4    one of the e-mails, and this is one of the e-mails that were

5    taken from archives.  They were kept from me.  I never see

6    them.  I have no access to them.  They were never given back

7    to me.

8        Q    **So you concede that there was an error in carrying**

9    **out this --**

10       A    It wasn't an error.  It was what I have at that

11   time.  In agreeance with Finance, that's what I used, based

12   on the numbers that were given.  The information that I was

13   dealing with is what I used.  She withhold the other

14   information.  She don't give it to me.  I repeat again, I'll

15   read it one more time.  I said --

16       Q    **Excuse me.  Let me -- how does your explanation**

17   **account for variances of 10K give or take?**

18       A    Because you do not know.  She gave me a formula

19   which I work on.  She mentioned 2004 CPI.  She did not

20   specify the lease number.  So I had to back to do the

21   adjustment, which list am I dealing with?  It wasn't

22   specified.

23       Q    **If the instructions weren't clear, shouldn't you**

24   **have asked?**

25       A    Yes, I did ask.  She never produced.  We have a

EXHIBIT

AF

Page 87

1    verbal communication.  She jump into -- as you know, she came

2    to supervise me, because she was planning to get me.

3              This was not an assignment for Barbara.  This was

4    an assignment coming from Cynthia.  She took it up on her own

5    to supervise me, and I asked for information.  This is what

6    she produced to me.  This is what I produced to her.

7         Q    Isn't Barbara your supervisor?

8         A    She wasn't my team leader.  I do not get assignment

9    from Barbara.

10        Q    But who is your supervisor?

11        A    My supervisor was Carol Vance.

12        Q    Are team leaders supervisors?

13        A    To me, the team leaders was supervise me.  They

14   give me my assignments.

15        Q    Under your understanding of GS, of the way the GSA

16   structure is, are team leaders supervisors, or do they just

17   apportion work?

18        A    Team leaders are team leaders.  They assign work.

19        Q    Are they supervisors?

20        A    In all tasks, they were the supervisors.

21        Q    Do they do evaluations?

22        A    They recommend.

23        Q    Do they do final evaluations?

24        A    Yes.  They give final evaluations to the team

25   leader, to branch chief.

Page 88

```
 1        Q     You mean they recommend evaluations, but they don't

 2   prepare the evaluation.  Did any of the team leaders prepare

 3   your annual evaluation?

 4        A     Yes, they prepare it.  They gave me copy.  I submit

 5   to Barbara, to show me which way I was.

 6        Q     A recommendation, or they prepared your final

 7   evaluation?

 8        A     A recommendation for evaluation.

 9        Q     So they don't prepare final evaluations?

10        A     No, they do not.  They recommend.

11        Q     So one of the functions of the supervisor is to

12   prepare the final evaluation, and you're saying that the team

13   leaders do not prepare final evaluations; is that correct?

14        A     Well, I don't know because --

15              MR. DURUJI:  Objection, leading.

16              MR. ADEBONOJO:  Answer the question.

17              THE WITNESS:  I don't know to what aspect.  When

18   they prepare an evaluation, they give us a copy.  We know

19   exactly where we stand.  It's no secret.  Whatever they

20   prepare is what you're going to receive on your final

21   evaluation.

22              BY MR. ADEBONOJO:

23        Q     It's a recommendation, is it not?

24        A     Whatever the team leader recommend is what we see

25   on our final evaluation.
```

Page 89

1   Q    Does the supervisor have the option to reject a

2   recommendation?

3   A    I don't know.

4        (Pause.)

5        BY MR. ADEBONOJO:

6   Q    Mr. Conteh, in your complaint, you indicated

7   that -- when did you indicate you were assigned the rent

8   estimate?

9   A    I don't have knowledge of that.  I don't recall.

10  May I see it?

11  Q    It's part of your complaint.  You don't remember

12  when you were assigned the rent estimate?

13  A    That was approximately end of January.

14  Q    You indicated that you also indicated or did you

15  also indicate that you had three weeks to complete the rent

16  estimate, in your complaint?

17  A    When I say three weeks of complaint, it was an

18  assignment at that period to complete within the rent

19  estimate, not the rent estimate that's here.  Within the rent

20  estimate, there were assignment that comes up and they're

21  fragmentized.  You have different that you do.  You have two

22  weeks to submit.  Like when I profile the other rent.

23  Q    Just to back up a bit, what is a rent estimate?

24  A    A rent estimate is when you do analysis within a

25  two-year time frame, so that it will give you a leeway.  It's

EXHIBIT

#G

1    Q    So you need the CBR to be able to do the estimate

2    that goes into the rent est; correct?

3         MR. DURUJI:   Objection.   Asked and answered, and

4    leading.

5         THE WITNESS:   No, not all the time.

6         BY MR. ADEBONOJO:

7    Q    Okay.   So how do you come up with the rent est

8    where you don't have a CBR?

9    A    If the CBR is expiring, if the lease is expiring,

10   you don't need a CBR.   The lease is going to expire.   It's

11   going to go out.   So when you do a blanket statement you need

12   this to do it, no it's not.

13   Q    Okay.   But in any case, even when the lease is

14   expiring, your projection is still based on the lease or the

15   CBR; correct?

16   A    Not all the time.

17   Q    Okay.   In any case, did you do any work on the high

18   profiles CBRs?

19   A    Yes, I do.

20   Q    You did?

21   A    Yes.

22   Q    Did you do all the work yourself?   Did you do it

23   before or after you got the password?

24   A    When I came, when I was given assignment, the CBR

25   was already in process, that we are -- four people.   If I

Page 108

1    may, an e-mail was sent to me.  Marcela Dimayuga was working

2    on it, Carol Vance, Marc Rappaport and Barbara Sisco started

3    the process.  You have to do the high profile to lead into

4    the rent est.

5         Q    Would that be this document?

6         A    Yes.

7              COURT REPORTER:  This is 14?

8              MR. ADEBONOJO:  Yes.

9                              (Whereupon, the document referred to

10                             was marked for identification as

11                             Conteh Deposition Exhibit 14.)

12             BY MR. ADEBONOJO:

13        Q    So you recall getting this one?

14        A    Oh yes.  This one I recall getting.  This one is in

15   2006, counsel.

16        Q    Yes, 2006.  Well, there's some e-mails from

17   December 2005.  What's the difference, 2005 -- you don't

18   recall some a month before this one?

19             MR. DURUJI:  Objection.  We have said he wasn't

20   available in December 2005.

21             BY MR. ADEBONOJO:

22        Q    In any case, so how much of the high profile CBR

23   work did you do after you got it, for the 2008 rent est?

24        A    I prepared -- I prepared some of the numbers on the

25   high profile, and then I was told to do a letter for Mr.

1          (Pause.)

2          BY MR. ADEBONOJO:

3      Q    After the rent est was completed, and that task was

4  done, what did you -- did you go back to your normal routine

5  of handling your D.C. case load?

6      A    Yes.

7      Q    And do you know who performed the rent est the year

8  after you did it?

9      A    After I did it?

10     Q    Yes, the year after you did it.

11     A    No, I do not.

12     Q    You don't?

13     A    No.

14     Q    Would it surprise you to know that a GS-9 completed

15  the rent est the following year after you?

16     A    I don't know.

17     Q    So what if -- is it your testimony that you

18  received no assistance whatsoever from Marcela Dimayuga in

19  the rent estimate project?

20     A    Counsel, I'll repeat again.  This is basically what

21  I said before.  I have the same stand.  When I was given

22  assignment, I did it all by myself until I think it was March

23  2nd, when Marcela was provided with access to the system, and

24  then they gave her an assignment that I knew nothing about.

25     Q    And the assignment that -- so it's your testimony

Page 131

```
1       A    I tried to enter, which I could not enter.  So I

2    told Carol Vance that I --

3       Q    After you got the good password.  I'm sorry.

4       A    After I got the good password?

5       Q    Yes, uh-huh.

6       A    I started updating the rent est to, based on

7    information that I had at that time.

8       Q    How many rent est records did you have to update?

9       A    How many?

10      Q    Yes.

11      A    Many of them.  I don't know the number.

12      Q    You don't know how many rent est records you had to

13   update?

14      A    No, I don't really know.  But they gave me about

15   approximately about 400 or something.  Then the number

16   increased to 415.

17      Q    So you do know the numbers?

18      A    No.  I'm giving an approximate number, based on my

19   recollection.

20      Q    Okay.  So did you update all of those 415 records

21   by the time the rent est was due?

22      A    By the time the rent est was due?

23      Q    Yes, or the deadline of March 31st, 2006?

24      A    We go by sequence.  We do them by different

25   deadlines.  March 31st, I think approximately was the last
```

Page 135

1    that whatever Marcela did didn't contribute to you completing

2    the rent est?

3        A    That's not my testimony.

4        Q    Okay.  That's why I'm asking you.  So are you

5    saying that she didn't help you in any way, shape or form?

6            MR. DURUJI:  That's not the testimony.  Objection.

7    Mischaracterization of testimony.

8            MR. ADEBONOJO:  Okay.  Answer the question.  I said

9    are you saying.  Answer.

10           THE WITNESS:  Repeat the question again for me.

11           BY MR. ADEBONOJO:

12       Q    Are you saying that Marcela helped you in no way,

13   shape or form, including whatever you allege that Barbara

14   asked her to do, that nothing she did assisted you in

15   completing, in performing the rent est to the extent that you

16   did?

17       A    Not to my recollection.

18       Q    You allege that you were given tasks with

19   unreasonable deadlines.  Is it your contention that the rent

20   est was one of those tasks that was given with an

21   unreasonable deadline?

22       A    The rent est, this is when Barbara request for

23   information, she gave me several unreasonable deadlines.

24       Q    Was the rent est one of those things?

25       A    That's what I'm saying is that there were different

Page 181

1          BY MR. ADEBONOJO:

2      **Q    What kind of school is the school you got your MBA**

3   **from?**

4      A    Southeastern University.

5      **Q    Okay.  Is it a building school?  Is it on-line?  Is**

6   **it a real school -- I'm sorry, I didn't mean real.  Please**

7   **forgive me for that.  Is it an established school,**

8   **accredited, on-line?  What is it?**

9      A    It's a class.  It's not too far from you.  I went

10  to class, took the credits.

11     **Q    Okay, and is it ranked?  Do you know anything?**

12     A    No, I don't know.  When I applied, when I saw it, I

13  applied, I was accepted.  I went to class.

14     **Q    Did you have to take any exam to get in?**

15     A    The GMAT, the Graduate Management Aptitude Test.

16          MR. ADEBONOJO:  Nothing further.

17          EXAMINATION BY COUNSEL FOR THE PLAINTIFF

18          MR. DURUJI:  Abdul, approximately what was the max,

19  but not the max, but where did we stop?  What number did we

20  stop at?

21          COURT REPORTER:  27.

22          MR. DURUJI:  27, okay.  This will be 27, because I

23  want you to look at it.  Is this -- describe it?

24          THE WITNESS:  This is an e-mail that was sent to

25  Barbara Sisco from Carol Vance, September 8, 2005 at 11:00

## AFFIDAVIT
### IN THE MATTER OF: <u>Abdulai Conteh v. GSA</u>
GSA Complaint Number:  Case No. 06-NCR-WP-AC-10

Location:  Washington, D.C.

I, Sharon Banks, solemnly swear to the truth of the following statement which is in response to questions posed by Robert Walker, Equal Employment Opportunity (EEO) Investigator, F & W Associates, and provides information pertaining to the formal complaint of discrimination, filed by Mr. Abdulai Conteh, against the U. S. General Services Administration on June 29, 2004, Case No 06-NCR-WP-AC-10.  The following claim has been accepted for investigation:

Whether he was discriminated against because of his race (African-American), color (Black), National Origin (African), sex (male), religion (Muslim) when you he was harassed starting December 5, 2006 (sic), regarding his work performance and assignments.

Also, he amended his harassment claim to include reprisal for filing an EEO complaint as a basis, when he was denied sick leave on February 29, 2006 (sic), and denied his AWS (Alternative Work Schedule) day on March 31, 2006.

My name is Sharon Jenkins Banks.  I am Deputy Director of the Metropolitan Service Center, GS – 15.  My race is African-American; my skin color is light skinned; I am female; my national origin is American; and my religion is Baptist.  I was aware of Mr. Conteh's prior EEO Complaint.  Yes.  Barbara Stewart, of the EEO Office sent notice of the Complaint.  I don't remember when that was.

I have been in my position since November 2004.  I work for the General Services Administration, Metropolitan Service Center, located at 1099 14th N.W., Suite 200W, Washington, DC 20009.  I am Mr. Conteh's second level manager.

My first-level supervisor is John P. Allen, Director, Metropolitan Service Center. My second-level supervisor is Tamela Riggs, Deputy Assistant Regional Administrator

Initial _____

Page 1 of 6



EXHIBIT
AA

for Operations.

## HARASSMENT IN WORK PERFORMANCE AND ASSIGNMENTS

Mr. Conteh did not complaint to me about Rent Estimate project. I am aware of the projects but not specific assignments. I would not get involved on the working level of who gets what assignments. The time-frames on that project come to the Director and Deputy Director from the Region or National Office. Time-frames are very exact and missing them are unforgivable. Assignments and completion dates are assigned by the supervisor.

Mr. Conteh worked on a team, which was responsible for the budget. I think everyone works on pieces of the budget. A team has to work on it. In prior years, we had a tag team approach. We could not have one person doing the entire budget. Individuals had pieces of it. The individual pieces were not so difficult that one person could not do that piece. e.g., Research may be a part of a bigger package and could be done alone, but it fed into a bigger budget.

It is not true, as Mr. Conteh alleged, that individuals allowed to set their own due dates for part of the budget package because due dates are driven by the national office and the Region in order for the budget packages to be submitted to the Hill. Working in the budget arena, everything has due dates. Some are driven by us, some by the needs of customers, or national office. Providing rental space for customers has due dates given by others.

It is not true that issuing the Performance Improvement Notice (PIN) was done to

Initial _____

Page 2 of 6

000358

harass Mr. Conteh. We are required to give employees mid-year and annual performance evaluations. April or May, generally, is when mid-year evaluations are given. Annual evaluations are given after the end of the fiscal year, September 30th. At mid-year time last year, 2005, Ms. Sisco spoke with him and told him his performance was not up to par. She had to evaluate him at the end of the performance year and at that time he was told that his performance was at a Level 2, which is substandard. We are required to give a person notice of the problem and an opportunity to improve before a final rating is assigned. So he received a PIN which essentially is notice and opportunity to improve before a final rating is assigned.

Mr. Conteh alleged that he was doing the job of three people. Other employees were doing much more than Mr. Conteh. They had a lot of projects wherein Mr. Conteh's workload was lighter.

Ms. Sisco's meeting with Mr. Conteh on a regular basis to review the progress of his performance was not done to harass him. The PIN stipulates that the supervisor or manager must meet, on a regular basis, with the employee under a PIN to help them. The goal is to make them successful. You have to have one-on-one meetings between the employee and the supervisor regularly to review projects and let the employee know how he is progressing. You have to do that by law for marginal and unsatisfactory performers before you can take action. Ms. Sisco had to meet with him to discuss his progress.

With respect to his allegation that he did not receive training, I don't know of any training he requested and did not get. We are very liberal with training and spending

Initial _~SIIB~_____                    Page 3 of 6

000359

funds for employee development, enhancement and advancement. Of course, we have to assess the request, but I am not aware of anything that he asked for and did not get. I can't speak to his allegation that other employees received more training than he did.

With respect to the allegation that he brought these allegations of harassment to my attention, and I did nothing to correct them, my response is that this is not true. He may have come to me and said he was not getting along with Ms. Sisco, but he did not raise the issues of specific projects he was working on or that he was being harassed. I encourage employees to work things out with their supervisors, because that is my manager running the operation. I knew that Mr. Conteh was having a performance problem and, as expected, my manager performed her job to address/correct the deficiencies. As a matter of fact, when deadlines are missed, I hold the managers accountable for it. I had not heard anything so outrageous that I had to step in. All of what was being done for Mr. Conteh was in full compliance with the law and our regulations.

## DENIAL OF SICK LEAVE AND AWS DAY

Some individuals have Monday or Friday off as a part of an alternate work schedule. We have asked people on occasion to pick another day because of project deadlines for time sensitive projects like the rent estimate. Many employees switch without being asked. We expect folks to do that. We have had projects that have been so critical an AWS day is cancelled. For some people that was necessary. Most of our employees volunteer to take another day without any prompting because they are aware of the criticality.

Initial ( /J/H

Page 4 of 6

000369

I cannot speak to his allegation concerning the denial of sick leave.

I did not discriminate against Mr. Conteh because of his race, color, sex, national origin, religion, or in reprisal for prior EEO activity. I did not know until the filing of this complaint, what Mr. Conteh's religion was, nor did I have reason to know that. I would like to note that I hired Mr. Conteh with full knowledge of his race, color, sex, and his national origin.

Initial _____

Page 5 of 6

000361

I have read this statement consisting of 6 pages, and I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty or perjury that the foregoing statement is true, correct, and complete to the best of my knowledge and belief.

Signature: _____

Date: _7/3/06_____

Subscribed and sworn to before me this ___ day of _____ 2006

Witness:

_Juwalogwelan  Abieyuwa  Igodan  Management Inter_

EEO Investigator, F & W Associates

Or

_____

Notary Public

My commission expires:_____

Initial _____

Page 6 of 6

000362

Routing Information:

| Originator | Supervisor | Time Keeper |
|---|---|---|
| Abdulai Conteh | ☒ Barbara A. Sisco | |

## APPLICATION FOR LEAVE

**INSTRUCTIONS:** Please complete the following.

| Name (Print or Type -- Last, First, M.I.): | | | Supervisor: | |
|---|---|---|---|---|
| **Abdulai Conteh** | | | **Barbara A. Sisco** | |
| I hereby request (if more than one box is checked, explain in the Remarks section): | Start Date: | | Hour: | Total Number of Hours: |
| ☒ Annual Leave | 03/29/2006 | | 01:30 PM | |
| ☐ Sick Leave | End Date: | | Hour: | |
| ☐ Leave Without Pay | 03/29/2006 | | 06:00 PM | 4.5 |
| ☐ Compensatory Time | Remarks: | | | |
| ☐ Family Friendly Sick Leave | | | | |
| ☐ Other (Specify) | | | | |
| Signature: | | | Date: | |
| ☒ Signed | | | 03/30/2006 11:11 AM | |

*Abdulai Conteh*

## OFFICIAL ACTION ON APPLICATION

If disapproved, give reason. If annual leave, initiate ation to reschedule.

| ● Approved   ○ Disapproved   ○ Review Required | Date: |
|---|---|
| Reason for denial (if applicable): | 04/24/2006 12:55:09 PM |

☒ Signed      Barbara A. Sisco

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than indicated above, it may provide you with an additional statement reflecting those purposes.--

EXHIBIT

#1

Routing Information:

| Originator | Supervisor | Time Keeper |
|---|---|---|
| Abdulai Conteh | ☒ Barbara A. Sisco | |

## APPLICATION FOR LEAVE

**INSTRUCTIONS: Please complete the following.**

| Name *(Print or Type -- Last, First, M.I.):* | | Supervisor: |
|---|---|---|
| **Abdulai Conteh** | | **Barbara A. Sisco** |

| I hereby request (If more than one box is checked, explain in the Remarks section): | Start Date: | Hour: | Total Number of Hours: |
|---|---|---|---|
| ☐ **Annual Leave** | 03/29/2006 | 08:30 AM | |
| ☒ **Sick Leave** | End Date: | Hour: | |
| ☐ **Leave Without Pay** | 03/29/2006 | 06:00 PM | 9.0 |
| ☐ **Compensatory Time** | Remarks: | | |
| ☐ **Family Friendly Sick Leave** | Doctor schedule a second Xray and and other exam to be done. | | |
| ☐ **Other (Specify)** | | | |

| Signature: | Date: |
|---|---|
| ☒ **Signed** | 03/28/2006 05:21 PM |

*Abdulai Conteh*

## OFFICIAL ACTION ON APPLICATION

| If disapproved, give reason. If annual leave, initiate ation to reschedule. | Date: |
|---|---|
| ○ **Approved**   ● **Disapproved**   ○ **Review Required** | 05/12/2006 01:17:49 PM |
| Reason for denial (if applicable):<br>**Associate provided another leave slip because he came in for half of the day** | |

☒ **Signed**     Barbara A. Sisco

### PRIVACY ACT STATEMENT

Section 6311 of title 5, United States Code, authorizes collection of this information. The primary use of this information is by management and your payroll office to approve and record your use of leave. Additional disclosures of the information may be: To the Department of Labor when processing a claim for compensation regarding a job connected injury or illness; to a State unemployment compensation office regarding a claim; to Federal Life Insurance or Health Benefits carriers regarding a claim; to a Federal agency when conducting an investigation for employment or security reasons; to the Office of Personnel Management or the General Accounting Office when the information is required for evaluation of leave administration; or the General Services Administration in connection with its responsibilities for records management.

Where the employee identification number is your Social Security Number, collection of this information is authorized by Executive Order 9397. Furnishing the information on this form, including your Social Security Number, is voluntary, but failure to do so may result in disapproval of this request.

If your agency uses the information furnished on this form for purposes other than indicated above, it may provide you with an additional statement reflecting those purposes.


EXHIBIT
A-J
tabbies

1    In regard to Mr. Conteh's claim that he did not receive training as a budget analyst, my

2    response is that we were all Program Analysts. The agency first switched Team Leaders to

3    Budget Analyst, and then a year later everyone became Budget Analysts. It was a name change.

4    There were no changes in duties.   Analysts in BA 53 are required to take financial or budget

5    related, or realty classes to help understand the work flow. During our review, our supervisor

6    told us to get training plans in even if we don't always get the training we want. My staff got the

7    classes they asked for. I can't recall anyone in BA 53 being turned down. The only

8    consideration is that leave/classes etc., not be taken certain times during the year, due to budget

9    call, end of the year closing of the books. I don't know if Mr. Conteh put in a request for

10   training.

11   I did not discriminate against Mr. Conteh because of his race, color, sex, national origin

12   or religion.

13   **DENIAL OF SICK LEAVE AND AWS DAY**

14   **AWS Day**

15   I did not have a role in this. I heard about it in one of the meetings that I sat in on. I

16   don't think Barbara Sisco knew how sick he was. The Rent Estimate due date was upon us.

17   Barbara wanted him to come in because she did not want the due date on the Rent Estimate

18   project to slip. I know that when Rent Estimate, budget call, financial plan, or data accuracy

19   projects are due, we have been told by the MSC director that all AWS days be cancelled and

20   leave has been cancelled to work on special projects. This is throughout MSC and applies to all

21   Budget Analysts and Reality Specialists. I am not familiar with anyone that had their sick leave

22   cancelled.

Initials _jds_          Page 5 of 7          EXHIBIT
                                             A-K

1    related to what I am doing day-to-day.  However, my overall curriculum under the

2    Business Degree major made "majority" of the courses permissible.  If additional courses

3    are needed and/or required, you develop your Individual Development Plan, and

4    management will review it to see what classes are permissible.

5

6    **DENIAL OF SICK LEAVE AND AWS DAY**

7    **AWS Day**

8

9         In regard to AWS days, we have been given flexibility to allow our AWS day to

10    float to take it at another time if you had to work on a given AWS day.  There have been

11    times when no one in WPD could take their assigned AWS day.  This happened about a

12    year to a year and a half ago during the "stand down" for data accuracy.

13         I have never had my sick leave cancelled in order to meet a due date.  I was never

14    denied sick leave or asked to take less than I requested.  As a result, I used my better

15    judgment and requested leave whenever absolutely necessary.  **(During the times that**

16    **you worked on the Rent Estimate project, did you ever request sick or annual leave**

17    **on the day of or a couple of days before the deadline on the project?  If so, when did**

18    **this occur and was the leave request granted?)  I cannot recall if I was ever on leave**

19    **during the time I worked on the Rent Estimate Project.  However, if there were such**

20    **any instances, my "back-up" would have completed my assignments and/or meet**

21    **any deadlines.**

Initials _____    Page 4 of 6    000379

1    available, but I choose not to take advantage of them. I have never been denied training

2    because of insufficient funds.

3    **DENIAL OF SICK LEAVE AND AWS DAY**

4        Last year all of BA53– the Realty Specialist, Budget Analyst, everyone–had to

5    work five days and eight hours per day. We could not take an AWS day. We were trying

6    to complete the data accuracy project. However, I have never asked for and been denied

7    sick leave.

000384

# GENERAL SERVICES ADMINISTRATION
## 7th & D Streets, SW
## Washington, DC 20407-0001

### EEO COUNSELOR'S REPORT

### 29 C.F.R. SECTION 1614.105(c)

**A.    AGGRIEVED PERSON**

Name:

Abdulai Conteh (Aggrieved person)

Job Title/Series/Grade:

Budget Analyst, GS-0560-11

Place of Employment:

General Services Administration
Public Buildings Service
Metropolitan Service Center, WPD
1099 14th Street, NW, Suite 200
Washington, DC 20405

Work Phone No.:

(202)219-3338

Home Phone No.:

(301)265-0259

Home Address:

9113 Little Stone Drive
Ft. Washington, MD 20744

**B.    CHRONOLOGY OF EEO COUNSELING**

Date of Initial Contact:

February 22, 2006

Date of Initial Interview:

March 9, 2006

Date of Alleged
Discriminatory Event:

February 21, 2006

45th Day After Event:

April 7, 2006

Reason for Delayed Contact
Beyond 45 days, if applicable:

N/A

Date of Final Interview:

April 6, 2006

Page 1 of 9



EXHIBIT
AL

Date of Notice of Right to File
a Formal Discrimination Complaint:        April 6, 2006

Date Counseling Report Requested:        February 24, 2006

Date Counseling Report Submitted:        April 13, 2006

**C.    BASIS(ES) FOR ALLEGED DISCRIMINATION**

(1)    [  ]    Race (Specify): _____
(2)    [X]    Color (Specify): __dark complexion_____
(3)    [X]    National Origin (Specify):__African_____
(4)    [X]    Sex (Specify): __male_____
(5)    [  ]    Age (Specify):_____
(6)    [  ]    Mental Handicap (Specify): _____
(7)    [  ]    Physical Handicap (Specify):_____
(8)    [X]    Religion (Specify):__Muslim_____
(9)    [  ]    Reprisal (Identify earlier event and/or opposed practice, give date):

**D.    ALLEGATIONS OF DISCRIMINATION**

Aggrieved alleges that he was subjected to continuous acts of harassment from November 2005 to February 21, 2006, based on his national origin (African), sex (male), color (dark complexion) and religion (Muslim) after he filed a grievance with the union. Instances of the harassment are as follows:

1.    On December 5, 2005, he was issued a Performance Plan Notice (PIN).
2.    On a daily basis, management (Sisco) visits his desk for no real apparent reason.
3.    On a weekly basis he meets with management (Sisco) regarding the PIN, but sometimes there is no PIN discussion, he sits in management's office (Sisco) while she receives and returns telephone calls.
4.    From October 17, 2004 to present, management has failed to provide him adequate Budget Analyst training. On October 17, 2004, he transferred from the position of Program Analyst to Budget Analyst.
5.    On January 17, 2006, he was asked to prepare the Yearly Rent Estimate alone, when previously this task was performed by three individuals for FY04 and FY05.
6.    On January 27, 2006, he worked through his lunch to provide a presentation to management (Allen, Banks and Sisco), therefore making management (Sisco) aware of his early departure. On January 27, 2006, management (Sisco) requested that he submit an annual leave request for one hour.

000032

The Aggrieved stated that he had been a Program Analyst, GS-12 at HUD and in April 2003 transferred to GSA as a Program Analyst GS-9/11/12. Aggrieved stated that he was promoted to a GS-11 but had not been promoted to a GS-12. Aggrieved stated that a week after arriving at GSA he was converted from a Program Analyst (343 Series) to a Budget Analyst (560 Series). Aggrieved stated that at the time of the transition he was told that he was going to be well trained for the position and that, to date, he has received two classes in Business Law and nothing else. Aggrieved stated that his position description is that of a Budget Analyst, GS-560-11.

Aggrieved stated that he came to the agency as a result of a vacancy announcement. He stated that he was very successful at his previous job and that when he joined the agency he was presented with cash bonuses and other incentives.

Aggrieved stated that he filed a grievance with the union regarding his not being promoted to a GS-12. He stated that he had no indication that he was not successful in his current position, however the day before he was to meet with the union regarding his not receiving his ladder promotion, he was given a Performance Improvement Notice (PIN). Aggrieved stated the PIN indicated that he had not been performing Critical Element #3, Budgetary/Financial Analysis. Aggrieved stated the notice was issued on December 5, 2005. He stated that if he has not been performing his job as expected he should have be notified earlier.

Aggrieved stated that on a daily basis Ms. Sisco comes to his desk for no apparent reason. He stated that on occasions she requested that he follow her to her office and then she assigned him duties to be completed by close of business. Aggrieved stated that Ms. Sisco does this at least twice a week. He stated that she stopped coming a few days following the filing of his EEO complaint. Aggrieved stated that after he filed his EEO complaint, Ms. Sisco started sending him emails.

Aggrieved stated that every Thursday he and Ms. Sisco meet to discuss the PIN. He stated normally during the meeting timeframe he would sit in her office while she received and returned telephone calls. Aggrieved stated that the week of February 27, 2006, Ms. Sisco provided him with a memorandum for the following week. He stated that was the first time she had done such. Aggrieved stated that he was able to substantiate that he had done everything she had on the memorandum. Aggrieved stated he believes that Ms. Sisco started providing the memorandum because a union representative began attending the meetings with him. Aggrieved stated there was never any positive information on the memorandum.

Aggrieved stated that he returned from leave on January 17, 2006 and on his first day back Ms. Sisco gave him the assignment of preparing the Yearly Rent Estimate report. Aggrieved stated that he has a memorandum showing that four people normally work on this particular rent report. Aggrieved stated that he asked Ms. Sisco if he could have someone to help him prepare the report and that in order to obtain the help, he had to give another individual his

000033

password. Aggrieved stated that Ms. Sisco stated that he should ask Marcilla Dumbuyuge for assistance.

Aggrieved stated that Ms. Dumbuyuge did not provide him with any help with regard to preparing the report. He stated that she simply signed onto the system and reviewed and approved what he had done. Aggrieved stated that the report was due to Ms. Sisco on March 31, 2006. The Aggrieved stated that the report is an 18 month forecast which determines what the future rental rates are going to be. He stated that normally a realty specialist helped with the report and that he did not receive any training as to how the report should be done.

Aggrieved stated that on January 27, 2006 he had to make two presentations, one in the morning and one in the afternoon. Aggrieved stated that one of the presentations had to be made to management, and in order to prepare for it he worked through his lunch. Aggrieved stated that he later informed Ms. Sisco that he worked through his lunch hour to prepare for the presentation, implying that he was planning to leave early to compensate for his time. Aggrieved stated that he did not specifically tell Ms. Sisco that he was leaving early or ask to leave early. Aggrieved stated that later during the day as he was leaving work, around 4:20PM, he ran into Ms. Sisco who requested that he submit a leave slip for one hour. Aggrieved stated that he normally leaves work at 5PM. Aggrieved stated that he believes that he is held to a higher standard than other employees. He stated that he believes that Ms. Sisco is making an effort to get rid of him. Aggrieved stated that he believes she is doing this intentionally because the structure of her organization is mostly Black females; and because he has been spoken highly of and Ms. Sisco is intimidated.

E.    **REMEDY REQUESTED**

In remedy, the Aggrieved seeks:

1.    To be assigned out of the service center;
2.    Payout for performance awards he believes he was entitled to;
3.    Attorney fees, if applicable;
4.    One hour leave restored; and
5.    PIN rescinded and it not become a part of his record.

F.    **THE EEO COUNSELOR ADVISED THE AGGRIEVED PERSON IN WRITING OF THE RIGHTS AND RESPONSIBILITIES CONTAINED IN THE EEO COUNSELOR CHECKLIST.**

The Aggrieved acknowledged receiving the following at the initial counseling session:

1.    Notice of Rights and Responsibilities;
2.    Agreement to Postpone the Final Interview and Extend the Counseling Period; and
3.    Designation of Representative

000034

## G.    SUMMARY OF COUNSELOR'S INQUIRY

(1)    Personal Contacts

Abdulai Conteh, Aggrieved Person
Barbara Sisco, Supervisory Program Analyst and Branch Chief, Financial
    Management Branch

03/07/06    Went for initial counseling with Abdulai Conteh (Aggrieved person) by EEO Counselor, Aggrieved thought the meeting was scheduled for 03/08/06. Met Aggrieved's representative and rescheduled meeting.

03/09/06    Initial counseling with Abdulai Conteh (the Aggrieved person) by EEO Counselor (60 minutes)

03/15/06    Barbara Sisco                    (202)219-3367
            Supervisory Program Analyst
            African/American, female, light-complexion, Methodist

Initial meeting with Ms. Sisco by EEO Counselor (90 minutes)

Ms. Sisco stated that she serves as Branch Chief for the Financial Management Branch, and supervises 15 people including government associates and contractors. Ms. Sisco stated that she has four males on her staff, two Black and two White. She stated that she also oversees the Human Resources group.

Ms. Sisco stated that the Aggrieved's performance was not at an acceptable level in one critical element - Budget and Financial Analysis. She stated the Aggrieved's duties involved managing a lease caseload and the primary responsibility involved processing documents to make certain that lease actions were paid in a timely manner. She stated that his duties also included processing taxes, CPRs, rent payments and lease changes. Ms. Sisco stated that in accomplishing his duties, the Aggrieved may work with several realty specialists.

Ms. Sisco stated that the branch handled almost 260 leases. She stated that she has two GS-12 analysts who handle approximately 100 leases each while the Aggrieved handles approximately 25.

Ms. Sisco stated that she is not the Aggrieved's immediate supervisor; she stated that she has two team leaders; Team A, which deals with finance and Team B which deals with the processing of documents. She stated that the Aggrieved is in Team B and that Team B processes the paperwork and passes it on to Team A. Ms. Sisco stated

000035

that the Aggrieved has been under her management for approximately three years.

Ms. Sisco stated that everyone was converted from Program Analyst to Budget Analyst. She stated that the duties of the individuals did not change as a result of the conversion. She stated that the conversion was done to bring everyone in the service center in line with each other.

Ms. Sisco stated that the Aggrieved had Appropriation Law classes. She stated that they do a lot of on-the-job informal training and mini sessions on FMIS. Ms. Sisco stated that she initially received one training request from the Aggrieved, during the first quarter of the last fiscal year, and that at the time they did not have the funding.

Ms. Sisco stated that she and the Aggrieved discussed the PIN letter and what needed to be accomplished on a weekly basis. She stated that in those meetings the completed assignments were discussed and that the Aggrieved was sometimes given additional assignments. Ms. Sisco stated that GS-12s also do other projects in addition to their caseload. She stated the Aggrieved was given the Yearly Rent Estimate report as a project and she had instructed the team leader to work with him. Ms. Sisco stated that she noticed that the Aggrieved did not take notes in the meeting especially with regard to the mistakes he was making.

Ms. Sisco stated that the Yearly Rent Estimate report was not prepared by three individuals in the past. She stated that last year one person completed the report. She stated that person was a contractor who has since left. She stated that she tried to point the Aggrieved in the right direction. She stated that the contractor tracked the information electronically. She states that the process normally takes four months to complete and has to be approved by April 15th.

Ms. Sisco stated that she told the Aggrieved that if he needed help with the input she would make someone available. She stated that s. Dumbuyuge was made available.

Ms. Sisco stated that she, on occasion, had another Branch Chief sit in on a meeting with the Aggrieved when his performance was discussed. She stated prior to that, Jacqueline Smith sat in. Ms. Sisco stated that she keeps a notebook with notes from the meetings. Ms. Sisco stated that in January 2006, the Business Resource Branch (BRB) provided her with a report showing the Aggrieved had only one action for the month. She stated that she later found that the information was incorrect and told BRB that they needed to be more accurate.

Ms. Sisco stated that she has a lot to do and does not, on a daily basis, check up on her employees. She stated that she does on occasion circle the office to see what is going on and to check on the status of projects and to see if anyone needs assistance.

000036

Ms. Sisco stated that she did request that the Aggrieved submit a leave slip. She stated that when she saw him downstairs she was surprised to find that he was leaving. She stated that the presentation he made to management was 15-20 minutes in length. She stated that it was not a full blown presentation and that the Aggrieved knew about it in plenty of time to have been prepared. Ms. Sisco stated that the Aggrieved never stated that he wanted to leave early.

Ms. Sisco stated that she does not treat the Aggrieved any different from anyone else. She stated that within the last three years she has placed one Black female on a PIP and one Black female on a PIN.

Ms. Sisco stated that in 2005 she noticed that the Aggrieved was not doing a lot of the work assigned to him. She stated that his team leader would take the work from him and complete it to make certain that it would be timely. She stated that the team leader tried to help the Aggrieved along. She stated that they have a lot of work.

Ms. Sisco stated that the Aggrieved came with good skills and with his education and his skills they were under the assumption that he did not have to be "baby stepped" through his work as someone out of high school might. She stated they had different expectations for the Aggrieved. She stated the Aggrieved was given some basic assignments, they saw him struggling. Ms. Sisco stated that the more she spoke with the Aggrieved about his work the more of an attitude he had about doing his job. Ms. Sisco stated that she had also sent emails indicating incidents which he had not followed through on. She stated that within the last week she had assigned a couple of the Aggrieved's tasks to someone else. Ms. Sisco stated that there are actions remaining from November 2005 that had been sent forward by the Aggrieved but he had never brought them to closure. She stated that if a case goes forward but is not accepted due to error, it is sent back for an action however, the Aggrieved never follows up to see if an action exists. Ms. Sisco stated that the Aggrieved does not necessarily take the initiative needed to complete his tasks.

| | |
|---|---|
| 03/16/06 | Counselor notified Aggrieved's representative that management was interested in resolving the complaint and would be back in touch. |
| 03/28/06 | Counselor received a call from Aggrieved's representative postponing the meeting with the Aggrieved, due to illness, which was scheduled for March 29, 2006. |
| 04/06/06 | A final interview was conducted with the Aggrieved and his representative to discuss the responses provided by Ms. Sisco. At the final interview the Counselor was made aware that the Aggrieved wanted to amend his complaint. At the advise of the EEO office, since the amended issue was related to his current complaint, the complaint was informally closed. |

The Aggrieved was briefed on the final process and the procedures for filing a

000037

complaint, and a Notice of Final Interview/Notice of Right to File a Formal Complaint was provided.

The Aggrieved was then provided with the following documents for which he acknowledged receipt by signature:

Notice of Final Interview
Notice of Right to File a Discrimination Complaint
Complaint of Discrimination Form

(2)    Documents Received and Reviewed [Attached as Exhibits]

(a)    Letter of Authorization for Pre-Complaint Counseling Services dated February 23, 2006.

(b)    Notice of Rights and Responsibilities dated February 22, 2006 and March 9, 2006.

(c)    Notice to Extend Counseling, Request to Resolve Complaint dated March 9, 2006.

(d)    Organization Chart, Metropolitan Service Center, Workforce Profile.

(e)    Performance Improvement Notice dated December 5, 2005 and February 13, 2006.

(f)    Aggrieved's Individual Development Plan dated October 19, 2004.

(g)    Aggrieved's Performance Planning Worksheet for Non-Supervisory Associates dated August 26, 2004.

(h)    Metropolitan Service Center FY03-06 Training, dated March 10, 2006.

(i)    Position description, Budget Analyst, GS-0560-11.

(j)    Performance Improvement Notice (PIN) Meeting Notes and Summary of Assignments for Abdulai Conteh, December to Present. (Provided by B. Sisco)

(k)    SF50 Reassigning Aggrieved to position of Budget Analyst dated June 12, 2005.

(l)    GSA Directive, CPO P 9430.1, dated December 31, 2003, SUBJECT: GSA Associate Performance Plan and Appraisal System.

(m)    GSA Associate Performance Plan and Appraisal System for Associates.

(n)    Notice of Final Interview/Notice of Right to File a Discrimination Complaint dated April 6, 2006.

## H.    SUMMARY OF INFORMAL RESOLUTION ATTEMPT

03/15/06    Requested Remedies:

Ms. Sisco stated that she was willing to attempt resolution of Aggrieved's complaint. She stated that she would give the Aggrieved his one hour of leave back but would

090038

not rescind his PIN. She did agree to look into transferring the Aggrieved to another organization and requested that the Counselor contact her on March 20, 2006 while she looked into where he could be placed. She also requested that the Counselor contact Aggrieved's representative to see if the Aggrieved was aware of an organization where he might like to go.

03/16/06    Counselor attempted to contact Aggrieved's representative by leaving a voicemail message. Aggrieved's representative did return the call attempts were made by both parties on several occasions without success.

03/20/06    Received an email from Ms. Sisco stating her willingness to return the Aggrieved's 1 hour of leave and help facilitate a transfer to another Service Center. She stated that Aggrieved's performance rating would remain a "2" and therefore he would not be entitled to a performance award and she was not willing to remove the PIN.

03/20/06    Counselor notified Aggrieved's representative of management's offer of resolution.

03/22/06    Aggrieved's representative responded that the proposed resolution was not acceptable and the date and time of the final interview was scheduled.

I.    **SUMMARY OF INFORMATION GIVEN TO AGGRIEVED PERSON BY COUNSELOR**

1.    Agreement to Postpone the Final Interview and Extend the Counseling Period
2.    Notice of Rights and Responsibilities
3.    Designation of Representative
4.    Notice of Right to File a Discrimination Complaint
5.    Complaint of Discrimination Form, and
6.    Notice of Final Interview.


_Saundra G. Davis_
Saundra G. Davis
EEO Counselor

_4/13/06_
Date

(703) 684-7619
Telephone Number

2059 Huntington Avenue
Suite P-10
Alexandria, Virginia 22303
Office Address

000039

# AFFIDAVIT
## IN THE MATTER OF: <u>Abdulai Conteh v. GSA</u>
### GSA Complaint Number:  Case No. 06-NCR-WP-AC-10

**Location:  Washington, D.C.**

I, Abdulai Conteh, solemnly swear to the truth of the following statement which is in response to questions posed by Robert Walker, Equal Employment Opportunity (EEO) Investigator, F & W Associates, and provides information pertaining to the formal complaint of discrimination, filed by me, Abdulai Conteh, against the U. S. General Services Administration on April 6, 2006, Case No 06-NCR-WP-AC-10.  The following claim has been accepted for investigation:

Whether I was discriminated against because of my race (African-American), color (Black), National Origin (African), sex (male), religion (Muslim) when you I was harassed starting December 5, 2005 (sic), regarding my work performance and assignments.

Also, I amended my harassment claim to include reprisal for filing an EEO complaint as a basis, when I was denied sick leave on February 29, 2006 (sic), and denied my AWS (Alternative Work Schedule) day on March 31, 2006.

My name is Abdulai Conteh.  My race is Black/African-American; color, Black; sex, male; national origin, African; and religion, Muslim.  I filed a prior EEO complaint on February 21, 2006, alleging discrimination in the terms and conditions of my employment.

I am a Budget Analyst, GS – 11, step 5.  I have been in this position for three years.  I work for the General Services Administration, Metropolitan Service Center, located at 1099 14th N.W., Washington, D. C. 20009.

My first-level supervisor is Barbara Sisco, (Black, color—light skinned—female, religion—non-Muslim, no prior EEO Complaint) Branch Chief.  My second-level supervisor is Sharon Banks, Deputy Director, African/American, light skinned, female, American, non-Muslim, and no prior EEO complaint.

Initials_____

1

000189


EXHIBIT
AM

The management officials responsible for the discrimination that I have been subjected to are Barbara Sisco, Carol Vance (African - American, Team Leader for Team B), and Jackie Smith (African-American, Team Leader for Team A).  My relationship with these managers is contentious.  I believe that Sharon Banks is a responsible management official, also,  ( Robert O'brycki , The union representative ) because I reported the harassment to her, and she did nothing to stop it.

## HARASSMENT IN WORK PERFORMANCE AND ASSIGNMENTS

The harassment in regard to my performance and assignments began as a response to a union grievance I filed in September 2005, and then evolved into an EEO problem about December 2005. The harassment that I have encountered links both my performance and my assignments. Ms. Sisco, Ms. Smith, and Ms. Vance gave me assignments that have unrealistic due dates, that is, dates that I could not possibly meet.  I was assigned a project, Rent Estimate Projection, which was to be completed by me alone, while previously three or four staff members working together had been assigned this project. They had three months to complete a project that I was given three weeks to perform. The other staff members who had worked on the project were Cynthia Cary, Vicky Taylor Carol Vance and Mercella Dimuyaga. I believe that I was discriminated against because my co-workers (all of whom are African-American, females, light-skinned, non-African born and non-Muslim) are not treated in the same fashion. There is a double standard here. They are not given assignments to complete in an unreasonable time. They were treated with respect, for example, they were asked when they would complete an assignment, and if they did not finish on time, they would be given additional time to finish. On

Initials_____ _____

2

000181

occasion, I was given their work to finish. Other projects that they were assigned did not have unreasonable due dates.

Ms. Sisco said there was not sufficient staff to assign someone to assist me. Management said that Marcella Dimayuga, co-woker and contractor, could not to help me. She was part of my team. I asked her to attend the meeting of Regional Office Building, a meeting for all of the regional services centers. Teams from other Services had two or three people working with them on the Rent Estimate project.

I was issued a Performance Improvement Notice (PIN) on December 5, 2005, without any prior notice that my performance was not satisfactory. My mid-year and annual performance evaluations prior to that indicated that I was performing satisfactorily. Ms. Sisco told me I was not performing at a successful level. However, I was doing the work of three people. Still, she would demand a turn-around time of three days on some projects, e.g. Rent Estimate and Gross margin report. After being issued the PIN, I had meetings periodically, generally every Thursday, with Ms. Sisco. Everything I did, she thought was wrong. I felt that she was harassing me.

In addition, my co-workers were given the tools to do their work, such as a printer. I couldn't get one. They were given training, but I was not given the training I needed to perform as a Budget Analyst. Most people get two classes per year. I only had one training session. I was told there was no money for additional training, yet others employees in my unit were getting two or more classes per year.

I am African-born, and the other employees are American. There, also, is a bias against Muslims now because of the war. My managers and co-workers are not Muslim. I have

Initials_____

3

000182

overheard comments about wiping out the Muslim areas of the globe. It was not said directly to me. Ms. Vance's husband is minister. They are always making comments like, "Have a blessed day," which I find offensive. However, I have not complained to management about it.

## DENIAL OF SICK LEAVE AND AWS DAY

My AWS day is Friday. One day in March or April 2006, I was ill. I thought that I had appendicitis. I wanted to go to the hospital, but Ms. Sisco would not allow me to take sick leave. The next day, Friday, I wanted to take my AWS day. Ms. Sisco ordered me to come in. She said that the Rent Estimate Project was due, and I could not be off. The assignment was not due until the following Monday. Further, Ms. Sisco told me I had to come in on Monday. In fact, the assignment did not go forward until after Monday. I had a CAT Scan, which showed that my appendix was swollen. I cancelled my AWS day. I did not get to use my AWS day.

None of the other members of my unit was denied sick leave or an AWS day. They are allowed to change their AWS day or to work from home. This unit is like a club. All of the co-workers and supervisors' husbands work for GSA. I am an outsider.

The denial of my request to take sick leave and my AWS day occurred shortly after I filed my EEO complaint. That is why I believe these actions were in retaliation for my having filed an EEO complaint.

## RELIEF

For relief I am seeking:

> --a transfer to another work unit—with my concurrence,
> --to be given training opportunities commensurate with my co-workers, and
> --payout for performance awards, which I was denied because of my rating.

Initials_____

4

000183

I have read this statement consisting of _____ pages, and I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

I hereby declare under penalty or perjury that the foregoing statement is true, correct, and complete to the best of my knowledge and belief.

Signature: _____

Date: _____

Subscribed and sworn to before me this ___ day of _____ 2006

_____

EEO Investigator, F & W Associates

Or

_____

Notary Public

My commission expires: _____

Initials_____

5

000184

# REBUTTAL

Case # 06-NCR-WP-AC-10
From Abdulai Conteh

Dear Mr. Walker:

I must first and foremost apologize for not able to respond to you on time which was due to illness.

As I indicated to you in my complaint, which still stand and I have documents to prove my allegations. To give you a brief synopsis of my rebuttal, look at my supervisor (Carol Vance) statement on page # 12. She indicated that she was not cognizance with my mid year and end of year review for fiscal year 2005. This tells you that Ms. Sisco did my review even though she was not my supervisor, but this is the way to show her dislike to wards me.

I was on the BA 53 team with Cynthia Cary, Jamie Johnson and Carol Vance was our supervisor which is a pity for Ms. Sisco her supervisor to do my mid and year of year review without consult her.

As for training the recode speaking for itself, I applied for two classes and I was told by Evelyn Smith in HR that Barbara said there is no funding and I'll be advised when funding is available. Since 20004 my colleagues have taken several classes and I was only allowed one class. (Appropriation Law Seminar).

I was not aware that on the job training is the major aspect of training at metropolitan, which is not the mandate of OPM or GSA. GSA is paying for several workers to obtain college degrees and formal education and knowledge. I came to GSA with an MBA, why not give me the privilege like others to sit in a formal class (Management Concept) to be training on rules and regulations on the way GSA does business and to be familiar with their budgetary concept and be certified like my colleagues and Barbara also promised me that privilege, which she indicate on my IDP.

I had a printer which in our team you need a printer to prints letters which that goes to out lessor. I was using a printer given to me by a co-worker and it was thrown away by the IT person who said he was instructed to do so. I asked Barbara for a replacement and she indicated that I do not need a printer.

000187

Since then, I have to ask my collogues to print professional letters to be sent to the Public.

As for the Rent Estimate assignments my colleagues from the other team were flabbergasted to see that I was the only one, from my team which has the second largest CBR's in the region. The team leader of the Rent est program sent an email to Barbara advised her that it is impossible for me to Met the deadline without help. I was given the Rent estimate assignment the day I came form vacation in January. There are documents to prove that there were four individual assigned to the Rent estimate program before assigned to me.

Sincerely

Abdulai Conteh    10/4/2006

000188

Affidavit

City: Washington, DC

I,      Abdulai Conteh, (prior EEO activity), Budget Analyst, GS-560-11, Metropolitan
Service Delivery Team, Public Building Service, National Capital Region, GSA, make
the following statement freely and voluntarily in response to questions posed by Sandra
Maddox, EEO Investigator, and provide information pertaining to the formal complaint
of discrimination of Abdulai Conteh on January 24, 2007. I hereby solemnly
swear/affirm to the truth of the following statement

**Issue 1.          Complainant claims he was discriminated against based on reprisal,
when management issued him a Level 2 performance appraisal on
November 22, 2006, extended the performance period to November 9,
2006, recommended that he not continue his Financial Management
certification and issued him a Performance Improvement Notice on
December 11, 2006.**

1.      My name Abdulai Conteh. I am a Budget Analyst, GS-560-11. My first level
supervisor is Barbara Sisco, Branch Chief. Roland Caton is my Team Leader. Ms. Sisco
reports to Sharon banks who is the Director.

2.      I have been working here for almost 4 years and Barbara Sisco has been my
supervisor the entire time. In 2004 she promoted me to a GS-11 for good performance
and she has given me 5 performance awards in the past.

3.      On November 22, 2006 Ms. Sisco issued me a Level 2 performance appraisal.
She did it out of reprisal. There was nothing that she substantiated in giving me the Level
2 appraisal. She has not told me specifically what I have not done with regard to my
duties. She didn't tell me there was any problem with my work before she gave me the
rating. When I asked her about it, she spoke to me in a sarcastic way. She said, "Maybe
you can improve down the line." She told me what she was going to do but did not tell
me why she gave a Level 2. She said she was going to put me on a Performance
Improvement Notice ("PIN") for 60 days. The PIN required that we meet weekly to
discus my performance. When we met she told me there were assignments that were not
completed, such as Pegasys and CPI which are data entry programs. I gave her
documentation showing her it was done and she said she would look into it. She never
got back with me. I met with her every week from December 2006 to March 2007 and
she kept telling me that something was not done and I would show her documentation
showing her that it was done. She said she would look into it but I never heard about it
from her again. She told me that she would make a decision about my PIN and to this
day she has not. I don't know what the result of the PIN is yet.

4.      Our appraisal period was supposed to end September 8, 2006. Our rating period
lasts for a year from September to September. She extended the appraisal period to
November 9, 2006 for me. I was out sick for 3-4 weeks during the appraisal period.

Exhibit E-2
Page 1 of 3

1

Even though I was out for 3 weeks, Ms. Sisco had the rest of the year to rate me on. She did not have to extend my appraisal period until November 9, 2006. In fact employees are allowed to take off 3 weeks and their appraisal periods are not extended. I had not taken off a lot of time, maybe a day or 2 prior to my taking 3 weeks sick leave.

**5.      On my end of year reviewed, she indicated that I am not going to continue with my certification; in 2007 I am going to be taking, time management and a writing class. I asked why, and she indicated that I need basic concept. I knew she is being reprehensive toward my certification.**

6.      I believe reprisal is a factor in the rating that Ms. Sisco gave me because I filed a complaint against her about a year ago {with the Union for and **EEO complaint in 2/22/2006** for discrimination based on national origin, race, color, religion, and sex. It is still on going.

**Issue 2.       The Lead Budget Analyst spoke to Complainant in disrespectful and inflammatory manner on January 23, 2007, regarding work assignments.**

7.      Roland Caton is my team leader and has been since May 1, 2006_____.  We had a good relationship until Ms. Sisco came in.  On the morning of January 23, 2007, I came to work and received an email from Roland saying he wanted me to do my budgetary report that day.  He gave me some numbers to include in my report that I did not agree with.  I went to his office to discuss it with him and he yelled at me and told me to leave. He said he didn't have time to talk, so I left.  I went and I gave my report. I did not speak to him or Ms. Sisco about his yelling at me. Mr. Caton was not involved in my prior EEO complaint.  He is working in cahoots with Ms. Sisco and trying to impress her because she promoted him.  He used to tell me what a good job I was doing before Ms. Sisco.  A few days later he came to me and apologized for yelling at me.  He said he was just frustrated.  He has never spoken to me like that in the past.

8.      I believe he knows about my prior EEO activity.  It is basically common knowledge.  I believe he and Ms. Sisco have discussed my prior EEO activity because of the change in his behavior towards me.

I have read the above statement, consisting of _2__ pages, and it is true and correct to the best of my knowledge and belief. I have initialed each page, and I have been given an opportunity to make any corrections. I understand that the information I have given is not to be considered confidential, and that it may be shown to the interested parties.

_Sandra Nedin_                          _Abduleh_  6/18/2007
Witness                                       Abdulai Conteh
Date _6/18/07_

Exhibit __E-2__
Page __2__ of __3__

Affidavit
(Rebuttal)

City: Washington, DC

I,      Abdulai Conteh, (prior EEO activity), Budget Analyst, GS-560-11, Metropolitan
Service Delivery Team, Public Building Service, National Capital Region, GSA, make
the following statement freely and voluntarily in response to questions posed by Sandra
Maddox, EEO Investigator, and provide information pertaining to the formal complaint
of discrimination of Abdulai Conteh on January 24, 2007.  I hereby solemnly
swear/affirm to the truth of the following statement:

[To give you a brief synopsis, of the deficiencies of Management responds, it is difficult to read,
due to illusive statements, I must surmise that 95 % of the statements are untrue.

Ms Sisco is being reprehensive by using the term training, yes I had training but the term
numerous does apply.
I am intelligent to see Ms. Sisco repugnance behavior towards me, the 48 hours she mentioned
on her statement  might be when a document is assigned to me on a Friday and I am off on the
following Monday (AWS).
It might also be when Pegasys is down, her clock is still ticking. I had given her documents to see
my justification; however, her mind set doesn't give her the latitude of fairness.

She extended my performance period because she can't find any deficiencies to penalized me. I
was out sick for six weeks, but I was here for the rating period, what sense does it makes to
extend the performance period.
She galvanized strategies that fell beyond the rating period, so she has no choice but to extend
the period to fit.

I have read the above statement, consisting of _2__ pages, and it is true and correct to the
best of my knowledge and belief.  I have initialed each page, and I have been given an
opportunity to make any corrections.  I understand that the information I have given is
not to be considered confidential, and that it may be shown to the interested parties.

_Juliana Conteh_                          _Conteh_  7/9/2007
Witness                                    Abdulai Conteh
Date_7/9/07_

GSA-NCR EEO OFFICE

2001 AUG -3  P 1:24

RECEIVED

Exhibit I-2
Page 3 of 3

Page 175

1      course in this email.

2            Q       Yes, but you asked people to react

3      to it when there is opportunity to submit.

4            A       Well, yes, the team leaders would,

5      in their meetings, you know, let the employees

6      know that, you know, if they wanted to take a

7      course, they would have to submit a request.

8            Q       Okay.  To the best of your

9      knowledge, --

10           A       On a first come, first serve

11     basis.

12           Q       Did Mr. Conteh submit a request

13     for this course?

14           A       To the best of my knowledge, I do

15     not remember him submitting this request.  But

16     I, I just want to make sure I get my dates

17     right.  May of -- Can I see that training

18     document, the --

19           Q       That's not --

20           A       -- yes, the Excel class?  No, the

21     certificate that he had, so I can just make

22     sure my date is right?

EXHIBIT
AN
tabbies®

8c30a558-8fa5-4569-a4f5-cd659dbf37ef

Page 440

```
1        her answer.

2                    MR. ADEBONOJO:  Okay.

3                    BY MR. DURUJI:

4            Q     Anyway, I would like to show you

5        what would be marked as 29A to be attached to

6        this.  Have you seen this document before?

7            A     Yes, I did.

8            Q     Okay.  Tell me about it.

9            A     Okay.  I gave all of the analysts

10       a questionnaire and asked them okay, do have

11       a certification?  I asked them a survey of

12       these questions.  And when Abdulai responded

13       no to this question, I went back to him.  I

14       said because you enrolled in the certification

15       program.  And I said, actually yes you did.

16       But I think what I did, since we kind of just

17       kept going back and forth, I may have just

18       went ahead and said okay.

19                    Because he self-enrolls.  So if he

20       goes and un-enrolls himself, I won't have

21       knowledge of that.

22           Q     What are you saying?  Did any of
```

EXHIBIT

A0

8c30a558-8fa5-4569-a4f5-cd659dbf37ef

1    The Rent Estimate due dates are region wide. We represented only Metropolitan

2    Service Center (WPD). Our deadlines were the same as those for other service centers.

3    There are mile stones to be done in addition to overall deadline. For example ten percent

4    had to be done by "x" date to ensure that the project would be completed on time. If you

5    are behind the milestone, you are told to step it up. There were no variance on due dates.

6    I had assistance with the Rent Estimate project. The first time I worked on it, I

7    provided assistance to the main point of contact. I was the "go for." We had to gather

8    information to submit into a database, and then input the data into the system. I gathered

9    information and did data entry. I had to get information from Realty Specialists and

10   bring it back to the person mainly responsible (POC). This was the leg work. The

11   person principally responsible and I sometime split the tasks down the middle, i.e., I

12   gathered some of the information and then gave it to the main POC to update or did the

13   update myself. At least two people worked on the project. We have the second largest

14   number of client billing records (CBRs) in the Nation Capitol Region (NCR), which is

15   the lease information on a client. A rent estimate is like a two-year forecast of what an

16   agency's bill will be to help them budget in the future.

17   I did receive training on the duties of a Budget Analyst, but prior to coming to

18   WPD, I had knowledge from another division. However, I still had to be trained on how

19   WPD did things. As a result, I got on-the-job training on the day-to-day work from my

20   peers and team leader. Training, such as, the STAR systems, I came to WPD with.

21   I was an undergrad student seeking a business administration degree. I took

22   courses toward that degree, which counted as my training. The courses were not directly

Initials _____    Page 3 of 6

EXHIBIT

# REBUTTAL

Case # 06-NCR-WP-AC-10
From Abdulai Conteh

Dear Mr. Walker:

I must first and foremost apologize for not able to respond to you on time which was due to illness.
As I indicated to you in my complaint, which still stand and I have documents to prove my allegations. To give you a brief synopsis of my rebuttal, look at my supervisor (Carol Vance) statement on page # 12. She indicated that she was not cognizance with my mid year and end of year review for fiscal year 2005. This tells you that Ms. Sisco did my review even though she was not my supervisor, but this is the way to show her dislike to wards me.
I was on the BA 53 team with Cynthia Cary, Jamie Johnson and Carol Vance was our supervisor which is a pity for Ms. Sisco her supervisor to do my mid and year of year review without consult her.

As for training the recode speaking for itself , I applied for two classes and I was told by Evelyn Smith in HR that Barbara said there is no funding and I'll be advised when funding is available. Since 20004 my colleagues have taken several classes and I was only allowed one class. (Appropriation Law Seminar).

I was not aware that on the job training is the major aspect of training at metropolitan, which is not the mandate of OPM or GSA. GSA is paying for several workers to obtain college degrees and formal education and knowledge. I came to GSA with an MBA, why not give me the privilege like others to sit in a formal class (Management Concept) to be training on rules and regulations on the way GSA does business and to be familiar with their budgetary concept and be certified like my colleagues and Barbara also promised me that privilege, which she indicate on my IDP.
I had a printer which in our team you need a printer to prints letters which that goes to out lessor. I was using a printer given to me by a co-worker and it was thrown away by the IT person who said he was instructed to do so.
I asked Barbara for a replacement and she indicated that I do not need a printer.



occasion, I was given their work to finish. Other projects that they were assigned did not have unreasonable due dates.

Ms. Sisco said there was not sufficient staff to assign someone to assist me. Management said that Marcella Dimayuga, co-woker and contractor, could not to help me. She was part of my team. I asked her to attend the meeting of Regional Office Building, a meeting for all of the regional services centers. Teams from other Services had two or three people working with them on the Rent Estimate project.

I was issued a Performance Improvement Notice (PIN) on December 5, 2005, without any prior notice that my performance was not satisfactory. My mid-year and annual performance evaluations prior to that indicated that I was performing satisfactorily. Ms. Sisco told me I was not performing at a successful level. However, I was doing the work of three people. Still, she would demand a turn-around time of three days on some projects, e.g. Rent Estimate and Gross margin report. After being issued the PIN, I had meetings periodically, generally every Thursday, with Ms. Sisco. Everything I did, she thought was wrong. I felt that she was harassing me.

In addition, my co-workers were given the tools to do their work, such as a printer. I couldn't get one. They were given training, but I was not given the training I needed to perform as a Budget Analyst. Most people get two classes per year. I only had one training session. I was told there was no money for additional training, yet others employees in my unit were getting two or more classes per year.

I am African-born, and the other employees are American. There, also, is a bias against Muslims now because of the war. My managers and co-workers are not Muslim. I have

Initials_____

3


EXHIBIT
A 12
tabbies

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ABDULAI CONTEH          )
       Plaintiff        )
                           )
vs.                       )     Civil Action No. 1:07CV00786
                           )
LURITA DOAN[1]         )
Administrator,          )
General Services Administration  )
       Defendant.       )

## AFFIDAVIT OF BARBARA SISCO

I, Barbara Sisco, do hereby declare:

1. I am over the age of eighteen and competent to testify as to the matters below.

2. I am currently employed by the General Services Administration ("GSA") as a Deputy Director, Asset Team, Metropolitan Service Center, National Capital Region, General Services Administration.

3. In March 2006 plaintiff entered a request to take sick leave on March 29, 2006. I approved that he take 4.5 hours of annual leave on that date. He had no accrued sick leave on that date.



---

[1] On April 30, 2008 Administrator Lurita Doan resigned. At that time David Bibb became the Acting Administrator. On August 19, 2008, President Bush appointed James A. Williams as the Acting Administrator for the General Services Administrator effective August 30, 2008.

4. In 2006 I approved plaintiff's request to take leave from August 1 through August 25. He was scheduled to return to work on August 28, but he did not return to work. He remained absent from work without having properly requested leave. I contacted him around September 11, 2006, concerning his status. At that time I informed him that he would need to properly request leave, to include providing supporting documentation for his request, or return to work. I explained that if he did not do so, he would have to be placed in an absence without leave status. He returned to work on or about September 12, 2006. He presented the attached medical documentation that indicated that he was to return to work on September 14, 2006. I asked him about this and whether he should be at work. He said it was okay. I do not recall assigning him anything due by the close of business on the day of his return to duty. If I did assign him such a project, it would have been something he could have easily completed within a day.

5. In January 2007 I received a request to provide information regarding the status of several employees under my supervision in the Financial Certification Program. Plaintiff was one of those employees. I asked each of the employees to complete a questionnaire concerning their status and provide that to me. Plaintiff returned the form to me. On the form, he had answered "no" to the question as to whether he was currently in a program to complete a certification. At that time it was my understanding that he was enrolled the certification program. I crossed his answer out on the form and wrote yes. I then discussed this with him. He said that he was not enrolled in the program. I prepared the attached chart titled, "Metropolitan Service Center: FY 07 Financial Certification Program" and submitted that to the requester. The forms were not provided

to the requester. Based on the plaintiff's representations, I listed him as not being

enrolled in the Certification program.

I SWEAR AND AFFIRM, UNDER PENALTY OF PERJURY UNDER THE LAWS OF
THE UNITED STATES OF AMERICA, THAT THE FOREGOING IS TRUE TO THE
BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

Executed on _August 27, 2008_

_Barbara Sisco_
Barbara Sisco



**Barbara A. Sisco**

06/15/2007 12:37 PM

To: Marge A. Overly/WL/RW/GSA/GOV@GSA
cc:
Subject: Conteh

----- Forwarded by Barbara A. Sisco/WPD/RW/GSA/GOV on 06/15/2007 12:36 PM -----



**Roland H.**
**Caton/WPD/RW/GSA/GOV**

06/15/2007 10:30 AM

To    Barbara A. Sisco/WPD/RW/GSA/GOV@GSA
cc
Subject  Fw: A10 & A40 Funding Status Analysis by Building

FYI
----- Forwarded by Roland H. Caton/WPD/RW/GSA/GOV on 06/15/2007 10:30 AM -----



**Roland H.**
**Caton/WPD/RW/GSA/GOV**

06/15/2007 10:29 AM

To    Roland H. Caton/WPD/RW/GSA/GOV@GSA
cc
Subject  Fw: A10 & A40 Funding Status Analysis by Building

fyi
----- Forwarded by Roland H. Caton/WPD/RW/GSA/GOV on 06/15/2007 10:29 AM -----



**Roland H.**
**Caton/WPD/RW/GSA/GOV**

12/14/2006 09:16 AM

To    Abdulai Conteh/WPD/RW/GSA/GOV
cc    Anthony Marable/WPD/RW/GSA/GOV@GSA, Barbara A.
Sisco/WPD/RW/GSA/GOV@GSA
Subject  Re: Fw:  A10 & A40 Funding Status Analysis by Building



I need whatever drafts you have ready now.

If you have not started the fund status analysis and will not have any ready before the end of today, please advise via email.  RC
Abdulai Conteh/WPD/RW/GSA/GOV



**Abdulai**
**Conteh/WPD/RW/GSA/GOV**

12/14/2006 09:04 AM

To    Roland H. Caton/WPD/RW/GSA/GOV@GSA
cc    Barbara A. Sisco/WPD/RW/GSA/GOV@GSA, Anthony
Marable/WPD/RW/GSA/GOV@GSA
Subject  Re: Fw:  A10 & A40 Funding Status Analysis by Building



EXHIBIT

Roland :

I do not have a completed fund status for the A10 & 40, for the past few days I was focus on my Pegasys documents.
As you might have known, three of the team members were in class and I have to carried some of their load by processing the Pegasys documents.
. On December 13th I was sick with the flu and I spoke to Barbara.
I have another pressing assignment from you which is due today. I should be able to send you my fund status Analysis by Monday December 18,2006.
If you will accept my request I'll greatly appreciate, because I'll like to join my colleagues on our Christmas Party today.

Abdulai Conteh
Budget Analyst
Metropolitan Service center
(202) 219-3338
(202) 692-3305
Roland H. Caton/WPD/RW/GSA/GOV



| | | | |
|---|---|---|---|
| **Roland H. Caton/WPD/RW/GSA/GOV** 12/13/2006 07:19 AM | To | Abdulai Conteh/WPD/RW/GSA/GOV@GSA | |
| | cc | Barbara A. Sisco/WPD/RW/GSA/GOV@GSA, Anthony Marable/WPD/RW/GSA/GOV@GSA | |
| | Subject | Fw: A10 & A40 Funding Status Analysis by Building | |



See email below. Have your drafts emailed to me by COB today, Wednesday, December 13, 2006. Questions, see me. RC
----- Forwarded by Roland H. Caton/WPD/RW/GSA/GOV on 12/13/2006 07:18 AM -----



| | | | |
|---|---|---|---|
| **Roland H. Caton/WPD/RW/GSA/GOV** 12/12/2006 03:18 PM | To | Abdulai Conteh/WPD/RW/GSA/GOV | |
| | cc | Barbara A. Sisco/WPD/RW/GSA/GOV@GSA, Anthony Marable/WPD/RW/GSA/GOV@GSA | |
| | Subject | RE: A10 & A40 Funding Status Analysis by Building | |



I came by to see you but you were not at your desk. Please provide me with your most current fund status analysis for FY07 BA61 bookmonth November, for A10 and A40 Fund Status Analysis by Building. I need to review. Thanks.

Roland Caton

1 of 1

LIST OF EMPLOYEES ISSUED PERFORMANCE IMPROVEMENT NOTICE UNDER THE SUPERVISION OF BARBARA SISCO
METROPOLITAN SERVICE CENTER, PBS

In the Complaint of Abdulai Conteh
DATED:  July 7, 2006

| Employee Name | Position Title | PP-Series-Grade | Race | National Origin |
|---|---|---|---|---|
| Conteh, Abdulai | Budget Analyst | GS-0560-11 | Black - African American | Unknown |
| Luter, Kimberleigh | Program Analyst | GS-0343-11 | Black - African American | Unknown |
| Murray, Gail | Administrative Aid (OA) | GS-0303-6 | Black - African American | Unknown |

I certify that the above named employees were issued a Performance Improvement Notice under my
supervision at the Metropolitan Service Center.  The documents are maintained on file in the
Human Resources Divion or Metropolitan ServiceCenter, Contracts Branch.


Barbara Sisco
Supervisor Program Analyst
Financial Mgt Branch, Metropolitan Service Ctr

I certify that the race/national original data was retrieved from the Comprehensive Human Resources Information System
(CHRIS).  The database is maintained in the EEO Office.

7/10/06

Barbara V. Stewart
EEO Specialist
GSA, NCR, EEO



EXHIBIT

Page 142

```
 1        leader to provide the input?

 2                A       Okay, what I said was --

 3                Q       No, no.  Was that what you said?

 4                A       What I said was that Ms. Cynthia

 5        Cary was the acting team leader for several

 6        months during that period, while Carol Vance

 7        was out on maternity leave.

 8                Q       Very good.

 9                A       And I asked for input --

10                Q       Very good.

11                A       -- as I generally do for all of

12        the team leaders --

13                Q       Very good.

14                A       -- who assign --

15                Q       Two questions.

16                A       -- work.

17                Q       Very good.  So, two questions.

18        First, when you say for several months,

19        approximately how many months did she

20        supervisor, a team leader supervises, whether

21        we like it or not, --

22                        MR. ADEBONOJO:  Objection.
```

**EXHIBIT**

8c30a558-8fa5-4569-a4f5-cd659dbf37ef

Page 144

```
 1              Q      So, for want of a better term, if

 2       somebody assigns work and makes sure the work

 3       flows, what is that?

 4              A      And the fact that they also review

 5       that work.

 6              Q      If they assign, ensure that it is

 7       done, and review what is done, is that

 8       supervision or is not supervision?

 9              A      The supervisor of record for that

10       period was myself.

11              Q      Very good.  Where have I gone

12       wrong?

13              So based on your answer, my

14       question, which you have not answered, for how

15       long did she oversee the assignment, the doing

16       and the reviewing of Mr. Conteh's work?  How

17       long?

18              A      That was from in about, I'm

19       estimating about four to five months.

20              Q      Four to five months, okay.  If the

21       record shows --

22              A      Closer to four months.
```

8c30a558-8fa5-4569-a4f5-cd659dbf37ef

Page 146

1    Was this submitted to you?

2           A     Yes, it was.

3           Q     Did you accept it?

4           A     In terms of what do you mean by

5    accept it?

6           Q     You know, a subordinate submits an

7    input, did you reject it, did you question it,

8    did you comment on it, or did you accept it?

9    Accept, or reject, or question?

10          A     Well, to answer your question, in

11   addition to this, since Cynthia Cary was the

12   acting team leader and not an experienced team

13   leader, I received input from not only Ms.

14   Cary but also from --

15          Q     I will object as being non-

16   responsive.

17                Did you accept what Cynthia

18   submitted?  I didn't ask you did anybody else

19   submit a document.

20          A     I questioned Ms. Cary's in

21   relation, what she submitted, in relation to

22   the information that I got from the other team

EXHIBIT

AW

4f5-cd659dbf37ef

Page 152

```
 1          A      What I wanted from her was her

 2     assessment, her input --

 3          Q      Yes.

 4          A      -- regarding this employee.

 5          Q      And then you got it.

 6          A      Okay, yes.  Let me give you

 7     another point.  She assessed all of the

 8     employees in that branch.  And when, you know,

 9     I have reviewed all of the appraisals, there

10     were many questions that came to mind when I

11     reviewed those appraisals.

12          Q      Okay, very good.  How many people

13     did you request information on, other than

14     what you received?  How many of the team

15     leaders or acting leaders did you request

16     information from, respecting their own

17     opinion?

18          A      I asked for the evaluation from

19     Carol Vance, from Jacqueline Smith, and from

20     the acting team leader, Cynthia Cary.

21          Q      Okay, very good.

22          A      I would like to show you a
```

Neal R. Gross and Co., Inc.
202-234-4433



EXHIBIT

tabbies®

8c30a558-8fa5-4569-a4f5-cd659dbf37ef

Page 113

1      Q    I don't know what a gross margin is.

2      A    It's a report that's prepared to tell you what is a

3   margin of a dollar amount.

4      Q    So is it basically an addition/subtraction

5   exercise?

6      A    I wouldn't say that.  It's a gross margin.  It's

7   based on different calculations.

8      Q    I'm asking you what it is.

9      A    It's based on different -- it's

10  addition/subtraction and what you say, an average, all come

11  into play.

12     Q    What is the gross margin?  What number is the gross

13  margin?

14     A    What number is the gross margin?

15     Q    How do you derive a gross margin?  Yes, how do you

16  derive a gross margin?

17     A    You have to have a lot of information.  You have to

18  have information from central office.  When you use a gross

19  margin, it's almost I would say vague, because you have to

20  have a list that you're dealing with.

21          You have to go from the bits and pieces to do the

22  gross margin.  It's not just ask do the gross margin, which

23  Barbara give to me in bad light.

24          She gave it to me, gross margin, without giving me

25  the proper documentation.  This was after she was upset,

EXHIBIT

tabbies



**Barbara A.**
**Sisco/WPD/RW/GSA/GOV**
03/31/2006 08:53 PM

To  Abdulai Conteh/WPD/RW/GSA/GOV@GSA
cc  Carol A. Vance/WPD/RW/GSA/GOV@GSA
bcc
Subject  Re: Urgent for FY08 Rent est FY08 Rent est

Abdulai,
Once again, you have not followed instructions nor completed the assignment within the established timeframe. I read the instructions to you when you came to my office this afternoon to make sure that you understood what you needed to do and you stated that you understood what needed to be accomplished. The attached spreadsheet has not been updated. Did you forget to send the updated spreadsheet in this e-mail?

Barbara Sisco
**Metropolitan Service Center (WPD)**
**Financial Management Branch Manager**
202 219 1779 - Desk 202 219 2317

Abdulai Conteh/WPD/RW/GSA/GOV



**Abdulai**
**Conteh/WPD/RW/GSA/GOV**
03/31/2006 04:57 PM

To  Barbara A. Sisco/WPD/RW/GSA/GOV@GSA
cc  Carol A. Vance/WPD/RW/GSA/GOV@GSA
Subject  Re: Urgent for FY08 Rent est FY08 Rent est

Based on my reviewed of the spread sheet from suzette, we in the BA 53 team have finished our administrative extension for our
holdover which would correct the CBR's for the draft run on April 4th.
The other CBR's need action from the RGA's to send to BRB to make the correction. Some of these lease expired in 2005
and the RGA are not here for their input.

**Abdulai Conteh**
**Budget Analyst**
Metropolitan Service center
(202) 219-3338
(202) 692-3305
Suzette C. Xenos/CONTRACTOR/WPN/RW/GSA/GOV



**Suzette C.**
**Xenos/CONTRACTOR/WPN/**
**RW/GSA/GOV**
03/30/2006 04:12 PM

To  Abdulai Conteh/WPD/RW/GSA/GOV@GSA, Alice K. Chiu/WPL/RW/GSA/GOV@GSA, Barbara A. Sisco/WPD/RW/GSA/GOV@GSA, Carol A. Vance/WPD/RW/GSA/GOV@GSA, Christine M. Ewing/WPF/RW/GSA/GOV@GSA, Daniel E. Bird/WPT/RW/GSA/GOV@GSA, Detra M. Washington/WPN/RW/GSA/GOV@GSA, Maria E. Garrison/WPG/RW/GSA/GOV@GSA, Mary E. Waters/WPZ/RW/GSA/GOV@GSA, Nancy J. Podorski/WPZ/RW/GSA/GOV@GSA, Roger J. Perrault/WPZ/RW/GSA/GOV@GSA, Rosemary H.



EXHIBIT

AZ



**Barbara A.**
**Sisco/WPD/RW/GSA/GOV**
04/04/2006 07:59 AM

To   abdulai.conteh@gsa.gov

cc   carol.vance@gsa.gov, sharon.banks@gsa.gov

bcc

Subject   FY08 Rent Est Project

Abdulai,

As of today, please stop all work related to the FY08 Rent Est. We did not make the target, nor were the
required reports submitted to the BRB for Central Office as requested from you. Too many of the CBR's
that you submitted for approval were not thoroughly researched. Please continue to review your DC
caseload and process all necessary actions associated with this caseload or any other assignments given
by your team leader.

Barbara Sisco
**Metropolitan Service Center (WPD)**
Financial Management Branch Manager
202 219 1779 - Desk 202 219 2317

000323